UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

GLENCORE LTD. and VITERRA B.V. (f/k/a
GLENCORE GRAIN B.V.),

           Plaintiffs,

   v.

LOUIS DREYFUS COMPANY B.V. (f/k/a LOUIS
DREYFUS COMMODITIES B.V.), ALLENBERG
COTTON CO., LOUIS DREYFUS COMPANY
HOLDING INC. (f/k/a LDC HOLDING INC.), TERM
COMMODITIES INC., LOUIS DREYFUS COMPANY
LLC (f/k/a LOUIS DREYFUS COMMODITIES LLC),
and JOSEPH NICOSIA,

           Defendants.

-------------------------------------------------------------------- X

Case No. _____

**COMPLAINT**

**JURY TRIAL
DEMANDED**

    Glencore Ltd. ("Glencore") and Viterra B.V. ("Viterra") (f/k/a Glencore Grain

B.V.) (together, "Plaintiffs"), by their undersigned attorneys, as and for their claims against

Louis Dreyfus Company B.V. ("LDC") (f/k/a Louis Dreyfus Commodities B.V.), Allenberg

Cotton Co. ("Allenberg"), Louis Dreyfus Company Holding Inc. (f/k/a LDC Holding Inc.), Term

Commodities Inc., Louis Dreyfus Company LLC (f/k/a Louis Dreyfus Commodities LLC), and

Joseph Nicosia (collectively, "Defendants"), allege as follows:[1]

---

[1] Plaintiffs' allegations are based upon counsel's independent review and investigation of
information from sources including: Plaintiffs' own contemporaneous records, including internal
communications and transactional data, and Plaintiffs' communications with the Intercontinental
Exchange and Commodity Futures Trading Commission; counsel's review of the allegations an
findings, and the underlying referenced data which is contained in public filings in *In re Term
Commodities Cotton Futures Litig.*, No. 12-cv-5126 (ALC) (KNF) (S.D.N.Y.), including the
Court's decisions on motions (i) to dismiss and (ii) for reconsideration of the motion to dismiss
(ECF Nos. 80, 111), (iii) for summary judgment and to exclude expert testimony (ECF No. 575),
and (iv) for class certification (ECF No. 628), as well as the factual allegations in the operative
Third Consolidated Amended Complaint (ECF No. 484); and other publicly available market
data and trading reports, news articles, and industry publications.

## SUMMARY OF ALLEGATIONS

1.     As fully alleged below, Defendants, by and through their subsidiaries, affiliates, employees, and agents, engaged in acts and practices that constitute violations of the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* ("CEA"), and Section 2 of the Sherman Act, 15 U.S.C. § 2.  In sum, Defendants executed a squeeze (defined in ¶ 42, *infra*) on the cotton futures market, extracting an unlawful toll from Plaintiffs and others who had short positions in the cotton futures market for May 2011.  Defendants then repeated this squeeze against Plaintiffs and other short position-holders in the cotton futures market for July 2011.

2.     (a)     In violation of the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* ("CEA"), Defendants manipulated and artificially inflated the prices of

(b)     the Intercontinental Exchange ("ICE") Cotton No. 2 futures contract ("cotton futures contract") expiring in **May** 2011 ("May 2011 Contract"), relative to the other prices alleged hereinafter, and

(c)     the cotton futures contract expiring in **July** 2011 ("July 2011 Contract"), relative to the other prices alleged hereinafter.

(d)     Allegations herein of Defendants' artificial inflation, manipulation, or fixing of the prices of May 2011 Contracts refer to the March 30 – May 6, 2011 period, inclusive.  Allegations of such conduct by Defendants toward July 2011 Contract prices refer to the period June 7 – July 7, 2011, inclusive.  Together, these two periods constitute the Relevant Periods.  Whenever artificial inflation is alleged, that means inflation relative to the fundamentals of supply and demand, the prices of the later futures contracts, and/or cash market prices, each as alleged in detail hereinafter.

3.      Defendants' manipulation also violated Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, in that Defendants' activities resulted in their cornering of the May 2011 and July 2011 Contracts.

4.      Cotton is seasonal.  Cotton supplies in the United States tend to be the highest after the harvest or picking is substantially complete (the harvest occurs between roughly September and December).  Cotton supplies in the United States tend to be the lowest at the end of July before any substantial picking of the new crop begins.  One of the promised societal benefits of cotton merchants and cotton futures contract trading is that they efficiently and economically allocate the substantial supplies of cotton in September in a manner that provides the lowest price of cotton throughout the year.

5.      (a)      Defendants, however, engaged in a series of demonstrably uneconomical actions with respect to the May and July 2011 Contracts.  Thus, Defendants in the May 2011 Contract insisted upon what was then the highest number of stops of deliveries (which means that Defendants received cotton) relative to the amount of certificated cotton stocks in ICE warehouses in the history of cotton futures trading on ICE.

(b)      Specifically, Defendants, through Defendant Term Commodities, Inc., stopped 3,898 May 2011 Contract deliveries in satisfaction of Defendants' long positions in the May 2011 Contract.  *See* ¶ 23 *infra* (defining "long position") and ¶¶ 61-64 (particularizing the deliveries).  This was **99.23%** of all deliveries on such contract.

(c)      The deliveries taken by Defendants alone on the May 2011 Contract were **2.02** times the certificated cotton stocks at the start of the notice period.  This was 56% greater than the next highest ratio of (i) **all** deliveries made in any prior ICE contract to (ii) the quantity of certificated stocks in the ICE warehouse at the start of the notice period.

(d)     Abnormal differences between (i) the price of one cotton futures contract on a commodity and (ii) the price of a later-expiring futures contract for that same commodity are the most important or among the most important indications of price manipulation.  A substantial backwardation[2] is a classic indicator of a manipulation undertaken by a large long trader who takes a large quantity of deliveries relative to the deliverable supply of the commodity in delivery warehouses.

(e)     Defendants engaged in sustained uneconomic conduct in the cotton cash and futures market in order to take this record ratio of deliveries.  Such uneconomic conduct caused an anomalous reversal in the backwardation of the May 2011 Contract prices relative to July 2011 Contract prices during a period when fundamental factors should have caused a continued decline in this backwardation.  It caused the highest percentage backwardation and highest absolute backwardation of any May/July Contract in the history of cotton futures trading for the period of April 1 – May 6 of each year from 2000–2011, inclusive.

(f)     The system of futures contract trading in the United States is designed to facilitate the ease of trading and **avoid** deliveries.  *See* ¶¶ 21-28, *infra*.  After backwardation, another indication of manipulated futures contract prices in the United States has been that futures contract prices diverge from the cash market price as the futures contract moves closer to the month before trading ends.  As time progresses and each futures contract moves toward its final trading month, there is less of a "predictive" or "anticipatory" component of the

---

[2] A "backwardation" is a condition in which the price of the earliest-expiring futures contract price exceeds the prices of later-expiring futures contracts.  In contrast to a backwardation, a "carrying charge" means that the prices of the later-expiring futures contracts are higher than the price of the earliest-expiring futures contract.  This is called a "contango" or, often, a "carrying-charge" market, because the somewhat higher prices of the deferred contracts compensate the holder of the commodity for the "carrying charges" of continuing to store the commodity (here, cotton) until the later delivery dates.

futures price.  Accordingly, non-manipulated futures contract prices and cash market prices should tend to converge during the month before the end of trading in a given contract.

(g)     By insisting upon taking their record ratio of deliveries of May 2011 Contracts relative to the certificated supplies in the warehouse, Defendants caused (i) a record **non**-convergence between the May 2011 Contract price and cash market prices, and (ii) an anomalous distortion between May 2011 prices and the fundamentals of supply and demand. *See* ¶¶ 74-136, *infra*.

(h)     Thus, Defendants' distinctly uneconomic conduct culminating in their record ratio of deliveries on the May 2011 Contract caused record distortions of prices and uneconomic conditions in which the May 2011 Contract blatantly violated the overriding "convergence" objectives (*see* sub-par. (f)-(g), *supra*) of United States futures contract trading. This is the type of abuse of market power by a large trader that Congress originally enacted the CEA to prevent and has been seeking through amendments to eliminate since the inception of the CEA.

6.     (a)     Defendants also, through Defendant Term Commodities, Inc., then topped their own record set in the May 2011 Contract by uneconomically insisting upon an even greater percentage of stops of deliveries **relative** to certificated stocks on the July 2011 Contract. *See* ¶¶ 61-64, *infra*.

(b)     Specifically, Defendants stopped 1,613 July 2011 Contract deliveries in satisfaction of their long positions in the July 2011 Contract.  This was **99.01%** of the stops of deliveries on the July 2011 Contract.

(c)     Defendants' stops of deliveries on the July 2011 Contract alone were **2.04** times more than the certificated stocks at the start of the notice period.

(d)     Defendants engaged in repeated uneconomic conduct in the cotton cash and futures market in order to take this record ratio of deliveries.  Such significant uneconomic conduct caused an anomalous reversal in the backwardation between the prices of July 2011 Contracts and the prices of the next two cotton futures contracts.

(e)     From March 2011 forward, there had been net cancellations of exports of cotton.  (*See* 126-127 & n.14, *infra*, re: "net cancellations of exports.")  These added to the supply of cotton and reduced the demand for cotton.  Consistent with these and other changes in the fundamentals of supply and demand for cotton (*see* ¶ 125), the backwardation between the July 2011 Contract price and the prices of the next two expiring futures contracts (the October 2011 and December 2011 Contracts) declined between March and early June 2011.

(f)     However, Defendants' uneconomic conduct (*see* ¶¶ 5-6, 61-64, 73-115), culminating in their threatened and actual insistence on high quantities of deliveries on the July 2011 Contract, caused the backwardation to reverse.  Anomalously, this occurred even as the net cancellations of exports continued and other changes in the fundamentals of supply and demand indicated that the backwardation should decline.

(g)     Defendants caused this backwardation (*see* n.2) between the July 2011 Contract price and the prices of the next two expiring futures contracts (the October 2011 and December 2011 Contracts) to become higher than the backwardation between any same-year July/October contract prices or any same-year July/December contract prices for the period from June 1 – July 6 of each year from 2000–2011, inclusive.

(h)     In fact, Defendants' record ratio of deliveries also artificially created and intensified a **non**-convergence between the July 2011 Contract prices and cash market prices.  Indeed, during the period of June 1 – July 6 for the twelve years of 2000–2011,

the **top thirteen** highest spreads between the July cotton futures contract and the cash market cotton price were **all** in the July 2011 cotton futures contract. The largest spread was reached on June 23, 2011. It was **almost five times** more than the highest spread in all the years prior to 2011, going back to 2000. It was **more than ten times** the average spread during the same, 2000–2010 period.

        (i)     This gross distortion to record non-convergence and unprecedented spreads, exactly when prices should have been converging, is yet another extreme badge of manipulation.

        (j)     In causing all the foregoing extreme distortions, Defendants intentionally manipulated and inflated July 2011 Contract prices. As in the May 2011 Contract, Defendants also intentionally exacerbated and abused the preexisting conditions of relatively low supplies and capacity constraints that further reduced the amounts of cotton that could be delivered on the futures contract. *See* ¶ 46, *infra*.

        (k)     Defendants uneconomically also substantially depleted the available deliverable cotton on the May 2011 Contract and the July 2011 Contract—not through genuine shipments to end users, but through their scheme to manipulate and monopolize the relevant market. *See* ¶¶ 44, 46(g)-(h), 61(d), 64(b), 73(b), *infra*.

        7.     (a)     The potential for a congestion or squeeze depends on the difference between the open interest (defined in ¶ 25(a), *infra*) and the available deliverable cotton supplies. Defendants' foregoing depletions of the available deliverable cotton supplies, Defendants' increases in the open interest of the May and July 2011 Contracts, and Defendants' taking of large deliveries created and exacerbated a congestion and squeeze in such Contracts. *See* ¶¶ 5(a)-(d), 73-115.

(b)      Although they were expected to try to acquire physical cotton through means other than stopping delivery, Defendants uneconomically refused to deal with market participants in the multiple active cash markets in which higher quality cotton was being <u>actively and repeatedly offered to Defendants at lower prices than May or, later, July 2011 Contract prices.</u>  *See* ¶¶ 74-107, *infra* (regarding EFP liquidations of Defendants' long futures positions).

(c)      Defendants, through their May 2011 Contract long positions, uneconomically caused the liquidation of the May 2011 Contract to be greatly delayed.  *See* ¶¶ 73(a)-(u), *infra*.  This caused the May 2011 Contract open interest to be 30% to 379% higher than the average open interest for prior May contracts during the history of ICE trading between the 13th trading day (which in 2011 was April 5) before FND (defined in ¶ 31, *infra*) and FND itself (which in 2011 was April 25).  Defendants' uneconomic refusals to liquidate their July 2011 Contracts also caused delays in the liquidation of that contract and increases in its open interest.  *See* ¶¶ 7(e), 73(q)-(s), *infra*.

(d)      Remarkably, Defendants' long positions also caused the open interest on the May 2011 Contract to increase on **eight of the twelve trading days** between the 25th day before FND and the 12th day before FND compared to **zero** such increases in the average open interest in the May contracts over that same period during the prior history of ICE trading.  *See* ¶¶ 73(a)-(u), *infra*.

(e)      By virtue of Defendants' foregoing substantial depletions of deliverable supplies, substantial increases in open interest of the May and July 2011 Contracts, and taking of substantial deliveries, Defendants' long positions well exceeded available deliverable supply (*see* ¶¶ 46(a)-(i), 73(a)-(u), *infra*) and forced Plaintiffs to deal with

Defendants in a congested May 2011 Contract and a congested July 2011 Contract.  Defendants

refused to liquidate their long positions except ta artificially inflated May and July 2011 Contract

prices.  *See* ¶¶ 46(a)-(i) 73(a)-(u), *infra*.

> (f)    Defendants themselves, through their systematic, uneconomic

conduct, thereby caused and exacerbated congestions and a manipulative squeeze in each such

Contract.  *See* ¶¶ 5(a)-(h), 6(a)-(d), 61-64, 73, 107.  Indeed, Defendants thereby caused "the

largest ever cotton squeeze" and the "worst thing that ever happened" to the cotton market in,

first, the May 2011 Contract and, later, the July 2011 Contract.[3]

> (g)    In addition, and inextricably intertwined with the foregoing

squeeze that Defendants intentionally engineered on these two successive ICE futures contracts,

Defendants also systematically engaged in uneconomic conduct in violation of the customs and

practices of cotton futures market participants, including cotton merchants.  *See* ¶¶ 5(a)-(h), 6(a)-

(d), 61-64, 73(a)-(u), 107(a)-(i), 130(b).  Because Defendants purported to be hedgers, this

systematic, uneconomic conduct also violated the law, including the then-effective version of

Commodity Futures Trading Commission ("CFTC") Regulation 1.3(z), 17 C.F.R. § 1.3(z)(1)(iv):

"[N]o transactions or positions shall be classified as bona fide hedging unless . . . such positions

are established and liquidated in an orderly manner in accordance with sound commercial

practices . . ."

> (h)    Therefore, Defendants' long positions were unlawfully large to the

extent that they exceeded the speculative position limit.  *See* ICE Futures U.S. Rule 6.19 (300-

contract limit on FND) and ¶¶ 73(s)-(t), *infra*.  In fact, Defendants unlawfully held long

---

[3] Gregory Meyer & Javier Blas, "Traders Cause Cotton Chaos with Bulk Deliveries," *Financial Times* (Sept. 25, 2011), available at https://www.ft.com/content/fec1a026-e77c-11e0-9da3-00144feab49a#axzz2Gqj9R5wp.

positions that were as much as thirteen times more than the position limit.  By the uneconomic and unlawful conduct alleged in this subparagraph alone, Defendants manipulated and artificially inflated May 2011 and July 2011 Contract prices.

   (i) As a direct and proximate result of Defendants' foregoing manipulation and unlawful conduct, and the resulting price distortions of the May 2011 and July 2011 Contracts, Plaintiffs suffered actual damages and were damaged in their property.

<b><u>JURISDICTION AND VENUE</u></b>

   8. This Court has jurisdiction over the federal claims in this action pursuant to 7 U.S.C. § 25 and 28 U.S.C. §§ 1331 and 1337.

   9. Jurisdiction and venue are proper in this District pursuant to 15 U.S.C. §§ 2, 7, 15, 22, and 26; 28 U.S.C. § 1391(b)(2); and 7 U.S.C. § 25(c), in that defendants are found in, reside, or transact business in this District or because part of the events or omissions giving rise to the claims occurred in this District.

   10. Cotton is a "commodity" and is the "commodity underlying" cotton futures and options contracts traded on ICE.  ICE operates the ICE Futures U.S. in this district. ICE Futures U.S. is a designated contract market pursuant to the CEA, as amended, and as such, is regulated by the CFTC.  *See* 7 U.S.C. §§ 1(a)(4), 25(a)(1)(D).

   11. ICE Futures U.S.'s headquarters are located at 1 North End Avenue, New York, New York 10282.  Venue is proper in this district pursuant to 7 U.S.C. § 25(c), because the claims arose in this district.  Defendants' unlawful acts manipulated the prices of the cotton futures contracts traded on ICE.

   12. Defendants, directly and indirectly, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate

commerce, or of the mails in connection with the unlawful acts and practices and course of business alleged herein.

## PARTIES

13.     Plaintiff Glencore is a company organized under the laws of Switzerland with its principal U.S. office in New York, New York.  Glencore is a supplier of commodities and raw materials to industrial consumers, and engages in commodities trading.

14.     Plaintiff Viterra is a company organized under the laws of the Netherlands, with its principal offices in Rotterdam, Netherlands.  Viterra also is a supplier of commodities and raw materials to industrial consumers, and engages in commodities trading.

15.     During the Relevant Periods, both Glencore and Viterra were forced to buy, roll (defined in ¶ 24, *infra*), or otherwise close out cotton futures contracts at prices that were artificially inflated as a result of defendants' wrongful and illegal manipulation and monopolization detailed herein.

16.     Defendant LDC trades and markets commodities, including cotton, on an international basis.  The LDC group's cotton platform conducts operations in all major world markets, including origination in key producing regions of the United States and other countries. LDC originates approximately 20% of United States cotton production.  LDC's main office is located in Rotterdam and is owned, directly or indirectly, by Louis Dreyfus Holding B.V.

17.     (a)     Defendant Allenberg is the name by which Defendant LD Commodities Cotton LLC is doing business.  Allegations herein relating to Allenberg are also allegations against LD Commodities Cotton LLC, which is, directly or indirectly, a wholly owned division or subsidiary of LDC or another Defendant, and is one of the largest cotton merchandising organizations in the world.  LD Commodities Cotton LLC a/k/a Allenberg Cotton Co. is a Delaware limited liability company whose principal place of business is located at 40

Danbury Road, P.O. Box 810, Wilton, Connecticut 06897-0810.  Allenberg has offices in

Cordova, Tennessee, and Fresno, California.

(b)       Additionally, among all 40 ICE-approved warehouses, Allenberg

owned 14 of them, representing 35% of the warehouses.  The company with the next highest

number of warehouses was Ecom, which owned five.  Allenberg's ownership of ICE-approved

cotton warehouses in 2011 represented 39% of the total ICE-approved cotton warehouse storage

capacity.  The company with the next highest capacity was Ecom, which owned 13% of the total

capacity.  In other words, Allenberg owned three times the storage capacity as the next largest

warehouse owner.

(c)       Louis Dreyfus Company Holding Inc. (f/k/a LDC Holding Inc.) is

a Delaware corporation whose principal place of business is located at 40 Danbury Road, P.O.

Box 810, Wilton, Connecticut 06897-0810.  Upon information and belief, Claude Ehlinger is the

executive vice president of Louis Dreyfus Company Holding Inc. and the chief financial officer

of Defendant LDC.  Defendant Louis Dreyfus Company Holding Inc. is, directly or indirectly,

owned and controlled by Defendant LDC and owns and controls, directly or indirectly,

Defendant LD Commodities Cotton LLC (a/k/a Allenberg Cotton Co.).

18.       Defendant Term Commodities, Inc. is a subsidiary of LDC.  Term

Commodities is a clearing member on ICE, the Chicago Board of Trade, the Chicago Mercantile

Exchange, and the New York Mercantile Exchange.  Term Commodities is located in Chicago,

Illinois.  Term Commodities does not act for public customers.  It acts for the other Defendants

and their affiliates.

19.       Defendant Louis Dreyfus Company LLC (f/k/a Louis Dreyfus

Commodities LLC) is a holding company for various operating companies engaged in the North

American business with the Louis Dreyfus Commodities group of companies.  Louis Dreyfus Company LLC's main office is located in Wilton, Connecticut.

20.     Defendant Joseph Nicosia ("Nicosia") was the Chief Executive Officer of Allenberg, at all times relevant herein, and handled the day-to-day running of Defendant Allenberg, was the Senior Platform Head Cotton trader of the Louis Dreyfus Commodities Executive Group within Louis Dreyfus Commodities Holdings B.V. and LDC, and was and is a member of Louis Dreyfus Commodities' executive committee.  Nicosia was also a manager of Louis Dreyfus Company Holding Inc.  According to Bloomberg, Nicosia, who was in charge of Defendants' cotton futures trading, has also served as a Director of both the New York Board of Trade and the American Cotton Shippers.  Nicosia served as a Member of the Board of Governors of ICE Futures U.S.  Nicosia is also a founding member and director of The SEAM, the cotton industry's internet trading marketplace.

(a)     In participating in the ICE cotton futures market, Defendants were subject to the customs, practices, and legal requirements imposed upon such participants.  *See* ¶¶ 7(g)-(h), 25(e), 73(t), 107(b), *infra*.  A class-action lawsuit, alleging violations of law by Defendants when Nicosia was in charge of the day-to-day activities of Defendants, was filed in the United States District Court for the Southern District of New York on June 29, 2012.  *In re Term Commodities Cotton Futures Litig.*, No. 12-cv-5126 (ALC) (KNF).

(b)     After the commencement of that class-action lawsuit, the following executive changes occurred with respect to Allenberg:

(1) On or about September 10, 2012, Anthony Tancredi, who was president of Allenberg, second in command to Nicosia, and responsible for global merchandising, left Allenberg;

(2) On or about October 26, 2012, approximately six weeks after Tancredi's departure, Defendants removed Nicosia as CEO of Allenberg and replaced him with Tancredi. As part of Tancredi's return, he took over Nicosia's former roles—CEO of Allenberg and Senior Platform Head Cotton trader of the Louis Dreyfus Commodities Executive Group within Louis Dreyfus Commodities Holdings B.V. and LDC;

(3) On or about January 11, 2013, Chief Operating Officer and 40-year Allenberg veteran Thomas Malone was promoted to President of Allenberg (second-in-command of Allenberg and Tancredi's former position).  As President of Allenberg, Malone took over some of Nicosia's day-to-day responsibilities as well.

## SUBSTANTIVE ALLEGATIONS

A.    **Background**

21.    **Futures Contract**.  A futures contract is an agreement to buy or sell or to make a cash settlement according to a formula in the contract in respect of a commodity, such as cotton, at a date in the future.  As a practical matter, typically fewer than 1–2% of all cotton futures contracts are settled through actual delivery of the cotton.

22.    **Offset by Trading**.  Rather, futures market participants almost always offset their futures positions before their contracts mature.  For example, a purchaser of one cotton futures contract may cancel or offset his future obligation to take delivery of cotton, by selling one cotton futures contract.  This sale of one contract offsets or liquidates the earlier purchase of one contract.  The difference between the initial purchase price and the sale price represents the realized profit or loss for the trader.  Futures traders also frequently couple such liquidations with "roll" trades.  *See* ¶¶ 24-25.

23.    **Long and Short.**  Thus, futures contracts have two sides.  The "long" side is the buyer of the contract.  In the rare event that the long does not offset or liquidate, the long is

obligated to take delivery and pay for the commodity or make the cash settlement in accordance

with the terms of the futures contract.  The "short" side is the seller of the contract.  In the rare

event that the short does not enter an offsetting trade, the short is obligated to make delivery of

the commodity during the delivery dates or make the cash settlement in accordance with the

terms of the contract.

24.     **Roll.**  To "roll" means that a trader makes the opposite trade of the

position held in the expiring month (*e.g.*, a person short one March 2011 Contract would buy one

March 2011 Contract), and simultaneously executes a transaction for the same position in the

next futures contract (*e.g.*, a short would sell one May 2011 Contract to create a short position

there).  In the example given in this paragraph, the trader who is short the March contract would

buy one March contract and sell one May contract.

25.     The commodity exchanges and the CFTC have repeatedly stated that

futures markets are not intended to be substitutes for the physical market.  Instead, the futures

markets are carefully designed to facilitate ease of trading into and out of futures contract

positions without deliveries.  As a result, liquidations and cash settlements occur on 99-plus

percent of futures contracts, and deliveries are extremely rare.

(a)     The quantity of the certificated stocks in the ICE warehouses

averaged 2.5% of the amount of open interest in ICE cotton futures contracts between 2006 and

2013.  The "open interest" of futures contracts is reported daily and reflects the number of

contracts that have been open but not yet liquidated or closed.

(b)     When the May 2011 Contract became the active contract, its open

interest during March and the first half of April was approximately **35 times** as great as the

certificated cotton stocks in ICE warehouses.  When the July 2011 Contract became the actively

traded contract, its open interest was, initially, **35 times** as great as the ICE-certified stocks.  But Defendants revealed their large decertifications on June 1–2, 2011 and the ratio then more than tripled to 115:1:

| Date | ICE Certificated Stock (in Bales) | July 2011 Open Interest (in Contracts) | Ratio of Open Interest to Certificated Stock |
|---|---|---|---|
| 5/25/2011 | 183533 | 68,982 | 37.58561131 |
| 5/26/2011 | 188042 | 66,328 | 35.27297093 |
| 5/27/2011 | 190030 | 64,952 | 34.17986634 |
| 5/31/2011 | 194333 | 65,026 | 33.46112086 |
| 6/1/2011 | 194715 | 63,431 | 32.57632951 |
| 6/2/2011 | 52035 | 60,215 | 115.7201883 |
| 6/3/2011 | 43207 | 57,322 | 132.6683176 |
| 6/6/2011 | 43057 | 54,951 | 127.6238475 |

(c)      The above data shows that delivery on all outstanding open interest was not practical or even possible.

(d)      Consistent with the fact that futures markets are not intended to be substitutes for the physical market, it is not expected that a multiple of the stocks in the warehouse of even twice as much, let alone 20-50 times as much, would be ordered for delivery on each succeeding contract by the shorts more than nine weeks before the Last Notice Day ("LND") in such contract.  Requiring such massive movements of cotton would be a great economic waste, needlessly burden the shorts, and would eventually destroy the futures contract.

(e)      On the contrary, the customs, practices, and legal requirements imposed upon futures market participants is that they act in a commercially reasonable fashion.

*See* ¶¶ 7(g)-(h), 73(t), 107(b).  These requirements are especially strict for persons who hold futures positions that exceed the speculative position limit, *i.e.*, so called hedgers.  *See* ¶ 7(g)-(h).

26.     The insistence by "longs" on stopping (that is, taking) significant deliveries to satisfy expiring futures contracts, does not make economic sense in various circumstances.  These include (as in this case) where the price of the expiring futures contract is more than the prices of the deferred futures contracts, or more than the price of purchasing cotton in the cash market.  *See* ¶¶ 44-46, 109, 123, 130(d).

27.     "Spread positions" are commonly used positions.  Typically, in a spread position, the trader is long a futures contract for one delivery month and short the same futures contract for another delivery month.  For example, with respect to cotton, during April 2011, Plaintiffs were short the May 2011 Contract and long the July 2011 Contract.

28.     **"Spreads"** may refer to the price differential between any two items.  For example, "spreads" refers to the price differences between futures contracts on the same item only with different expirations.  Thus, if the May 2011 Contract were priced at $2.50 per pound and the July 2011 Contract were priced at $3.00 per pound, then the "spread" would be 50 cents; if the July 2011 Contract were priced at $2.50 per pound and the December 2011 Contract were priced at $2.60 per pound, then the spread would be 10 cents per pound.  Similarly, "spreads" may refer to the difference between the cash market price and the futures market price.  If the July 2011 Contract price was $2.50 per pound and the cash market price was $2.46 per pound, the spread would be 4 cents.  Typically, the cash spread is referred to as the "basis."  *See* ¶ 107(d), *infra*.

29.     ICE Futures U.S. has been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7.  ICE Futures U.S. submits to the CFTC various

rules and regulations for approval through which the ICE designs, creates the terms of and conducts trading in various commodity futures and options, including futures and options contracts for cotton.

30.    ICE trades cotton futures contracts expiring in March, May, July, October, and December of each year.

31.    ICE regulates when a party can notify the market when it will either stand for delivery (or make delivery), or seek to cover its position:

- The "First Delivery Day" is the first business day of the contract month.

- The "Last Delivery Day" is the seventh business day before the end of the contract month.

- The "First Notice Day" ("FND") is the fifth business day before the first delivery day of the contract month.

- The LND is the fifth business day before the last delivery day, or the twelfth business day before the end of the contract month.

- The "Last Trading Day" is the tenth business day before the last delivery day, or the seventeenth business day before the end of the contract month.

- The time between Notice Days is called the "Notice Period."

32.    The May 2011 Contract ceased trading on May 6, 2011, and the FND was April 25, 2011, and the first delivery date on such contract was May 2, 2011.  The FND of the July 2011 Contract was June 24, 2011, the first delivery date of such contract was July 1, 2011, and the last trading day of such contract was July 7, 2011.

33.    Every aspect of a futures contract traded on the ICE, such as the grade and amount of cotton, is standardized, except the price and delivery month. This standardization of futures contracts is specifically designed to facilitate the ease of trading of fungible contracts in one central marketplace.

34.    The time required to certificate cotton plays a significant role in how cotton futures may be settled.  There are deadlines for when a party must reduce its futures position to an ICE-approved position limit, unless that party announces to ICE that it intends to carry through with the physical delivery under the contract.  If a net short party is forced to make physical delivery of cotton, that delivery will take a certain amount of time, because the cotton must be certificated.  Thus, any contract for physical delivery typically must be completed several days before the FND.

35.    As a practical example of the impact of this process, one can imagine a party with a net short position for the May 2011 Cotton futures.  As the FND draws nearer, that party has three choices: (1) deliver physical cotton, either (a) as certificated stock pursuant to a futures contract, or (b) sold to the futures-holder in a transaction such as "exchange for physical" ("EFP"); (2) purchase offsetting long contracts; or (3) roll its position by trading its May 2011 Contracts for July 2011 Contracts.

36.    Prices of ICE cotton futures contracts are quoted in cents and hundredths of a cent per pound.  The contract size for ICE cotton futures contracts is 50,000 pounds net weight.

37.    ICE Cotton No. 2 rules specifies that the Official Cotton Standards of the United States existing on the date of delivery shall be used as the standards for the grade, staple, quality, or value of all cotton delivered on a contract for future delivery.  *See* ICE Futures U.S. Cotton No. 2 Rules, Rule 10.03 (Official Standards and Undeliverable Cotton).

(a)    Not only are deliveries extremely low and rare relative to the volume and open interest of ICE cotton futures contracts.  *See* ¶ 25(a).  ICE-delivered cotton is ill-suited for the efficient satisfaction of obligations in the cotton cash markets.  There is an

extraordinarily wide variety of cotton deliverable on the ICE contract.  This includes but is not limited to different grades, staples, and micronaire of cotton, as well as different colors and times and locations of the delivery.

(b)     Thus, under ICE rules, shorts have the option to deliver cotton of one of 36 combinations of leaf and color grade, at one of 40 widely dispersed warehouses, in one of five widely dispersed locations (between the mid-Atlantic and the southernmost Gulf of Mexico), during a time band that merely begins the running of a clock that will continue for up to 63 days (the load-out deadline under ICE rules) after the long asks to extract the cotton it receives from the ICE warehouses.

(c)     Only U.S. rain-grown or U.S. non-rain grown cotton is deliverable against the ICE contract.  Rain-grown or EMOT cotton comes from the Eastern, Memphis, (New) Orleans, and Texas regions ("EMOT").  Non-rain-grown cotton—which is referred to as Far Western Upland Cotton—is grown in California, Nevada, Arizona, New Mexico (except Lea County), and El Paso and the Pecos Valleys of Texas.

(d)     The very wide variety of the qualities of cotton deliverable against the ICE Cotton No. 2 Futures Contract, includes eight color grades.

| White Grades | Light Spotted Grades |
|---|---|
| Good Middling | Good Middling Light Spotted |
| Strict Middling | Strict Middling Light Spotted |
| Middling | Middling Light Spotted |
| Strict Low Middling | |
| Low Middling | |

(e)     Further, Leaf Grades 1 through 5 are deliverable for white cotton and Leaf Grades 1 through 3 are deliverable for light spotted cotton.

(f)     Under the ICE rules, there is also a wide dispersion from the mid-Atlantic to the southernmost Gulf of Mexico in the geographic location of warehouses where a short could deliver cotton.  In 2011, the 40 ICE-approved warehouses were spread over five designated delivery points: Galveston, Texas; Greenville, South Carolina; Houston, Texas; Memphis, Tennessee; New Orleans, Louisiana (New Orleans is effective with respect to all delivery months through and including October 2013).  Furthermore, each of these five locations, as per ICE rules, includes all areas within a 15-mile radius from the city's limits.

(g)     Thus, shorts have the option to deliver one of 36 combinations of leaf and color grade, at one of 40 warehouses, in one of five different locations.

(h)     To the limited extent that deliveries may be made on any futures contract, shorts have a strong financial incentive to deliver the least valuable grades and colors of cotton at the least valuable locations at the least desirable times.  Longs have no control over the quality or color or location of cotton they receive nor the exact time of receipt.

(i)     This provides an incentive for the rational market participant to source cotton from the multiple cash markets.  There, the rational person may select the exact color and quality of cotton they want, the exact location, and the exact times that most efficiently satisfy their obligations or requirements.  Customs and practices among market participants (including cotton merchants) are to seek to obtain for the lowest price the right color and grade of cotton at the right place at the right time.  *See* ¶¶ 7(g)-(h), 25(e), 73(t), 107(b).

(j)     Consistent with the foregoing, and because of the wide dispersion of quality and location of cotton deliverable against the ICE Cotton No. 2 Futures Contract, the International Cotton Association ("ICA") export cotton contracts are typically never based upon a requirement of an ICE cotton futures contract (nor the predecessor cotton futures contract).

(k)     The overwhelming majority of U.S. cotton is exported under contracts subject to ICA bylaws and rules.

(l)     ICA export contracts have always typically included detailed quality parameters that are significantly more restrictive than the wide band available under the ICE cotton futures contract.

(m)     Indeed, upon information and belief, for the past several decades, active cotton merchants have never seen an ICA cotton contract that required delivery of merely ICE- or other futures exchange–certificated cotton.

(n)     On the contrary, the wide band of qualities, colors, locations, and other variables under the ICE cotton futures contract, makes it less practical to use the ICE futures contract as an efficient source of export cotton.

(o)     Although any cash market contract specifying ICE-certificated cotton would be contrary to efficient merchandising of cotton and ICE customs and standards, such a contract would be extremely useful for supplying a long with a (pretextual) rationale to insist upon large deliveries, in order to create or exploit a congestion or otherwise inflate futures contract prices.  *See* ¶¶ 20(a)-(b), *supra* (regarding Defendants' executive changes after the filing of this action) and ¶¶ 6(e)-(f), 46(e), 74, 126-131 (regarding the large cancellation of export orders immediately after the July 2011 Contract ended).

38.     Thus, in the rare event that a cotton market participant holds its positions to the end of trading in the prompt-month contract, the longs must stop or take delivery and shorts must make delivery of 50,000 pounds net weight per contract as alleged above.  The price for the cotton that is delivered is the settlement price of the ICE Cotton No. 2 contract.  The

difference between that and each trader's original price has been adjusted for, through variation margin payments.

      39.    All ICE warehouses for cotton are required to load-out cotton within nine weeks from the date of receiving a valid load-out order.

      (a)    As with the foregoing friction in extracting cotton from ICE warehouses, there is similar friction in extracting cotton from non-exchange cotton warehouses. There was typically a substantial amount of time, up to nine weeks, from the time of the load-out order to the non-ICE warehouse, to the time the cotton was extracted.

      (b)    The USDA's Commodity Credit Corporation ("CCC") is a government-owned and operated entity which aids producers through loans, purchases, payments, and other operations, and makes available materials and facilities required in the production and marketing of agricultural commodities. Cotton warehouses must provide data to the CCC on shipments and storage capacity on a weekly basis. Cotton warehouses must load-out stored cotton "without unnecessary delay" which means at least 4.5% of its applicable storage capacity per week. Common tariffs for such warehouses provide that a cotton warehouse need load out only 4.5% of its capacity per week.

      (c)    Requests for load-outs from third-party warehouses (non-ICE-licensed warehouses) were at a substantial level during February–June 2011.

      (d)    In order to deliver non-certificated cotton stored in a non-ICE warehouse, after the cotton was extracted from a non-ICE warehouse, it had to be shipped to an ICE warehouse. Depending upon the location, this process typically required days or weeks.

      (e)    After the cotton was loaded out and transported to ICE warehouses, the ICE rules in effect during March–July 2011 required that the cotton had to be

certificated by the USDA.  The amount of time required for such certification varied.  During April–May 2011 and June–July 2011, the amount of time required for this certification was unusually long.  On the May 2011 Contract, it grew to more than two weeks, which was much longer than usual.  *See* ¶ 39(g)-(j).

(f)      The LND on the July 2011 Contract was July 14, 2011, and on the May 2011 Contract was May 13, 2011.  At least nine weeks before the LND—that is, approximately March 11, 2011 for the May 2011 Contract and approximately May 12, 2011 for the July 2011 Contract—it was no longer feasible for market participants to plan to order load-outs of cotton from non-ICE warehouses and move that cotton into the ICE warehouse in time to make a delivery by the LND.

(g)      After the commencement of the class action, ICE announced, on March 4, 2013, new rule changes to the ICE Cotton No. 2 futures contract.  According to ICE, Cotton Resolution No. 2 to Chapter 10 (which is the new rule) is designed to reduce the amount of time it takes to move cotton into a "tenderable position" by reducing bottlenecks and frictions in the process of moving cotton into delivery warehouses and certificating it.  "Tenderable position" means that a market participant could tender a warehouse receipt in respect of that cotton under ICE rules and, for example, thereby satisfy a short position.  In order to be of tenderable quality for a Cotton No. 2 Futures Contract, the cotton must be stated in bales with average values above the minimum standards outlined in Rule 10.22 of the Cotton No. 2 Rules provided by ICE.  (A "bale" of cotton must be between 400-650 pounds net weight.)

(h)      Compared to the conditions actually existing during April–June 2011, this rule change alone shortened the time to make delivery by approximately as much as two weeks.

(i)     Under the old ICE rules, the owner of cotton moved into an ICE

warehouse requested the ICE warehouse owner/agent to request certification from the USDA of

such cotton, at which time the USDA includes this bale in its daily report of bales pending

Certification.  Bales must be reweighed by the warehouse, and samples must be cut at the

licensed store and then moved to the USDA classing office, where they are subject to potential

backlogs.  The USDA eventually undertakes and completes the process and provides the results

of same to ICE.  If there is certification, the ICE removes the bale from its daily report of bales

pending Certification and adds the bale (if it meets ICE standards) to ICE's daily Certified

Stocks Report.

(j)     Because of these backlogs, the amount of time required from the

time the owner requested that the USDA classing office undertakes the process, and the time

when the USDA completed the process and provides the results to the Exchange, varied and was

subject to delays and bottlenecks.  Once Defendants intended to cause a high ratio of deliveries

relative to certificated stocks, Defendants well knew (but the rest of the market did not) that

Defendants' conduct could (and, in fact, did) create just such a bottleneck, slow the certification

process, and thereby effectively further reduce the available deliverable supply.

## B.     Manipulation

40.     The social benefits that justify commodity futures trading are (a) price

discovery, (b) efficient risk-transfer, and (c) price stabilization.  *Cargill, Inc. v. Hardin*, 452 F.2d

1154, 1156-58 (8th Cir. 1971).

41.     Price manipulation destroys all three of these benefits.  *Cargill*, 452 F.2d

at 1156-58.  Defendants' uneconomic conduct, culminating in their insistence upon record

numbers of deliveries relative to ICE warehouse certified stocks, caused record non-convergence

between futures and cash market prices, record backwardation in the futures market, and a dramatic separation of the futures prices from the fundamentals of supply and demand for cotton. Thereby, Defendants destroyed the social benefits of cotton futures contract trading in order to benefit themselves.

42.     **"Squeeze."**  In general, a party is said to "corner" a market when it has a net long position and owns all or substantially all of the deliverable supply of a particular commodity.  In a "squeeze"—a form of a corner—the manipulator has a dominant long position, but not an actual monopoly of the cash commodity.  Instead, the cash supply is limited due to drought, unexpectedly heavy demand, or other natural or economic forces that are not necessarily within the manipulator's control, such as a lengthy certification process.

43.     In any case, a manipulator engaging in a squeeze can force shorts to pay artificially high prices as the FND approaches in order to settle their accounts.  Defendants executed a squeeze on the market for both the May 2011 and July 2011 Contracts.

44.     **Uneconomic Conduct.**  Standard practice among market participants (and other business entities) is to purchase a commodity for the lowest price available, all other things equal, and sell the commodity for the highest price available, all other things equal.  Firms acting in accordance with this standard practice are said to be acting in an "economic" or "economically rational" manner.  Firms who violate this standard practice are said to be acting uneconomically. Pursuant to their manipulative scheme alleged herein, Defendants repeatedly engaged in highly unusual violations of this standard practice by seeking uneconomically to overpay to purchase cotton by taking delivery on, first, the May 2011 Contract and, later, the July 2011 Contract.

45.     Efficient risk-transfer and the other social benefits of futures trading alleged in ¶¶ 40-41 cannot be realized in a regime in which uneconomic deliveries cause non-

convergence of cash and futures prices.  In such a regime of uneconomic deliveries and non-convergence, each hedger would have to maintain a "double book."  For every short position, the hedger would have to keep certificated supplies that could be used to deliver in order to liquidate the short futures positions—and avoid having to liquidate at non-converging futures prices.  For every long position, the hedger would have to maintain the substantial spare cash and credit necessary to take delivery and purchase the entire amount of the commodity represented by the long futures position—and thereby avoid having to liquidate at non-converging futures prices.  Maintaining such "double books" would enable hedgers to exit a hedging futures position without sustaining large losses.  But maintaining such double books would be extremely expensive, and make the economic cost of hedging in the futures market outweigh the benefits.

46.     Furthermore, in a regime of uneconomic deliveries and non-convergence, the futures contract would be useful only as a hedge for ICE-warehouse cotton, and not for out-of-position cotton.  However, warehouse stocks represent only a small fraction of the overall total cotton stocks.  The overwhelming majority of cotton is "out-of-position," *i.e.*, outside the ICE warehouse, in non-deliverable locations, of non-deliverable grades; this was true during the Relevant Periods as well.  Limiting effective hedges to deliverable cotton would effectively end the risk-transfer function of the cotton futures market and, ultimately, would end cotton futures trading.

(a)     Between 2000 and 2011, inclusive, the lowest projected cotton stocks in the U.S. for February, March, April, May, and June of each year, were each registered in 2011 according to the World Agriculture Supply and Demand Estimates Report by the USDA.

(b)     Similarly, the quantity of ICE-certificated cotton stocks from mid-February to June 2011 was lower than it had been during the same months for all the earlier years of ICE cotton trading.

(c)     During the Relevant Periods, according to cotton merchants, there were no or virtually no supplies of non-certificated cotton in ICE warehouses that were available for sale and there were almost no supplies of non-certificated cotton that were already in transit for ICE warehouses that could have been certificated in time for delivery and were available for sale.

(d)     The precise quantity of available deliverable supplies was a function of time and other matters including USDA certification delays.  Plaintiffs have good grounds to believe and do allege that the total quantity of deliverable supplies on the May 2011 Contract during the relevant period of March 30 – May 6 was significantly less than 500,000 bales.  Similarly, after Defendants' cancellation of 142,680 bales on June 1–2, 2011, the quantity of the deliverable supply on the July 2011 Contract between June 7 and July 7, 2011 was significantly less than 250,000 bales.

(e)     Reasons for such low deliverable supplies included the amount of time required to move cotton from non-ICE warehouses into ICE warehouses and thereafter to certificate same to make such cotton "tenderable" (*see* ¶ 39(a)-(j), *supra*); the large export cancellations from mid-March 2011 forward that produced increasing large amounts of available cotton in the cash markets that could not be timely moved into the ICE warehouse for delivery (*see* ¶¶ 6(e), (f), 39(a)-(j), 46(e), 74-109, 126-131); Defendants' uneconomic refusal to re-tender (*see* ¶¶ 61(c)-(f), 64(b), 73(a)-(u)); Defendants' decertification of ICE warehouse supplies

(¶ 61(c)-(d)); and Defendants' rejections of EFP transactions for the cotton being offered to Defendants by Plaintiffs and others in the actively trading cash markets.  *See* ¶¶ 74-109.

(f)      Although the cotton being offered to Defendants (more than 1,000,000 bales in aggregate) could not be moved into the ICE warehouses in time for futures market delivery, **such cotton was freely available to satisfy any legitimate needs for cotton that Defendants or any market participant had.**

(g)      Part of the deliverable supply was owned during March and, perhaps, during April 2011 by Defendants themselves and, therefore, should be excluded from the deliverable supply.

(h)      On March 9, 2011, Defendants began stopping deliveries on the March 2011 Contract.  By March 14, 2011, Defendants stopped 88 March 2011 Contracts (8,800 bales) and by March 16, 2011, Defendants stopped a total of 120 March 2011 Contracts (12,000 bales).

(i)      Speculators' ability to transact in the futures market is important because, as Nicosia and others have said and as the law recognizes, speculators provide important benefits.  These benefits include taking on price risks, permitting hedgers to transfer price risks, and supplying liquidity.

**C.      <u>Convergence, Issues of Certificates, and Stops of Certificates</u>**

47.      **<u>Absence of Safe Harbors.</u>**  CEA manipulation law and the convergence of futures contract prices and cash market prices each supersede the sometimes-asserted right of large traders to insist on receiving or making significant quantities of deliveries.  Manipulation is a separate violation.  Manipulation is not derivative.  That is, manipulation does not depend upon whether the alleged manipulator claims to have followed all of the other rules.  Nor does it

depend on whether the alleged manipulator did in fact follow all of the other rules.  Rather, if the participant intends to and does cause artificial prices or artificial price trends, then the participant has manipulated prices.  If the participant intended to do and did the foregoing, there are no safe harbors.

48.     Although convergence is a hallmark and a primary objective of futures contract trading in the United States, the custom and practice of the commodity exchanges and the CFTC have been not to intervene in trading when manipulation is suspected (except in emergency situations).  Instead, the exchanges and the CFTC have typically allowed the market to "trade out."  After the market has traded out, private parties and others (including the CFTC) may allege that violations of the law or rules against manipulation have occurred or that other deleterious acts occurred.

49.     In the foregoing context, on each trading day, the ICE cotton delivery notices market data reports reflect the number of contracts stopped and issued as of such day and cumulatively by clearing members.[4]

50.     The daily ICE cotton futures contract issues and stops relate to the deliveries of cotton against expiring contracts traded on ICE Futures U.S. in New York.  The notices reflect the movement of cotton to offset each long or short futures position.  Issuers make deliveries, and stoppers take deliveries.

---

[4] *See* ICE, Report Center, available at
https://www.theice.com/marketdata/reports/ReportCenter.shtml.

D.     **Additional Facts of Defendants' Manipulation**

1.     **The Industry Came to Realize that Defendants Were Executing a Short Squeeze, and ICE Responded with New Rules and Position Limits**

        51.     Defendants' short squeeze became widely known within the industry, as

evidenced by reports in industry-related news sources referencing a short squeeze on the cotton

futures market:

- "The scuttlebutt on the floor is that the move in cotton is a big short squeeze." – Rich Ilcyszyn of Lind-Waldock, as stated in an interview with CNBC, February 17, 2011.[5]

- "The action in Cotton Futures the past few months is a perfect example of a commodity putting in a classic 'Blow Off' top. During the final week of the rally when futures were going straight up open interest in the market dropped by over 23,000 contracts indicating the shorts were being forced out of the market.  A classic Short Squeeze resulting in a blow off top in prices." – February 23, 2011 post on cottonfutures.net.[6]

- "The perverse nature of the cotton market was displayed when the May premium to July widened dramatically in the face of thousands of May contracts scheduled to be sold and rolled forward by Goldman Sachs and other index funds. . . . A squeeze appeared to have developed in May, said Sharon Johnson, senior cotton analyst with Penson Futures in Atlanta.  But it is difficult to say for how long and whether it is in futures, options or both, she said." – Duane Howell of the *Lubbock Avalanche-Journal*, April 10, 2011.[7]

- "Cotton futures have offered traders the ultimate roller coaster ride, routinely making limit moves. . . . The quick drop in prices after the May first-notice day and the price disparity between months also offered confirmation that a short squeeze and panic buying had a lot to do with

---

[5] *See* Lee Brodie, "Pro Traders: Cotton Surge Is Short Squeeze; Reversal Likely," CNBC (Feb. 17, 2011), available at https://www.cnbc.com/id/41644805.

[6] *See* Cotton Futures.net (via Wayback Machine) (Feb. 23, 2011), available at https://web.archive.org/web/20110809125403/http://cottonfutures.net/2011/02/23/blow-off-top-in-march-2011-cotton-futures.

[7] *See* Duane Howell, "Old-Crop Cotton Rallies as Deferred Prices Hit New Highs," *Lubbock Avalanche-Journal* (via Wayback Machine) (Apr. 10, 2011), available at https://web.archive.org/web/20110413112653/http://lubbockonline.com/agriculture/2011-04-10/howell-old-crop-cotton-rallies-deferred-prices-hit-new-highs.

Cotton's ascent." – Mike Zarembski of OptionsXpress, posted on theoptionsinsider.com, April 28, 2011.[8]

52.     Indeed, the industry even pointed to LDC's subsidiary, Allenberg, as being the culprit of the short squeeze.  As the trade press reported:

- "Since the cash market has been declining for several weeks in a row now, it was just a matter of time until the futures market would begin to crack as well. . . . The market seemed to finally give up on the idea that a short squeeze in the May contract would propel values significantly higher. However, the short-squeeze still took place, but it played out via a record inversion in the May/July spread instead of a directional move.

    Open interest in the May contract was still stubbornly high at 15,503 contracts at the beginning of session, which was the last before First Notice Day on April 25th.  Shorts continued to scramble out of their positions by rolling into July, pushing the inversion out to over 1900 points by the close.

    After the close we learned that only 13 notices (1,300 bales) were issued for Monday, with all of them being stopped by Allenberg.  This indicates that Allenberg owns all of the remaining open longs in May and this could spell trouble for whoever remains short at this point." – Plexus Cotton Limited, reported on fibre2fashion.com, April 23, 2011.[9]

- "[T]he May/July spread has maintained a 'bullish' appearance despite the strong downtrend, because trapped May shorts are being forced to roll over to July at a stiff inversion.  Allenberg, who is firmly in control of the long side in May, is apparently only letting a small amount of shorts out every day.

    As of this morning there were still 5,350 contracts open in May, which means that over the last three sessions only 1,239 contracts managed to get out.  With Allenberg owning the remaining longs as well as over half of the existing certified stock, anyone who is still short may be in a predicament.  There is not nearly enough certified stock outside of what Allenberg owns, which means that most of these shorts will be forced to

---

[8] See Mike Zarembski, "Cotton Collapse," The Options Insider (via Wayback Machine) (Apr. 28, 2011), available at https://web.archive.org/web/20110510110544/http://www.theoptionsinsider.com/unusualactivity/?id=6872.

[9] Fibre2Fashion, "NY Cotton Market Seems to Be Ready for a Bounce" (Apr. 23, 2011), available at https://www.fibre2fashion.com/news/textile-news/newsdetails.aspx?news_id=98079&page=2 (emphasis added).

pay their way out via a costly May/July spread." – Plexus Cotton Limited,
reported on fibre2fashion.com, April 30, 2011.[10]

(Emphasis added.)  Thus, it was widely known that a short squeeze was on, and that some or all

Defendants were behind it.

53.     In the face of increased volatility in the market, as well as to head off a

potential squeeze that threatened to drive up cotton prices, effective with the March 2011 Cotton

No. 2 futures contract, ICE began to require cotton market participants who expected to carry

positions in excess of 300 contracts into the notice period to file an exemption request form with

the ICE Market Surveillance Department.

54.     To be eligible for an exemption to this position limit, applicants had to

request a specific long or short position sufficient to cover the applicant's bona fide physical

delivery requirements for the contract month's delivery month and the next succeeding calendar

month.  Information had to be provided to demonstrate that the requested position limit is

economically appropriate to the reduction of risks arising from the potential change in the value

of the assets owned by the applicant, such as inventories and fixed-price physical purchases, or

liabilities owed, such as fixed-price physical sales.

55.     An exemption request had to be approved by ICE in order for a market

participant to carry a Cotton No. 2 futures position in excess of the 300-contract spot month

speculative position limit into the Notice Period.  Any exemptions granted would be for a

specified contract month only.

56.     On November 24, 2010, Defendants applied to ICE for an all-months

hedge exemption.  They indicated to ICE that they were merchandising in excess of 9,000,000

---

[10] Fibre2Fashion, "NY Futures Drops; Mills Remain Withdrawn from Market" (Apr. 30, 2011),
available at https://www.fibre2fashion.com/news/company-
news/plexuscotton/newsdetails.aspx?news_id=98311 (emphasis added).

bales of cotton per year and had outstanding sales exceeding 3.5 million bales.  They requested a net long position of up to 70,000 contracts (*i.e.*, 7,000,000 bales) in any one month and a net overall long position limit of 85,000 contracts (*i.e.*, 8,500,000 bales).

57.    ICE granted Defendants the position limits exemptions they requested with the stipulation that at no time should Defendants' positions exceed their bona fide hedging needs.  Upon information and belief, Defendants violated this stipulation by taking long positions that exceeded their bona fide hedging needs.

58.    On April 13, 2011, Defendants established their peak long position of approximately 3.1 million bales (30,032 futures contracts) in the May 2011 Contract.  The next day, ICE instructed Defendants not to increase their long position in the May 2011 Contract beyond their long position at the close of business on that date.

59.    On April 15, 2011, Defendants applied for a notice period hedge exemption for the May 2011 Contract, requesting a long position limit of 11,506 contracts, and stated that they had over 2.3 million bales of unfulfilled cotton sales due for delivery through September.  Upon information and belief, Defendants' holdings of "available stock" in their inventory far exceeded the amounts represented to ICE.

60.    ICE granted Defendants' request on April 20, 2011, with a stipulation that Defendants reduce their position to 600,000 bales by April 27.  On April 26, ICE required Defendants to reduce their position further to 350,000 bales by May 3, 2011.

2.    **Defendants Took Delivery of Over 99% of the ICE May 2011 Cotton No. 2 Contract**

61.    Between April 25 and May 13, 2011, the issuers making deliveries filed notices in respect of 3,928 May 2011 ICE Cotton No. 2 contracts and the stoppers taking deliveries filed notices in respect of the same number of such contracts.  The breakdown in

respect of issues and stops by clearing member firms and stops are set forth below.  Defendant

Term Commodities took delivery of almost 100% of the May 2011 ICE Cotton No. 2 contract.

       a.    **The Issuances by Clearing Member Firms.**  ICE clearing members

issued notices relating to 3,928 May 2011 Contracts as follows:

| Date | Issues By Firm | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 25-Apr | 2-May | 4-May | 5-May | 6-May | 9-May | 10-May | 11-May | 12-May | 13-May |
| ADM Investor Services | 6 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 | 17 |
| Citigroup Global Markets Inc. | 7 | 20 | 0 | 0 | 33 | 0 | 31 | 0 | 0 | 97 |
| JP Morgan | | | | | 203 | 0 | 0 | 0 | 0 | 374 |
| Merrill Lynch Futures Inc. | | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Morgan Stanley Co., Inc. | | 280 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Newedge USA, LLC[11] | | 1179 | 0 | 185 | 94 | 0 | 0 | 100 | 252 | 963 |
| Penterra Div. of FC Stone, LLC | | | | | | | | | | 1 |
| RJ Obrien and Associates LLC | | | | | 1 | 11 | 3 | 0 | 0 | 58 |
| Term Commodities | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

---

[11] Plaintiffs issued their delivery notices through Newedge USA, LLC ("Newedge").  The vast majority of the total 2,773 May 2011 Contract notices issued by Newedge were on behalf of Plaintiffs.

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| UBS Securities LLC | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Totals** | **13** | **1489** | **1** | **185** | **331** | **11** | **34** | **100** | **254** | **1510** |

Upon information and belief, Plaintiffs' deliveries on the May 2011 Contract were among the largest quantities ever delivered on an ICE cotton futures contract, and were greater than total deliveries in all but two contract months in ICE history.

   b. **The Taking of Deliveries by Defendants.** Defendants, through Term Commodities, took delivery of 3,898 of 3,928 May 2011 Contracts (99.23% of stops by all clearing member firms) as follows:

| Stops By Firm | | | |
|---|---|---|---|
| Date | Term Commodities | All Other Clearing Members | Totals |
| 25-Apr | 13 | 0 | 13 |
| 2-May | 1481 | 8 | 1489 |
| 4-May | 1 | 0 | 1 |
| 5-May | 184 | 1 | 185 |
| 6-May | 329 | 2 | 331 |
| 9-May | 11 | 0 | 11 |
| 10-May | 34 | 0 | 34 |
| 11-May | 99 | 1 | 100 |
| 12-May | 252 | 2 | 254 |
| 13-May | 1494 | 16 | 1510 |
| **Totals** | **3898** | **30** | **3928** |

Source:  www.theice.com.  The figures reflect the number of ICE contracts involved in deliveries.

Each contract represents 50,000 pounds net weight.

      c.      **Uneconomic Failure to Re-tender; Decertification.**  As the above numbers and those in ¶ 63 reflect, Defendants did not re-tender or sell back on the ICE any of the certificated cotton of which Defendants took delivery.  Because ICE cotton during April–May 2011 and again in June–July 2011 was the highest-priced cotton in the world, it was economic for Defendants to re-tender same.  In such circumstances, where ICE cotton was costlier than cotton available off-exchange, it was uneconomic for Defendants to refuse to re-tender.  Such uneconomic refusal to re-tender depleted deliverable supplies and further inflated prices.  This conduct is contrary to a cotton merchant's economic self-interest and only makes sense as part of a strategy to manipulate the May and July 2011 Contracts.

      d.      **Uneconomic Depletion of Cash Market Supplies Available for Delivery on the May 2011 and July 2011 Contract.**  Further depleting the deliverable cash market cotton supply, Defendants decertified all of the cotton of which they received delivery on the ICE in the May 2011 Contract.  Defendants' uneconomic refusal to re-tender and extreme decertification of 100% of such cotton further depleted available deliverable cash market supplies on the May 2011 Contract from April 25, 2011 forward, and on the July 2011 Contract, especially from the surprisingly large decertification by Defendants on June 1–2, 2011.

      e.      Defendants' foregoing uneconomic conduct inflated prices on the May 2011 Contract from April 25 until the end of trading therein, and in the July 2011 Contract from at least June 1, 2011 forward.

      f.      **Load-Out Orders.**  To the extent that Defendants moved the cotton out of ICE warehouses, this created another evil of manipulation: an economic waste of moving cotton into and out of the warehouses.  The deliveries taken by Defendants alone on the May 2011

Contract were **2.02** times the certified cotton stocks at the start of the notice period.  This was 56% greater than the next highest ratio of (i) **all** deliveries made in any prior ICE contract to (ii) the quantity of certificated stocks in the ICE warehouse at the start of the notice period.

**3.**     **Continuing Their Pattern of Uneconomic Conduct, Defendants Took Delivery of Over 99% of the ICE July 2011 Contract**

62.     Industry publications began discussing the threat of a repeat squeeze in advance of the July 2011 Contract:

> Cotton that was squeezed to the board in May is being taken away and presumably shipped overseas, leaving few tenderable bales for July. <u>The lack of tenderable bales obviously makes July more vulnerable to a squeeze not unlike what was seen in the May contract</u>. . . . [T]he July/December spread traded well over 8,000 contracts and should have resulted in a large drop in July open interest and equally large gain in December's open interest.  What we saw this morning was a modest 1,595-contract drop in the July versus a 4,263-contract gain in December open interest.  This anomaly in open interest is consistent with what one might see when somebody is preparing a long position to take delivery of a contract, also referred to as a squeeze.[12]

63.     Between June 24 and July 14, 2011, the issuers making deliveries filed notices in respect of 1,629 July 2011 Contracts and the stoppers taking deliveries filed notices in respect of the same number of such contracts.  The breakdown in respect of issues and stops by clearing member firms and stops are set forth below.  Defendant Term Commodities took delivery of almost 100% of the July 2011 ICE Cotton No. 2 contract.

a.     **The Issuances by Clearing Member Firms.**  ICE clearing members issued notices relating to 1,629 July 2011 Contracts as follows:

---

[12] *See* FC Stone After-Market Cotton Report (June 2, 2011) (emphasis added).

| | Issues By Firm | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | 24-Jun | 27-Jun | 28-Jun | 29-Jun | 30-Jun | 1-Jul | 5-Jul | 6-Jul | 7-Jul | 8-Jul | 11-Jul | 12-Jul | 13-Jul | 14-Jul |
| ADM Investor Services | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Citigroup Global Markets Inc. | | 10 | 6 | 0 | 0 | 0 | 0 | 10 | 1 | 0 | 5 | 4 | 15 | 153 |
| JP Morgan | 313 | 17 | 0 | 47 | 27 | 41 | 34 | 32 | 31 | 30 | 34 | 31 | 20 | 408 |
| Merrill Lynch Futures Inc. | | | | | | | | | | | | | | |
| Morgan Stanley Co., Inc. | | | | | | | | | | | | | | |
| Newedge USA, LLC | | | | | | | | | | | 29 | 0 | 0 | 0 |
| Penterra Division of FC Stone, LLC | 145 | 0 | 0 | 0 | 0 | 0 | 0 | 98 | 0 | 0 | 38 | 0 | 0 | 44 |
| RJ Obrien and Associates LLC | | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Term Commodities | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| UBS Securities LLC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Totals | 459 | 29 | 7 | 47 | 27 | 41 | 34 | 140 | 32 | 30 | 106 | 35 | 35 | 607 |

b.    **The Taking of Deliveries by Defendants.**  Defendants, through Term

Commodities, took delivery of 1,613 of 1,629 July 2011 Contracts (99.01% of stops by all

clearing member firms) as follows:

| Stops by Firm | | | |
|---|---|---|---|
| **Date** | **Term Commodities** | **All Other Clearing Members** | **Totals** |
| 24-Jun | 455 | 4 | 459 |
| 27-Jun | 28 | 1 | 29 |
| 28-Jun | 7 | 0 | 7 |
| 29-Jun | 47 | 0 | 47 |
| 30-Jun | 27 | 0 | 27 |
| 1-Jul | 41 | 0 | 41 |
| 5-Jul | 34 | 0 | 34 |
| 6-Jul | 139 | 1 | 140 |
| 7-Jul | 32 | 0 | 32 |
| 8-Jul | 30 | 0 | 30 |
| 11-Jul | 105 | 1 | 106 |
| 12-Jul | 35 | 0 | 35 |
| 13-Jul | 35 | 0 | 35 |
| 14-Jul | 598 | 9 | 607 |
| **Totals** | **1613** | **16** | **1629** |

Source:  www.theice.com.  Again, the figures reflect the number of ICE contracts involved in

deliveries.  Each contract represents 50,000 pounds of net weight.

64.    (a)    Almost all of the stopped deliveries for May and July were taken

by a single clearing firm, Term Commodities, which is owned by other Defendants.  Plaintiffs

have good grounds to believe and do allege that Term was working for and on behalf of

Defendants.  That is, from April 25 to May 13, 2011, Defendants took delivery of 3,898 or

99.23% of May 2011 Contracts, and from June 24 to July 14, 2011, Defendants took delivery of

1,613 or 99.01% of May 2011 Contracts.

(b)     Defendants' uneconomic conduct in stopping and refusing to re-

tender record ratios of deliveries and further depleting the deliverable supplies by de-certificating

such cotton are only the most visible culminating tip of the iceberg of many less visible,

uneconomic steps taken by Defendants which uniformly had the effect of inflating and

manipulating prices.  *See* ¶¶ 64-137, *infra*.  Defendants' interconnected series of uneconomic

steps each consisted of highly unusual steps that were contrary to the customs and practices of

cotton market participants, including cotton merchants.

### 4.     Defendants' Large Long Positions in May 2011 Contracts and, Later, July 2011 Contracts

65.     Defendants, through Term Commodities, not only were the dominant

stopper of deliveries.  Defendants also held dominant long positions in, first, the May 2011

Contract and, later, the July 2011 Contract.  *See* ¶¶ 186-192, *infra*. Defendants did so, in part, as

part of spread positions.

66.     Defendants built a "bull spread position," meaning a position in which the

earlier-expiring futures contract is a long position and the later-expiring contract is a short

position, leading up to the FND on the May 2011 Contract.  Defendants' additions to their bull

spread position peaked with a 3,093,200-bale long position.  This, along with Defendants' slower

rate of liquidation compared to other market participants, caused their percentage market share of

the May 2011 Contract long positions to grow from 25.7% on March 30 to **99.4%** on April 25,

2011.  *In re Term Commodities Cotton Futures Litig.*, No. 12-cv-5126 (ALC), 2020 WL

5849142, at *8 (S.D.N.Y. Sept. 30, 2020).

67.     As Defendants' percentage market share of the open interest in the May
Contract increased to the point where Defendants held more than 99% of the long open interest,
the spread between the price of the May 2011 Contract and the price of the July 2011 Contract
generally tended to increase as well.

68.     Defendants' large late buying deprived the shorts (including Plaintiffs) of
liquidity to exit their positions at market-balanced prices.  Although Plaintiffs closely monitored
market data and industry publications throughout the Relevant Periods, Defendants' squeezes in
both May and July 2011 came too rapidly and too late in their respective contract months for
Plaintiffs to avoid massive trading losses caused by Defendants' manipulation.

69.     Between May 23 and June 20, 2011, Defendants were net buyers of
1,797,700 bales of July 2011 Contracts.  Defendants' share of the long open interest in the July
2011 Contract **increased from -0.10% on June 3 to 72.19% on June 24, 2011**, as Defendants
made **99.01%** of the stops of deliveries on the July 2011 Contract.  Thus, even though
Defendants had in April 2011 requested from ICE a long position limit of 11,506 contracts based
on their anticipated sales through September, Defendants still had a net <u>short</u> position as of June
3, which they built into an overwhelming long position over the following three weeks.  This
behavior strongly suggests a scheme by Defendants to repeat their May squeeze, rather than a
genuine need for cotton.  Defendants' large late buying again deprived shorts (including
Plaintiffs) of liquidity to exit or buy out of the contract.  *In re Term Commodities Cotton Futures
Litig.*, No. 12-cv-5126 (ALC), 2020 WL 5849142, at *8 (S.D.N.Y. Sept. 30, 2020).

70.     Plaintiffs' good grounds for alleging these facts include their
contemporaneous records, CFTC Commitment of Traders Reports, the ICE open interest reports,

the motion-to-dismiss, summary-judgment, and class-certification decisions in the class action,
No. 12-cv-5126 (ALC) (KNF) (S.D.N.Y.); *see* ECF Nos. 80, 111, 575, 628.

      71.    During February 2011, the March 2011 Contract Futures Contract, as it
approached the expiration of trading in such contract, gradually ceased to be the most actively
traded cotton futures contract and gradually ceased to be the cotton futures contract with the
largest open interest.  The May 2011 Contract then became the most actively traded cotton
futures contract and the one with the most open interest.

      72.    By the end of February or early March 2011, most of the market had
liquidated their March 2011 Contract positions, or rolled out of the March 2011 Contract and
into the May 2011 Contract.

      73.    (a)    Traders who do not roll generally find ample liquidity to establish
new positions during the time of the rolls.  Given the foregoing facts, it is most likely that
Defendants purchased their long May 2011 Contract positions by late March 2011 and added to
them thereafter during April.

              (b)    Due to a similar but not identical sequence of open interest and
trading in the July 2011 Contract, it is most likely that Defendants purchased July 2011 Contracts
by late May 2011.

              (c)    Just as Defendants took 99-plus percent of the deliveries on each
of the May and July 2011 Contracts, so Defendants held dominant long positions in those
contracts prior to the delivery period and caused highly unusual or unprecedented changes in the
rate of the liquidation of the outstanding open interest in those contracts.

              (d)    The pattern of liquidation in each of the prior years (2008–2010) of
trading in May contracts during the history of ICE (and for the prior five years before ICE,

2003–2007) was very similar.  The May 2011 Contract dramatically deviated from this prior

history of trading in May Contracts.

(e)     Defendants' additions to their long positions and Defendants'

continuing refusal to liquidate their May 2011 Contract long positions caused there to be

between 30% and 379% more open interest in the May 2011 Contract from the 13th trading day

before FND through FND than the historical May contract experience.

(f)     Worse, from the 25th trading day before FND forward, the average

open interest fell on every succeeding trading day for the prior May contracts during the history

of ICE trading.  However, in the May 2011 Contract, the open interest anomalously increased (1)

from the 25th to the 24th day, (2) from the 24th to the 23rd day, (3) from the 23rd to the 22nd

day, (4) from the 22nd day to the 21st day, and (5) from the 21st day to the 20th day.  After these

five straight increases, the open interest in the May 2011 Contract declined on the 19th day.  But

the open interest anomalously increased again (6) from the 18th day to the 17th day, (7) from the

16th day to the 15th day, and (8) from the 12th day to the 11th day before FND.

(g)     In other words, the open interest on the May 2011 Contract

increased on **eight of the twelve trading days** between the 25th day before FND and the 12th

day before FND compared to **zero such increases** in the average open interest in May contracts

over that period.  Plaintiffs have good grounds to believe and do allege that the reasons for the

anomalous increases in the open interest of the May 2011 Contract included Defendants' highly

unusual purchases of additional May 2011 Contract long positions.

(h)     Alleged in the **first column** below are the number of trading days

before FND in the May 2011 Contract; alleged in the **second column** is the cumulative

percentage of the total open interest in the May 2011 Contract on the 26th trading day before

FND, that was liquidated by each such trading day; alleged in the **third column** below is the cumulative average percentage of open interest on the 26th trading day before FND in each of the prior May contracts during the history of ICE trading, that had been liquidated by such trading day; alleged in the **fourth column** is the actual outstanding open interest in the May 2011 Contract on that trading day in 2011; and alleged in the **fifth column** is the amount of the open interest of the May 2011 Contract would have been on that trading day if it had conformed to the average liquidation pattern during the history of ICE May futures contract trading.

| Trading Days until FND | 2011 % Change from Day 26 | Average % Change from Day 26 for Over ICE History of Prior May Contracts | 2011 Open Interest | What 2011 Open Interest Would Have Been Had It Conformed to ICE History of May Contract Average Open Interest |
|---|---|---|---|---|
| 26 | | | 70638.0 | |
| 25 | 0.3 | -0.1 | 70406.0 | 70722.0 |
| 24 | -1.0 | 1.5 | 71310.0 | 69551.5 |
| 23 | -2.1 | 3.0 | 72109.0 | 68500.2 |
| 22 | -2.3 | 4.1 | 72254.0 | 67721.9 |
| 21 | -2.4 | 5.1 | 72354.0 | 67021.8 |
| 20 | -2.6 | 6.6 | 72442.0 | 65966.4 |
| 19 | -1.7 | 8.2 | 71810.0 | 64880.8 |
| 18 | -2.4 | 11.2 | 72351.0 | 62760.5 |
| 17 | -2.3 | 15.1 | 72287.0 | 59952.6 |
| 16 | -2.8 | 17.5 | 72646.0 | 58276.8 |
| 15 | -1.7 | 20.3 | 71838.0 | 56300.8 |
| 14 | 0.1 | 22.2 | 70540.0 | 54991.1 |
| 13 | 0.4 | 25.8 | 70372.0 | 52407.2 |
| 12 | 0.0 | 33.6 | 70654.0 | 46914.0 |
| 11 | 3.6 | 42.4 | 68115.0 | 40709.3 |

| 10 | 13.4 | 50.7 | 61202.0 | 34853.5 |
|---|---|---|---|---|
| 9 | 18.1 | 58.5 | 57820.0 | 29343.1 |
| 8 | 24.9 | 66.7 | 53072.0 | 23517.6 |
| 7 | 30.6 | 73.2 | 49009.0 | 18930.7 |
| 6 | 35.0 | 79.4 | 45891.0 | 14575.3 |
| 5 | 41.6 | 82.6 | 41286.0 | 12320.7 |
| 4 | 57.2 | 89.3 | 30203.0 | 7566.6 |
| 3 | 69.1 | 92.7 | 21802.0 | 5165.3 |
| 2 | 78.1 | 95.3 | 15503.0 | 3350.2 |
| 1 | 90.7 | 96.5 | 6589.0 | 2456.8 |
| 0 | 91.6 | 98.2 | 5936.0 | 1238.7 |

(i)      Based upon the foregoing, in **column one** below, the number of trading days until FND is again alleged.  In the **second column** below, Plaintiffs allege the ratio of the actual open interest in the May 2011 Contract to what that open interest would have been if it had conformed to the liquidation pattern in prior May contracts during the history of ICE trading (again, the results would be similar if at least the first five years prior to ICE trading were added into the average).  That is, each line in column two below reflects the number for that trading date in column four above divided by the number for that trading date in column five above.  Alleged in **column three** below is the percentage by which the actual May 2011 Contract open interest was greater than what the May 2011 open interest should have been based upon historical experience.

| Days until FND | Ratio of May 2011 Open Interest to What May 2011 Open Interest Would Have Been Had It Conformed to ICE History of the May Contract Average Open Interest (2008-2010) | Percentage by Which the Actual May 2011 Contract Open Interest Was Greater Than What 2011 Open Interest Would Have Been Had It Conformed to ICE History of the May Contract Average Open Interest (2008-2010) |
|---|---|---|
| 26 | | |
| 25 | 1.0 | -0.4 |
| 24 | 1.0 | 2.5 |
| 23 | 1.1 | 5.3 |
| 22 | 1.1 | 6.7 |
| 21 | 1.1 | 8.0 |
| 20 | 1.1 | 9.8 |
| 19 | 1.1 | 10.7 |
| 18 | 1.2 | 15.3 |
| 17 | 1.2 | 20.6 |
| 16 | 1.2 | 24.7 |
| 15 | 1.3 | 27.6 |
| 14 | 1.3 | 28.3 |
| 13 | 1.3 | 34.3 |
| 12 | 1.5 | 50.6 |
| 11 | 1.7 | 67.3 |
| 10 | 1.8 | 75.6 |
| 9 | 2.0 | 97.0 |
| 8 | 2.3 | 125.7 |
| 7 | 2.6 | 158.9 |
| 6 | 3.1 | 214.9 |
| 5 | 3.4 | 235.1 |
| 4 | 4.0 | 299.2 |
| 3 | 4.2 | 322.1 |

| 2 | 4.6 | 362.8 |
| 1 | 2.7 | 168.2 |
| 0 | 4.8 | 379.2 |

(j)     As may be seen from column two, for the last nine days of trading the May 2011 Contract, the actual open interest was at least approximately twice as much, for the last six days was at least approximately at least three times as much, and for the last four to two days was at least approximately four times as much as the number of contracts that should have been outstanding under a normal historical liquidation pattern for May contracts.

(k)     Applying the percentage difference between what the May 2011 Contract should have been under ICE historical experience and the extremely high actual May 2011 Contract open interest that Defendants caused shows that Defendants caused the actual open interest to be almost 35% higher than it should have been thirteen trading days from FND *i.e.*, on April 5, 2011; almost 68% higher eleven trading days from FND, *i.e.*, April 7, 2011, and between twice as much and four times greater than it should have been for the remaining trading days until FND.

(l)     These large differences reflect Defendants' uneconomic squeeze of the shorts when was too late to bring new cotton to the ICE warehouse.

(m)     Based on the foregoing and other information, Plaintiffs allege (1) that Defendants' May 2011 Contract long positions far exceeded the available deliverable supply of cotton on the May 2011 Contract during the relevant period;, (2) that Defendants liquidated at least 14,000 to 21,000 May 2011 Contracts long positions from April 18, 2011 until FND and thereafter; (3) that the 14,000 contracts represented 1.4 million bales which constituted, by itself, approximately three times the available deliverable supply; and (4) that Defendants additionally

took their record ratio of deliveries amounting to another 380,000 bales (or 3800 contracts) of cotton.

(n)     Similarly, the CFTC Commitment of Traders Report reflects an anomalous increase in the interest held by producers, merchants and users during late March-early April 2011 followed by an anomalous plunge in such holdings.

(o)     Absent manipulation, the level of backwardation is determined by the level of prices and the level of the excess of demand over the supply.  The lower the level of prices, the lower the backwardation.  Between March 25 and April 27, 2011, the price levels declined from above $2.00 to less than $1.80, but the backwardation almost tripled from 7 cents to 21 cents.  The backwardation should commensurately have gone down.  In essence, the backwardation fell from 12 cents to 6 cents between March 11 and March 30 consistent with the cancellation of export orders and the deteriorating supply-demand fundamentals for cotton. However, due to Defendants' conduct, the backwardation reversed and began to increase contrary to the fundamentals and the falling price levels:

| Date | May 2011 Contract Closing Price | May 2011 - July 2011 Backwardation |
|---|---|---|
| 3/11/2011 | 204.94 | 11.69 |
| 3/14/2011 | 197.94 | 11.69 |
| 3/15/2011 | 190.94 | 11.69 |
| 3/16/2011 | 185.12 | 9.66 |
| 3/17/2011 | 192.12 | 9.66 |
| 3/18/2011 | 199.12 | 9.66 |
| 3/21/2011 | 198.96 | 9.06 |
| 3/22/2011 | 205.96 | 9.06 |
| 3/23/2011 | 201.87 | 7.94 |

| | | |
|---|---|---|
| 3/24/2011 | 208.82 | 8.33 |
| 3/25/2011 | 204.49 | 7.38 |
| 3/28/2011 | 197.49 | 7.38 |
| 3/29/2011 | 194.88 | 7.09 |
| 3/30/2011 | 193.67 | 6.82 |
| 3/31/2011 | 200.23 | 7.33 |
| 4/1/2011 | 195.55 | 7.45 |
| 4/4/2011 | 195.55 | 8.28 |
| 4/5/2011 | 201.06 | 9.67 |
| 4/6/2011 | 208.06 | 12.64 |
| 4/7/2011 | 208.22 | 13.65 |
| 4/8/2011 | 202.97 | 13.07 |
| 4/11/2011 | 204.58 | 13.67 |
| 4/12/2011 | 199.73 | 14.16 |
| 4/13/2011 | 197.35 | 16.71 |
| 4/14/2011 | 196.04 | 18.04 |
| 4/15/2011 | 195.52 | 18.12 |
| 4/18/2011 | 196.45 | 18.29 |
| 4/19/2011 | 189.82 | 18.66 |
| 4/20/2011 | 183.17 | 16.11 |
| 4/21/2011 | 186.67 | 19.16 |
| 4/25/2011 | 188.08 | 21.69 |
| 4/26/2011 | 181.84 | 21.45 |
| 4/27/2011 | 174.89 | 21.5 |
| 4/28/2011 | 172.82 | 20.8 |
| 4/29/2011 | 178.78 | 20.76 |
| 5/2/2011 | 175.91 | 21.46 |
| 5/3/2011 | 179.21 | 21.7 |
| 5/4/2011 | 173.19 | 21.68 |

(p)     By adding to their May 2011 Contract long position and refusing

to liquidate except at record levels of backwardation, Defendants knowingly created and/or

greatly exacerbated the congestion in which the amount of the open interest in the May 2011

Contract greatly exceeded the amount of cotton that could be timely delivered on the May 2011

Contract.  This congestion was intensified by the long times it took during April–May 2011 to

move cotton from non-ICE warehouses into ICE warehouses and certificate such cotton during

April–May 2011.

(q)     Similarly, for the last eight trading days before FND, Defendants'

large long positions in the July 2011 Contract caused the July 2011 open interest to be between

1.2 and 2.9 times more than it should have been based upon ICE trading history.

| Trading Days until FND | Ratio of July 2011 Open Interest to What July 2011 Open Interest Would Have Been, Had It Conformed to ICE History of the July Contract Average Open Interest (2008–2010) | Percentage by Which the Actual July 2011 Contract Open Interest Was Greater Than What 2011 Open Interest Would Have Been, Had It Conformed to ICE History of the July Contract Average Open Interest (2008–2010) |
|---|---|---|
| 8 | 1.2 | 12.4 |
| 7 | 1.5 | 46.3 |
| 6 | 1.8 | 82.5 |
| 5 | 2.4 | 140.3 |
| 4 | 2.8 | 179.8 |
| 3 | 2.9 | 194.6 |
| 2 | 2.4 | 138.4 |
| 1 | 2.0 | 97.3 |
| 0 | 2.9 | 190.1 |

(r)     Defendants' long positions in the July 2011 Contract well

exceeded the available deliverable supply.  Defendants' long positions in the May 2011

Contracts and July 2011 Contracts exceeded the position limit at all times between March 30 and

May 6 with respect to the May 2011 Contract; and all times between June 7 and July 7 with

respect to the July 2011 Contract.

(s)     Defendants' uneconomic and uncommercial conduct in

establishing and refusing to liquidate their large long positions in the May and July 2011

Contracts coupled with Defendants' other uneconomic conduct (*see* ¶¶ 107(a)-(i)), violated and

failed to satisfy CFTC Reg. 1.3(z)(1)(iv), 17 C.F.R. § 1.3(z)(1)(iv).

(t)     Defendants knew the futures market was an anticipatory and

forward-looking market.  Defendants knew that their unusual conduct during March–April 2011

would cause the May 2011 Contract prices to increase, and that their unusual conduct during

May–June 2011 would then cause July 2011 Contract prices to increase.  This was in anticipation

of the threatened record ratio of deliveries that did in fact occur, and because Plaintiffs and other

shorts had to deal with Defendants to buy out of their short positions in, first, the May 2011

Contract and, later, the July 2011 Contract.

(u)     Defendants' foregoing manipulation produced great net profits for

Defendants from their uneconomic behavior of taking high-priced deliveries and turning down

lower cash market prices, in spite of the expectation that they would attempt to acquire cotton

through means other than stopping deliveries.  However, these profits to Defendants from their

uneconomic conduct caused great damages to Plaintiffs, as well as to the markets generally.

**5.     In Order to Stop Such High Amounts of Deliveries, Defendants Turned Down
       Lower-Priced Cotton Available on The SEAM Cash Market**

74.     The market for physical cotton is a robust one, in which merchants can

deal directly with one another and with producers and suppliers of cotton, as well as transacting

through an online exchange for cash market cotton called The SEAM.  Defendants, along with

other leading agribusiness companies, started The SEAM in December 2000.  The SEAM is the

most widely used online service provider for commercial sales in the cotton industry.  Sellers are provided maximum exposure for sale of their commodities while buyers have real-time access to the most complete inventory in the market.  The SEAM allows growers to market cotton directly to the merchant and mill community, and merchants and textile mills can transact with one another over SEAM.

75.     The SEAM guarantees the credit and the transactions, and effectively acts as the clearinghouse.  It is the buyer to every seller, and the seller to every buyer, and guarantees performance.  Thus, Defendants would have faced The SEAM as its counterparty, if Defendants purchased on The SEAM.  The SEAM also takes extensive measures, as Defendants well know and have stated, to ensure that the quality of cotton delivered meets the terms agreed to by the buyer and seller.  Therefore, there is no credit risk to The SEAM market transactions (or the same amount of low risk to The SEAM transactions as ICE transactions).

76.     As Defendants and The SEAM have repeatedly stated, The SEAM frequently has hundreds of thousands of bales being offered and buyers are able to source virtually any type of cotton year-round.  Cotton offered on The SEAM must have an electronic warehouse receipt, meaning all such cotton is genuinely available U.S. cotton at a specified location and of a specified quality.

77.     Because it is a very active cash market and counterparties are guaranteed by The SEAM itself, The SEAM is recognized by the CCC as the means for making and resolving cotton transactions when there are difficulties or failures to deliver by farmers.  For example, the CCC uses The SEAM to market cotton obtained when farmers default on CCC loans.  Further indicating the reliability of The SEAM, the CCC also uses it to market its cotton

directly to merchants and mills.  Formerly, CCC cotton inventories were sold through the government-based The Cotton Online Processing System.

78.     Through May 2011, as alleged in further detail below, repeated offers were made to Defendants of 800,000 bales of physical cotton (8,000 contracts): 300,000 bales (3,000 contracts) on The SEAM and 500,000 bales (5,000 contracts) offered directly.  In total, therefore, Defendants were offered an amount of cotton roughly equal to their total long position limit granted by ICE.  Notwithstanding the substantial price, quality, and other advantages inherent in such offers, Defendants overwhelmingly refused to accept or otherwise purchase the foregoing offers of cotton.

79.     With respect to the separation of cotton futures contract prices and cotton cash market prices, cotton in the cash market was freely available during April–July 2011.  This was due to cancellations of export orders, declines in near-term demand for cotton, and increases in near-term supplies of cotton.  In fact, cotton was being repeatedly offered in the cash market at lower prices than those in the futures market.

80.     By refusing to cover their long contracts by acquiring physical cotton, Defendants were purporting to need to stand for delivery of vast amounts of physical cotton.  Glencore, a net short that was obligated to deliver physical cotton if it did not cover its short positions, possessed a large amount of tenderable quality cotton, some of which was certificated, and some that was not yet certificated.  As a means of covering its open short positions, Glencore offered that cotton in an EFP transaction, at a price discounted from the May 2011 Contract price.  In this particular EFP, the physical cotton would be exchanged for May 2011 Contract long positions.  Glencore offered physical cotton so as to avoid having to roll or buy futures at artificial prices caused by Defendants' manipulation.

81.     During April–May 2011, there were contemporaneous offers of substantial higher-quality cotton on the public SEAM market than potentially would have been delivered on cotton futures contracts.  In fact, there is a very wide variety of cotton qualities that could be delivered on the cotton futures contract.  Therefore, the cotton actually received on a cotton futures contract delivery could be unusable under many export contracts and many domestic contracts.  Moreover, the cotton on The SEAM was offered at a significantly lower price than the May 2011 Contract price.

82.     These offers were made at prices that were substantially below May 2011 Contract prices.  The cotton for these offers was also available more quickly than through ICE. But Defendants nonetheless uneconomically refused to purchase the lower-priced, high-quality cotton available on The SEAM and in other cash markets.  Instead, Defendants insisted upon deliveries of the high-priced May 2011 Contract, which meant uncertain quality at an uncertain date, while forgoing artificially high-priced sales of the May 2011 Contract in order to satisfy Defendants' May 2011 Contract long positions.  LDC's conduct caused May 2011 Contract prices to further diverge from cash market prices, rather than converging with cash market prices

as future prices usually do when delivery approaches:



a.   **The SEAM Offer**

83.   By April 13, 2011, the May/July spread was approximately 16.71 cents per pound in backwardation.  That day, Glencore offered the open market through The SEAM a material volume of U.S. spot cotton (151,728 bales, or approximately 1,517 contracts' worth), which was priced 50 points per pound, or $2.50 per bale, cheaper than taking delivery of the May 2011 Contract futures.  This represented a total savings of approximately $379,320 compared to taking delivery on ICE or the "board" (taking physical cotton through a futures mechanism).

84.   Of the volume offered, about 30% of it was certificated stocks (the type of cotton long futures holders would receive in the futures delivery process), and the remainder was of a quality that would pass certification, although it had not yet been certified.  Glencore also offered load-out dates between April and June 30, which ensured the long position-holder would

take possession earlier than they might by stopping the May 2011 Contract.  (The final, possible load-out date for cotton delivered on May 2011 contracts was July 22.)

85.     Also on April 13, 2011, Glencore trader Mark Allen emailed William O'Brien, ICE's Manager of Market Surveillance, saying, "[W]e are very concerned with the cotton market at present.  It can hardly be described as orderly or representative of physical market prices and from the outside looks very much like someone is manipulating the market (regardless of what fundamental/technical legitimacy they may have to support their position)."

86.     On April 14, 2011, SEAM employee Charles Garner confirmed that all of the major merchants in this business had viewed Glencore's offers, including Allenberg, Cargill, Noble, Ecom, and Olam.

87.     No bids were received, but Glencore did receive one inquiry.  A representative of The SEAM orally informed Glencore that the prospective buyer was Allenberg.

88.     However, the Allenberg inquiry was not commercially reasonable, for several reasons.  Allenberg requested specific qualities of cotton that were appreciably higher than what is normally traded.  Allenberg also requested delivery to a specific place on the west coast, within an unreasonably short timeframe.  Finally, Allenberg never directly addressed price or quantity.

89.     Allenberg, in its bid, also required that Glencore provide cotton with a quality that was well above tenderable quality, as opposed to cotton that was equivalent to certificated stock.  Further, Allenberg requested that Glencore reconfirm the weight of the cotton—something normally done by a party seeking to certify the cotton, and a term that is not considered industry standard.

90.     Given these facts, along with the fact that no bid was received, even for the certificated stocks, the only logical conclusion—and certainly the most plausible conclusion—is that Allenberg did not actually want to purchase physical cotton.  Instead, Allenberg was pretending it needed cotton, but placing so many obstacles to reaching a delivery agreement that Allenberg knew it would not actually have to take physical delivery.  Instead, Allenberg would be able to force Glencore to trade out of its short futures position, allowing Allenberg to profit from the squeeze.

91.     The reason that Allenberg even engaged in a negotiation is because of ICE's practices regarding its hedge exemptions.  As noted previously, there are deadlines for when a party must reduce its futures position to the ICE-approved position limits of 300 contracts or less, unless that party announces to ICE that it intends to carry through with the physical delivery under the contract.  Thus, when a party carries a net long position into a delivery period, the party must be able to demonstrate to ICE that it must stand for delivery, rather than obtaining cotton through other means—in other words, that it has a bona fide need to purchase physical cotton.  Allenberg's sham negotiations, then, were nothing more than a feint aimed at showing ICE that it was attempting to purchase physical cotton, a feint necessary to maintain its hedge exemption and long May 2011 Contract squeeze position.

92.     The May/July spread was approximately 18.12 cents per pound in backwardation on April 15, 2011.  That day, Glencore increased its SEAM offers of tenderable quality cotton to 303,408 bales, or about 3,034 contracts' worth.  The offer was priced at a discount to (i.e., a "few" percentage points below) taking delivery on ICE.  But once again, despite the availability of this cheaper equivalent or preferred cotton, Defendants did not bid on this cotton.

93.     On April 18, 2011, The SEAM reported that Allenberg asked if delivery FOB Long Beach, California, by May 20 (four weeks) was possible.  Allenberg also requested the seller to load containers with numerous quality parameters, but did not specify the usual commercial details for a transaction, including but not limited to payment terms.  Even after two further requests, Allenberg refused to provide more details.

94.     On April 19, 2011, the SEAM reported Allenberg was not willing to buy on the terms offered.  No further bid was received.

b.     **The Direct Offer**

95.     On April 19, 2011, the May/July spread was approximately 18.66 cents per pound in backwardation.  That day, Glencore tried again, directly emailing major market participants (including Allenberg, Cargill, Olam, and Noble) with an offer for 300,000 bales, or 3,000 contracts' worth, of tenderable quality cotton with all terms, quality, and price superior to taking delivery of May 2011 Contract futures.  Of that number, 1,537 contracts' worth were fully certificated physical U.S. cotton in certified warehouses.  The offered price was 2 cents per pound below the price that a buyer would pay by simply standing for delivery of May 2011 Contract futures.

96.     As of April 19, there were now 600,000 bales of cotton offered directly to the market at a price that was $10.00 per bale more attractive than "ICE parity" or so called "board parity."  This was $6,000,000 more attractive than taking delivery on the ICE.

97.     LDC made a bid for this cotton, but again, on terms and conditions that were unreasonable and substantially more stringent than the equivalent of taking delivery of May 2011 Contract futures.  Glencore was willing to sell LDC this cotton on terms superior to LDC's taking delivery of May 2011 Contract futures, but LDC's actions again indicated that it did not

want the physical cotton, but instead wanted to force Glencore to trade out of its short futures

against LDC, a manipulation that would earn LDC a significant profit at Glencore's expense.

98.     On April 20, 2011, Glencore increased its direct offer to LDC to 400,000

bales, or 4,000 contracts' worth, and decreased the offer price to 3.5 cents per pound less than

the May 2011 Contract futures.  LDC replied with a bid for cotton with higher quality

specifications, open credit payment terms, and delivery to ICE-certified warehouses by May 18,

a shorter period than offered and a commercially unreasonable delivery window.

99.     Further, LDC demanded samples of the cotton, which is extremely

unusual in U.S. cotton trading.  Samples are unusual because cotton sold through a so-called

"descriptive offer" conforms to a "base grade" level of quality specified by the USDA.  The

USDA provides a scale of premiums and discounts to be applied on delivery of cotton physicals.

If the quality of the cotton delivered is higher than the base grade offered, the buyer pays the set

premiums.  If the quality is lower than base grade, the buyer receives the set discount.  Thus,

there is no need for samples in advance.  If a buyer wants a specific quality of cotton and wants

to deviate from the USDA tables, the buyer will make or respond to a so-called "recap offer" that

specifies the quality, and upon delivery for a recap trade, the buyer has the opportunity to reject

any delivered cotton that fails to meet the recap bid.

100.     Glencore re-offered to LDC the original terms, which remained superior to

taking delivery of May 2011 Contract futures, and increased the offered volume to 500,000

bales, or 5,000 contracts' worth.  LDC refused to amend its unreasonable specifications.

101.     On April 20, 2011, Sylvie Kosorog, of the Legal Department at Glencore

Grain B.V. (which is now Viterra), wrote to O'Brien with a copy to ICE President and Chief

Operating Officer Thomas Farley:

We are very concerned about the lack of convergence between ICE Cotton May11 futures and physical cotton prices, the relationship between May11 and July11 futures prices, the general lack of orderliness in the ICE cotton futures market and the fact that the ICE has allowed these circumstances to develop without the ability, or the will, to prevent it.

We know that Glencore Ltd has offered over 600,000 bales (equivalent to 6,000 futures lots) to the May11 longs directly and through The Seam (the electronic physical trading platform) on EFP terms.  Further more, the offers are in every way a more commercially attractive alternative to taking delivery of ICE futures.  The offer price for these physical bales is more than 2.00 usc/lb more attractive in price than taking delivery of the May11 futures contract.  In absolute terms these psychical [*sic*] offers are approximately six million USD cheaper than the alternative of taking physical delivery.

Despite this, so far, Glencore Ltd has not received a bid for these offers and the responses it has received are merely a stalling tactic aimed at doing everything possible to avoid buying the physical cotton.  We can only deduce that the futures long does not intend to buy the physical on offer despite the offers being legitimate and attractive alternatives to stopping May11.  This appears to us to be nothing more than a blatant and crude market manipulation.

102.    On April 21, 2011, Glencore advised LDC that its terms were

unreasonable, but improved the offer to meet LDC's quality request.  Thus, the offer—in terms

of quality and price—was far superior to taking delivery of May 2011 Contract futures.  LDC

replied with the same unreasonable terms, plus added other, more difficult terms, making a sale

impossible.  LDC's bid was even lower than Glencore's already-low offer, and LDC held the bid

open for only 51 minutes.  Further, LDC made its offer subject to approval, giving LDC an "easy

out" to renegotiate or cancel.

103.    Thus, again, a fair inference from LDC's conduct is that LDC was

pretending it needed cotton physicals to deliver on May and June sales, but placing so many

obstacles to reaching agreement that LDC knew it would not actually have to take physical

delivery.  Instead, LDC could force Glencore to trade out of its short futures position, thus allowing LDC to profit from its artificial squeeze.

104.     Glencore did, eventually, sell Allenberg some cotton in the May 2011 Contract notice period.  Specifically, on April 28, 2011, Glencore sold 5,456 bales tenderable quality cotton (approximately 55 contracts' worth) to Allenberg through The SEAM with May load-out dates.  On April 29, 2011, Glencore sold 16,716 bales (approximately 167 contracts' worth) to Allenberg through the SEAM with May load-out dates.  These sales were *de minimis* compared to the volume that LDC purported to need, indicating that Allenberg was making a token purchase in order to bolster its disingenuous position that it needed to buy physical cotton.

105.     In all, Glencore offered 8,000 contracts' worth of cotton to the market, which was in Glencore's possession and ready for delivery at the time of the offer, all on better terms than a buyer would have obtained by standing for delivery.  In total, these offers were more than $8 million cheaper for LDC and Allenberg than taking delivery of certificated stocks on the May 2011 Contract.  Yet Allenberg bought only a total of 222 contracts' worth.

106.     Allenberg's refusal to buy tenderable-quality, United States cotton when offered at discount prices is even more revealing because on May 20, 2011, LDC, acting through its wholly-owned clearing firm Term Commodities Inc., stood for delivery on 3,898 contracts. This number represented 99.2% of all of the contracts for which a buyer stood for delivery in this period.  In other words, with 8,000 total contracts worth of cotton on offer, LDC chose not to buy any of that cotton, and instead forced sellers to deliver physical cotton to LDC—which was all but impossible at the time—or pay an artificially high price to close out their contracts.

107.     (a)     Customs and practices among cotton market participants (including cotton merchants) include the following: (1) to solicit offers of cotton in the cash

market during the month prior to expiration in a futures contract in order to source cotton more cheaply than standing for delivery on a long position; (2) to accept offers, during the month before end of trading in a futures contract, of cotton that provide comparable or better quality cotton at lower prices than standing for delivery on a long position; (3) to source cotton from the cash markets rather than through taking delivery when the cash markets provide lower priced comparable or higher quality cotton than the futures market.

(b)      As alleged herein, Defendants violated the foregoing customs and practices repeatedly during the Relevant Periods.

(c)      Even if there had been time for cotton market participants to bring cotton from other warehouses into the ICE warehouses for delivery during the Relevant Periods, doing so was contrary to what cotton market participants (including merchants) economically and efficiently should have done.

(d)      The "basis" refers to the difference between the futures market price and the cash market price.  The "basis risk" refers to the risk of liquidating a futures contract position at a price that is significantly different from the cash market price.  Defendants' violations of the customs and practices of cotton market participants intentionally caused record increases of the May 2011 and, later, the July 2011 Contract prices above specified cash market prices.  *See infra*.  These record deviations caused record basis risks to materialize.  They damaged persons who had hedged cash market commitments by shorting the May 2011 and, later, the July 2011 Contract, including Plaintiffs—who had to buy out of their futures market short positions at prices far above what they could simultaneously sell their cotton for in the cash market.

108.     Similarly, during June 7 – July 7, 2011, prices in the cash market were even more dramatically lower than the July 2011 Contract prices. However, less physical cotton was offered on The SEAM during the lead-up to FND on the July 2011 Contract than for the May 2011 Contract.  This was because of the failure to obtain any significant transactions or positive results from the offers of physical cotton on the May 2011 Contract, as alleged in ¶¶ 73-83, *supra*.

109.     If Defendants were acting economically, they would have purchased the lower-priced cotton in the cash market and sold their higher priced futures contracts on ICE. Instead, Defendants acted uneconomically and intentionally manipulated and artificially inflated first, May 2011 Contract prices and, later, July 2011 Contract prices.

**6.     Defendants Effectuated Another, Similar Squeeze on the July 2011 Contract**

110.     Defendants' conduct with respect to the May 2011 Contract set the stage for their ability to corner the July 2011 Contract.  By standing for delivery of unprecedented quantities, Defendants depleted the available supply of certifiable cotton that could be delivered on the July 2011 Contract; and this behavior was coupled with a dramatic and rapid shift by Defendants during June 2011 from a net short position to a substantial net long position shortly before the delivery period, creating tremendous pressure on the shorts.

111.     Having successfully implemented their squeeze on the market for the May 2011 Contract, Defendants began to effectuate another squeeze—this time on the market for the July 2011 Contract.  Following essentially the same playbook, Defendants amassed such a massive long position that they once again monopolized the July 2011 Contract, making 99.01% of the stops of deliveries and again causing shorts such as Plaintiffs to incur huge losses.  *See* ¶¶ 62-64, 69, 73(q)-(s), *supra*.

112.     On June 1, 13, 20, and 21, 2011, Allen repeatedly wrote to ICE urging it to take action to prevent a repeat of the May 2011 squeeze, and pointing to evidence of ongoing market manipulation.

113.     On June 17, 2011, Defendants again applied to ICE for a notice period hedge exemption, this time for the July 2011 Contract, requesting a long position limit of 14,000 contracts and stating they had over 1.47 million bales of unfulfilled cotton sales due for delivery through October.  As of June 20, 2011, Defendants held a long futures position of approximately 1.17 million bales on the July 2011 Contract.  *In re Term Commodities Cotton Futures Litig.*, No. 12-cv-5126 (ALC), 2020 WL 5849142, at *7 (S.D.N.Y. Sept. 30, 2020).

114.     On June 21, 2011, ICE granted Defendants an exemption equivalent to 9,000 contracts.  *Id.*

115.     Between June 3 – 24, 2011, the inversion between the July 2011 Contract price and the October 2011 Contract price increased from 14.03 cents per pound to 38.3 cents per pound.  Between June 14 and July 5, 2011, the July 2011 Contract price was much higher than the cash market price, but on July 6 – 7, the July 2011 Contract price crashed by approximately 20 cents per pound.  *Id.* at *8.

**7.     The Non-Convergence of Futures and Cash Market Prices; the Much Lower-Priced Cotton Available in the Cash Markets**

116.     Beyond Defendants' manipulative and uneconomic behavior with respect to their rapid acquisitions of dominant long positions in May and later July, and their rejections of highly favorable offers of physical cotton, market prices strongly suggest the existence of a squeeze affecting both the May and July 2011 Contracts.  Specifically, in addition to distorted spreads between futures contracts, another indication of manipulation is distorted spreads between cash market prices and futures prices.  However, cash markets frequently will price

directly off of the futures price.  For this and other reasons, some cash market prices sometimes do not provide an independent benchmark with which to measure or evaluate the futures market price.

117.    **Record Divergence Instead of Expected Convergence.**  During the Relevant Periods, the May 2011 Contract and the July 2011 Contract prices each diverged significantly from cash market prices other than the previously alleged SEAM prices.  These include the following two series of cash market cotton prices: (a) USDA 1-1/16 inch SLM cotton deliverable in Memphis, Tennessee and (b) USDA 1 inch SLM cotton deliverable in Memphis, Tennessee.

118.    **USDA Cash Market Cotton 1-1/16-Inch SLM Deliverable in Memphis.**

(a)    *May 2011 Cotton Futures Contract.*  For the period of April 1 – May 6 for the twelve years of 2000 through 2011, the **top twelve** highest spreads between the May cotton futures contract price and the cash market cotton price were **all** in the May 2011 Contract. The largest spread during this period was 20.80 cents on April 28, 2011.  This spread was **almost three times** the highest spread between 2000 and 2010, inclusive.  It was **more than five times** the average spread price during such 2000-2010 period.  The unprecedented spread between the prices of the May 2011 Contract and cash market cotton price in April and May 2011 is a classic badge of manipulation.

(b)    *July 2011 Cotton Futures Contract.*  For the period of June 1 – July 6 for the twelve years of 2000 through 2011, the **top thirteen** highest spreads between the July cotton futures contract and the cash market cotton price were all in the July 2011 Contract. The largest spread during this period was 32.05 cents on June 23, 2011.  This spread was **almost**

**five times** more than the highest spread between 2000 and 2010 inclusive.  It **was more than ten times** the average spread price during the same period.  The unprecedented spread between the prices of the July 2011 Contract price and the cash market cotton price in June and July 2011 is a classic badge of manipulation.

119.    **USDA Cash Market Cotton 1-Inch SLM Deliverable in Memphis.**

(a)     *May 2011 Cotton Futures Contract.*  For the period of April 1 – May 6 for the twelve years of 2000 through 2011, the **top fourteen** highest spreads between the May cotton futures contract and the cash market cotton price were all in the May 2011 cotton futures contract.  The largest spread during this period was 19.63 cents on May 3, 2011.  This spread was **more than two times** the highest spread in all the years prior to 2011 back to 2000.  It was **more than four times** the average spread price during the same period.  The unprecedented spread between the prices of the May 2011 Contract and cash market cotton price in April and May 2011 is a classic badge of manipulation.

(b)     *July 2011 Cotton Futures Contract.*  For the period of June 1 – July 6 for the twelve years of 2000 through 2011, the **top thirteen** highest spreads between the July cotton futures contract and the cash market cotton price were all in the July 2011 cotton futures contract.  The largest spread during this period was 32.34 cents on June 23, 2011.  This spread was **more than four times** the highest spread in all the years prior to 2011 back to 2000.  It was **more than eight times** the average spread price during the same period.  The unprecedented spread between the prices of the July 2011 Contract price and the cash market cotton price in June and July 2011 is a classic badge of manipulation.

120.    Next, Defendants also caused record distortions between the May 2011 Contract price and an index of cash market prices in export markets.

121.    Moreover, Plaintiffs allege below a chart showing the "A-Index" price (an average of the five cheapest offers of various origins, including United States cotton on a CNF Far East basis[13]) compared to May 2011 Contract prices.  In this chart, the green line represents the May 2011 Contract price and the blue line represents the A-Index price.



122.    As the chart indicates, the Cotlook and futures prices usually move closely in tandem.  However, during 2011, the relationship between the A-Index price and the May 2011 Contract price completely separated and disconnected leading up to the May 2011 Contract FND.

123.    These distorted price relationships as well as the quality and availability differentials and the capacity constraints alleged herein, further made it very economic for Defendants to do the following.  They should have sold their high-priced May 2011 Contracts and, later, their high-priced July 2011 Contracts, and purchased cotton at the lower prices in the cash markets.

---

[13] CNF is when the seller pays for all freight charges to destination port, after that the buyer pays all costs for clearance customs duties and transport.

8.      **Divergence from Fundamentals of Supply and Demand**

      a.      <u>**Old Crop**</u>

      124.    Futures prices and cash market prices influence one another.  Therefore, the foregoing dramatic deviations between May 2011 Contract prices and cash market prices, or July 2011 Contract prices and cash market prices, understate the artificiality of the futures prices.

      125.    Demand is directly related to price. That is, as demand decreases, prices tend to fall (all other things equal).  Supply is inversely related to price.  That is, as supply increases, prices tend to fall (all else equal).

      126.    During March–July 2011, there were large numbers of cancellations of cotton sales orders occurring in the United States.  Not only was the overall number of cancellations high.  There were also a very high number of net cancellations and net cancellations of exports.[14]  And there was an extreme constancy of the net cancellations of exports: in 15 out of 16 weeks, there were net cancellations.  This showed that demand for cotton was plummeting.

      127.    <u>**Net Cancellations of Exports.**</u>  From March until August 2011 and continuing thereafter, the USDA reported net cancellations of exports of United States cotton. *See* n.14.  The net cancellation of export orders unexpectedly freed up cotton in the cash market.

      128.    From March 18–31, 2011 there were 49,170 running bales of net cancellations; April 2011 had 185,235 running bales of net cancellations; May 2011 had 110,727

---

[14] Plaintiffs' "net cancellations of exports" data was obtained from the USDA Export Sales Query System.  Net cancellation of exports refers to what the USDA calls "net sales."  The USDA defines "net sales" as: "[t]he sum total resulting from new export sales, increases resulting from changes in destination, decreases resulting from changes in destination, decreases resulting from purchases from foreign sellers, and cancellations resulting from contract adjustments, buybacks, loading tolerances, changes in marketing year, or change in commodity."

running bales of net cancellations; June 2011 had 342,054 running bales of net cancellations; July 2011 had 153,864 running bales of net cancellations.[15]

129. Between March and April 17, 2011, cancellations exceeded old-crop sales in four out of five weeks. By July 17, 2011, new sales had been exceeded by cancellations in 15 of the last 16 weeks.[16]

130. (a) On July 17, 2011, there were unprecedented United States old-crop export sales cancellations.[17]

(b) Defendants did make during the First Quarter of 2011 (i) export contracts that were cancellable at Defendants' option, and (ii) export contracts in which Defendants had an option as to the exact time of shipment. Any such ICA contracts by Defendants would typically never have required ICE-certificated cotton. If any such contracts specified ICE-certificated cotton, they would have been contrary to customs and practices of ICA contracts and would only have made sense as a rationale to justify taking large deliveries on ICE futures contracts.[18]

(c) Consistent with such non-commercial behavior, there was an extraordinary number of cancellations reported on July 17, 2011. If Defendants tried to justify taking large deliveries on the May and/or July 2011 Contract in order to satisfy an export sale

---

[15] *See* USDA Foreign Agricultural Service, Export Sales Query System (via Wayback Machine), available at https://web.archive.org/web/20110903120256/http://www.fas.usda.gov/esrquery/.

[16] *See* Duane Howell, "Global Demand Issues Hammer Cotton as Export Outlook Dims," *Lubbock Avalanche-Journal* (July 16, 2011), available at http://lubbockonline.com/agriculture/2011-07-17/howell-global-demand-issues-hammer-cotton-export-outlook-dims#.T7UOmMWrHdI.

[17] *Id*.

[18] *Id*.

and if that sale was both cancellable at a Defendant's option and in fact cancelled, then this would tend to add to the inference of manipulation.

(d)     Even if Defendants knew they could use and intended to use some or all of the cotton received on delivery of the May 2011 Contract or July 2011 Contract to fulfill supposed fixed time cotton export contracts that had to be shipped at those times, Defendants acted uneconomically for the reasons alleged herein.  That is, Defendants used the most expensive cotton, rather than the most economical cotton, to meet their supposed contract obligations.  This profoundly uneconomic, uncommercial conduct is contrary to that of a cotton merchant and can be explained only as part of a considered strategy to manipulate the May and July 2011 Contracts.

131.     The record U.S. export cancellations confirm that the United States domestic market in general, and specifically ICE Cotton No. 2 May 2011 and later July 2011 futures contracts, were the most attractive sale price and destination for U.S. cotton worldwide. That is, ICE No. 2 was offering the best price to "sell" U.S. cotton to, and the worst price to "buy" U.S. cotton from.  But to the extent of the deliveries they stopped, Defendants uneconomically refused to sell their long positions at these best-selling prices, and instead overpaid to purchase cotton at these worst buying prices for cotton.

132.     USDA statistics show that the amount of the actual cotton available on August 1, 2011 compared to the amount that had been projected by the USDA in March 2011 to be available on August 1, 2011, constituted the highest March 1 – August 1 increase since at least 1990.

133.     The foregoing large **decrease** in actual and near-term **demand** for cotton and large **increase** in the actual and near-term **supply** of cotton meant that prices of cotton for

immediate and near-term delivery should fall relative to prices for delivery further into the future.

134.    In fact, the projected amount of cotton in the carryout—meaning the expected surplus of cotton, *i.e.*, the expected difference between the demand for cotton and available supply—from the 2010 crop was increasing steadily between April and July.  This and the other facts alleged herein should have caused the prices of old-crop cotton to **DECREASE** relative to the prices of new-crop cotton.

b.    **New Crop**

135.    Meanwhile, the USDA projected crop size for the new, 2011 crop **declined** by 11% between April and July 2011.  This meant that, all other things equal, prices for new-crop cotton (*i.e.*, from August 1, 2011) forward should **INCREASE** relative to the price of old-crop cotton (*i.e.*, cotton delivered before August 1, 2011).

136.    Thus, the fundamentals for the old crop (¶¶ 124-134) and the fundamentals for the new crop both indicated that the prices of the expiring futures contract (first, the May 2011 Contract and, later, the July 2011 Contract) price should become much lower relative to the prices of later expiring futures contracts.

c.    **Spreads Moved in the Opposite Direction of That Indicated by the Fundamentals**

137.    However, Defendants' uneconomic conduct (including their insistence upon record ratios of deliveries relative to certificated stocks) caused price relationships to move in the opposite direction.

138.    In a competitive market, increasing backwardation should be associated with stock drawdowns.  This is because, as the present cotton becomes much more valuable or higher priced than cotton in two to three months, the rational economic actors hurry to sell their

cotton at the relatively high prices now available.  Such sales are preferable to continuing to pay storage, insurance, and other charges to hold the cotton in warehouses **for months until the lower prices** are projected to materialize.

139.    During the delivery period on the May 2011 Contract, deliverable cotton stocks were rising while the backwardation was increasing.  This is not expected in a competitive market.  Rising backwardations should be associated with deliverable cotton stock drawdowns.  This also indicates a manipulated market.

140.    The price and deliverable cotton stock movements were highly anomalous, a badge of manipulation, and not consistent with normal competitive market behavior.

**9.**    **Comparison of Average Spreads in 2011 to Average Spreads in 2010**

a.    **May Contract**

141.    The USDA reported (using the USDA's December 2011 World Agricultural Supply and Demand Estimates report) U.S. carryout stocks at 2.95 million bales as at July 31, 2010.  In comparison, the U.S. carryout stocks as at July 31, 2011 were 2.60 million bales, only slightly less than the prior year.  Over the 1990-2010 period, differences in carryout of .35 million bales across years are associated with far smaller differences in spreads across these years, including years with low levels of carryout, than the differences alleged below.

142.    The May 2011 Contract price during the last trading days prior to the FND[19] of such contract, was greater than the price of the July 2011 Contract on the corresponding dates.

---

[19] Data obtained from ICE does not reflect closing prices for these contracts on April 22, 2011.

| Days To FND | Trade Date | May 2011 Contract - Closing Price | July 2011 Contract - Closing Price | Differential |
|---|---|---|---|---|
| 11 | 4/8/2011 | 202.97 | 189.9 | (13.07) |
| 10 | 4/11/2011 | 204.58 | 190.91 | (13.67) |
| 9 | 4/12/2011 | 199.73 | 185.57 | (14.16) |
| 8 | 4/13/2011 | 197.35 | 180.64 | (16.71) |
| 7 | 4/14/2011 | 196.04 | 178 | (18.04) |
| 6 | 4/15/2011 | 195.52 | 177.4 | (18.12) |
| 5 | 4/18/2011 | 196.45 | 178.16 | (18.29) |
| 4 | 4/19/2011 | 189.82 | 171.16 | (18.66) |
| 3 | 4/20/2011 | 183.17 | 167.06 | (16.11) |
| 2 | 4/21/2011 | 186.67 | 167.51 | (19.16) |
| 1 | 4/25/2011 | 188.08 | 166.39 | (21.69) |

143.    Thus, the average difference, which was a backwardation, as reflected in column 4 above, was (17.06) cents per pound.

144.    The May 2010 Contract price for each of the last eleven trading days prior to the FND of such contract, was less than the price of the July 2010 Contract.

| Days To FND | Trade Date | May 2010 Contract - Closing Price | July 2010 Contract - Closing Price | Differential |
|---|---|---|---|---|
| 11 | 4/12/2010 | 78.13 | 79.63 | 1.50 |
| 10 | 4/13/2010 | 80.03 | 81.61 | 1.58 |
| 9 | 4/14/2010 | 79.5 | 81.09 | 1.59 |
| 8 | 4/15/2010 | 80.5 | 82.12 | 1.62 |
| 7 | 4/16/2010 | 80.01 | 81.59 | 1.58 |
| 6 | 4/19/2010 | 79.85 | 81.6 | 1.75 |

| 5 | 4/20/2010 | 82.85 | 84.6 | 1.75 |
| 4 | 4/21/2010 | 83.04 | 85.15 | 2.11 |
| 3 | 4/22/2010 | 82.42 | 84.82 | 2.40 |
| 2 | 4/23/2010 | 84.26 | 86.2 | 1.94 |
| 1 | 4/26/2010 | 84.02 | 85.89 | 1.87 |

145.    Thus, the average difference, which was a carrying charge, was 1.79 cents per pound. Accordingly, although the ending stocks were comparable in 2010 and 2011, the May 2010 Contract actually showed a carrying charge; but 2011 dramatically switched to a record backwardation.  This was due to Defendants' unlawful manipulation and artificial inflation of May 2011 Contract prices.

     b.    **July/December Spread**

146.    The July 2011 Contract price for each of the last eleven trading days prior to the FND of such contract, was greater than the price of the December 2011 Contract on the corresponding dates.

| Days Prior To FND | Trade Date | July 2011 Contract - Closing Price | December 2011 Contract - Closing Price | Differential |
|---|---|---|---|---|
| 11 | 6/10/2011 | 150.03 | 133.65 | (16.38) |
| 10 | 6/13/2011 | 150.95 | 131.58 | (19.37) |
| 9 | 6/14/2011 | 155.54 | 131.78 | (23.76) |
| 8 | 6/15/2011 | 151.96 | 125.8 | (26.16) |
| 7 | 6/16/2011 | 145.96 | 120.18 | (25.78) |
| 6 | 6/17/2011 | 145.18 | 123.77 | (21.41) |
| 5 | 6/20/2011 | 148.73 | 124.07 | (24.66) |
| 4 | 6/21/2011 | 154.73 | 124 | (30.73) |
| 3 | 6/22/2011 | 161.22 | 121.45 | (39.77) |

| 2 | 6/23/2011 | 164.55 | 119.4 | (45.15) |
| 1 | 6/24/2011 | 165.22 | 121.92 | (43.30) |

147.     Thus, the average difference, which was a backwardation, as reflected in column 4 above, was (28.77) cents per pound.

148.     The July 2010 Contract price for each of the last eleven trading days prior to the FND of such contract, was greater than the price of the December 2010 Contract on the corresponding dates.

| Days To FND | Trade Date | July 2010 Contract - Closing Price | December 2010 Contract - Closing Price | Differential |
|---|---|---|---|---|
| 11 | 6/10/2010 | 82.51 | 79.07 | (3.44) |
| 10 | 6/11/2010 | 81.54 | 78.94 | (2.60) |
| 9 | 6/14/2010 | 82.56 | 79.47 | (3.09) |
| 8 | 6/15/2010 | 81.97 | 79.62 | (2.35) |
| 7 | 6/16/2010 | 81.77 | 79.7 | (2.07) |
| 6 | 6/17/2010 | 80.8 | 79.42 | (1.38) |
| 5 | 6/18/2010 | 81.78 | 78.95 | (2.83) |
| 4 | 6/21/2010 | 82.15 | 79.17 | (2.98) |
| 3 | 6/22/2010 | 82.46 | 79.21 | (3.25) |
| 2 | 6/23/2010 | 84.45 | 78.16 | (6.29) |
| 1 | 6/24/2010 | 84.48 | 78.72 | (5.76) |

149.     Thus, the average difference, which was a backwardation, as reflected in column 4 above, was (3.28) cents per pound. Although the end-of-year supplies were comparable, the backwardation in 2011 was almost nine times greater than that in 2010.  This

was due to Defendants' unlawful manipulation and artificial inflation of the July 2011 contract prices.

        c.     **July/October Spread**

150.    The July 2011 Contract price for each of the last eleven trading days prior to the FND of such contract, was greater than the price of the October 2011 Contract on the corresponding dates.

| Days Prior to FND | Trade Date | July 2011 Contract - Closing Price | October 2011 Contract - Closing Price | Differential |
|---|---|---|---|---|
| 11 | 6/10/2011 | 150.03 | 139.67 | (10.36) |
| 10 | 6/13/2011 | 150.95 | 139.58 | (11.37) |
| 9 | 6/14/2011 | 155.54 | 138.54 | (17.00) |
| 8 | 6/15/2011 | 151.96 | 133.45 | (18.51) |
| 7 | 6/16/2011 | 145.96 | 127.46 | (18.50) |
| 6 | 6/17/2011 | 145.18 | 129.61 | (15.57) |
| 5 | 6/20/2011 | 148.73 | 129.29 | (19.44) |
| 4 | 6/21/2011 | 154.73 | 130.33 | (24.40) |
| 3 | 6/22/2011 | 161.22 | 128.22 | (33.00) |
| 2 | 6/23/2011 | 164.55 | 125 | (39.55) |
| 1 | 6/24/2011 | 165.22 | 126.92 | (38.30) |

151.    Thus, the average difference, which was a backwardation, as reflected in column 4 above, was (22.36) cents per pound.

152.    The July 2010 Contract price for each of the last eleven trading days prior to the FND of such contract, was greater than the price of the October 2010 Contract on the corresponding dates.

| Days Prior to FND | Trade Date | July 2010 Contract - Closing Price | October 2010 Contract - Closing Price | Differential |
|---|---|---|---|---|
| 11 | 6/10/2010 | 82.51 | 78.64 | (3.87) |
| 10 | 6/11/2010 | 81.54 | 78.53 | (3.01) |
| 9 | 6/14/2010 | 82.56 | 79.15 | (3.41) |
| 8 | 6/15/2010 | 81.97 | 79.32 | (2.65) |
| 7 | 6/16/2010 | 81.77 | 79.28 | (2.49) |
| 6 | 6/17/2010 | 80.8 | 79.16 | (1.64) |
| 5 | 6/18/2010 | 81.78 | 78.56 | (3.22) |
| 4 | 6/21/2010 | 82.15 | 78.91 | (3.24) |
| 3 | 6/22/2010 | 82.46 | 79.39 | (3.07) |
| 2 | 6/23/2010 | 84.45 | 79.56 | (4.89) |
| 1 | 6/23/2010 | 84.48 | 80.01 | (4.47) |

153.     Thus, the average difference, which was a backwardation, as reflected in column 4 above, was (3.27) cents per pound.

154.     In other words, the backwardation in 2011 was seven times greater than that in 2010. This notwithstanding comparable amounts of carryout supplies of old-crop cotton in 2010 and 2011, and declining near-term demand during 2011.

**E.     Defendants' Monopoly Power**

155.     The relevant product market is the long position in the expiring ICE cotton futures contract or the market for taking deliveries on such Contract. From March 30 until the end of May 2011, this was for the May 2011 Contract.

156.     From June 7 until the end of July 2011, this was for the July 2011 Contract.

157.    Defendants attempted and effectuated a scheme to monopolize and did monopolize the relevant market.  During May and July 2011, Defendants acquired 99-plus percent of same.

158.    Defendants did so through restrictive and anticompetitive means.  These include uneconomically overpaying for cotton and forcing deliveries to happen on the May 2011 Contract and July 2011 Contract that could have been satisfied much more cheaply in the cash market.

159.    Through such violation, Defendants uneconomically and restrictively obtained and exercised control over prices, first, of the May 2011 Contract and, later, of the July 2011 Contract.

160.    Defendants' price control over the May 2011 Contract and the July 2011 Contract reflects monopoly power.

**F.    Motive**

161.    Plaintiffs disclaim any burden to plead the motive of Defendants in manipulating prices.  But Plaintiffs have good grounds to believe and do allege as follows.  In manipulating a public market, it is better to work in concert with associates.  *Strobl v. N.Y. Merc. Exch.*, 582 F. Supp. 770, 775 (S.D.N.Y. 1984), *aff'd*, 768 F.2d 22 (2d Cir. 1985).  The record backwardation and dislocations that Defendants relentlessly caused, during March 30 – May 6, 2011 and June 7 – July 7, 2011 enabled Defendants to gain financially from, first, the artificially high May 2011 Contract prices and, later, the artificially high July 2011 Contract prices compared to Defendants' financial return if normal price relationships had prevailed.

**10.      Plaintiffs Incurred Artificially Induced Losses on Their Cotton Futures Positions**

a.      **Glencore**

162.     Up to and including April 2011, Glencore owned physical cotton stocks of several origins of cotton, including cotton of U.S. origin.  In order to hedge against future price decreases for this cotton, Glencore hedged these physical cotton positions with cotton futures short positions.

163.     Before April 29, 2011, Glencore, as a hedger with physical stocks, had an ICE-approved exemption of 3,436 short Cotton No. 2 contracts for its bona fide hedging requirements on physical cotton stocks.  At that date, Glencore had a Cotton No. 2 futures position of 2,382 short contracts.

b.      **Viterra**

164.     Viterra holds physical cotton from various origins throughout the world, but not from the United States.  In order to hedge against future price decreases for this cotton, up to and including April 2011, Viterra hedged these physical cotton positions with over 14,000 cotton futures short contracts.

165.     Despite having stocks of non-United States cotton, Viterra did not hold any United States cotton, and therefore, did not have any ICE-approved exemption to carry a Cotton No. 2 futures position in excess of the 300-contract limit into the Notice Period.

166.     As a result, Viterra was forced to buy all of its short futures hedges before the notice period, or roll them to the following contract period.

c.      **Plaintiffs' Positions**

167.     Plaintiffs' positions on the May 2011 Contract were as follows between March 30 and May 13, 2011.  Negative numbers indicate a net short position.

| Date | Plaintiffs' Combined Net Positions |
|------|-----------------------------------:|
| 3/30/2011 | -17,484 |
| 3/31/2011 | -16,320 |
| 4/1/2011 | -16,320 |
| 4/4/2011 | -16,330 |
| 4/5/2011 | -16,534 |
| 4/6/2011 | -16,776 |
| 4/7/2011 | -16,729 |
| 4/8/2011 | -16,730 |
| 4/11/2011 | -15,899 |
| 4/12/2011 | -15,127 |
| 4/13/2011 | -15,050 |
| 4/14/2011 | -14,854 |
| 4/15/2011 | -14,332 |
| 4/18/2011 | -8,537 |
| 4/19/2011 | -7,702 |
| 4/20/2011 | -7,189 |
| 4/21/2011 | -2,436 |
| 4/22/2011 | -2,436 |
| 4/25/2011 | -2,436 |
| 4/26/2011 | -2,436 |
| 4/27/2011 | -2,436 |
| 4/28/2011 | -2,382 |
| 4/29/2011 | -2,382 |
| 5/2/2011 | -1,038 |
| 5/5/2011 | -731 |
| 5/6/2011 | -880 |
| 5/13/2011 | 0 |

168.    Plaintiffs' positions on the July 2011 Contract were as follows between June 7 and July 7, 2011.  Again, negative numbers indicate a net short position.

| Date | Plaintiffs' Combined Net Positions |
|------|-----------------------------------:|
| 6/6/2011 | -13,713 |
| 6/7/2011 | -13,461 |
| 6/8/2011 | -13,048 |
| 6/9/2011 | -12,798 |
| 6/10/2011 | -12,467 |
| 6/13/2011 | -9,362 |
| 6/14/2011 | -8,133 |
| 6/15/2011 | -8,404 |
| 6/16/2011 | -8,289 |
| 6/17/2011 | -7,556 |
| 6/20/2011 | -7,396 |
| 6/21/2011 | -6,359 |
| 6/22/2011 | -1,512 |
| 6/23/2011 | 0 |

169.    In addition, Plaintiffs' short positions included options contracts relating to the May and July 2011 Contracts.  As a direct result of Defendants' squeeze, Plaintiffs incurred further losses on those options contracts, in an amount to be determined at trial.

d.    **Plaintiffs Forced to Cover Their Contracts at an Artificially High Price**

170.    On April 29, 2011, ICE reduced Glencore's approved exemption in half, to 1,191 short contracts, effective by the close of business on May 3, 2011.  In order to reduce its futures position, Glencore proceeded to purchase long contracts to cover its position and make deliveries of physical cotton.

171.    On May 2, 2011, Glencore in-house counsel Michael Zografakis wrote to O'Brien (of ICE) in response to this reduction in Glencore's position limits exemption:

> Based on the developments in the market over the last several weeks, it was our intention to roll forward our short May futures to the July trading

period if the spread traded to a reasonable level during the notice period. However, in the event that the May futures remained at a significant premium to the July futures, our intention was to deliver certificated stock against these short futures before the end of the notice period. We were in a position to deliver certificated cotton against all our May futures prior to the end of the notice period; this fact was communicated to ICE on a daily basis. Due to the reduction of our exemption, particularly with such short notice, we were effectively forced to issue delivery notices immediately, potentially precluding a future opportunity to trade out of our position in an orderly and liquid manner.

172.    The May/July spread was trading at a much higher price than it could reasonably have been expected to be absent a squeeze. As a result, Glencore was forced to cover 1,191 contracts for a higher price that would have been incurred without a squeeze. Glencore also incurred further losses from making physical deliveries that it made solely because doing so was a less harmful option than covering the contracts.

173.    Upon information and belief, ICE did not reduce LDC's hedge exemption, on the basis that LDC was representing to ICE that it had a bona fide need to take delivery of cotton. As demonstrated by Glencore's offer to sell that cotton, LDC's statements to ICE were misrepresentations.

174.    Because Viterra did not hold any physical cotton that originated in the United States, Viterra did not have a hedging exemption. Thus, Viterra was forced to cover its entire position of 14,453 cotton futures, again at a price that was far higher than the price could reasonably have been expected to be absent a squeeze. Viterra covered its contracts on different dates during the trading period, generating damages in slightly different amounts for each sale.

175.    In all, Plaintiffs' combined estimated losses as a result of Defendants' market manipulation and monopolization or attempted monopolization are in excess of (i) $100 million on the May 2011 Contract and (ii) $100 million on the July 2011 Contract, for total estimated damages **in excess of $200 million** attributable to Defendants' unlawful conduct.

176.    As mentioned in ¶ 20(a), *supra*, a proposed class-action lawsuit was filed

against Defendants on June 29, 2012, alleging their acts of market manipulation in violation of

the CEA and monopolization or attempted monopolization in violation of Section 2 of the

Sherman Act, among other claims, relating to the May 2011 and July 2011 Contracts.  Plaintiffs

were members of the class, which was certified on February 17, 2022.  *See In re Term*

*Commodities Cotton Futures Litig.*, No. 12-cv-5126 (ALC)(KNF), 2022 WL 485005 (S.D.N.Y.

Feb. 17, 2022).

177.    A form of class notice was approved by the district court on August 10,

2023 (ECF No. 691).  On November 20, 2023, Glencore and Viterra submitted timely notices of

exclusion to the Class Administrator.

## IV.    EFFECTS ON INTERSTATE COMMERCE AND INJURY TO PLAINTIFFS

178.    ICE futures prices are publicly reported in interstate commerce throughout

the United States and the world.  They affect shipments of cotton in interstate commerce.

179.    During the Relevant Periods, purchasers in interstate commerce of, first,

May 2011 Contracts or the cotton-on-call contracts based thereon, and, later, July 2011 Contract

or the cotton-on-call contracts based thereon, paid the artificially high prices caused by

Defendants.

180.    The unlawful agreements and acts alleged herein have had the foregoing

and additional substantial additional anticompetitive effect on interstate commerce within the

United States.

181.    The monopoly, unlawful agreements, and other anticompetitive conduct

restrained commerce, inflated May 2011 Contract prices relative to other prices, inflated July

2011 Contract prices relative to other prices, and otherwise burdened commerce.

## V.   DEFENDANTS' ANTITRUST VIOLATIONS

182.   Beginning on approximately March 30, 2011, and continuing until at least May 6, 2011, and again beginning on approximately June 7, 2011 and continuing until at least July 7, 2011, the exact dates being unknown to Plaintiffs, Defendants attempted and schemed to monopolize, and did monopolize, almost 100% of the relevant market.

183.   In formulating and effectuating their monopolization of the market, Defendants engaged in anticompetitive, restrictive, and exclusionary activities, the purpose and effect of which were to restrain trade in, fix, or manipulate prices ICE cotton futures and options contracts.  These activities included the following:

a.   Defendants took deliveries on (i) 3,898 of 3,928 May 2001 Contracts (99.23% of stops by all clearing member firms), and (ii) 1,613 of 1,629 July 2011 Contracts (99.01% of stops by all clearing member firms).

b.   Defendants acted uneconomically by taking delivery on May 2011 ICE Cotton No. 2 contracts while rejecting offers at lower prices for substantial amounts of equivalent physical cotton prior to the FND of such contract;

c.   Defendants acted uneconomically by taking delivery on July 2011 ICE Cotton No. 2 contracts because substantial amounts of equivalent physical cotton were available in the cash market prior to the FND of such contract;

d.   Defendants otherwise knowingly acted in order to restrain trade.

184.   Defendants' restraint of trade and anticompetitive conduct had severe adverse consequences on competition and price discovery.  Plaintiffs were deprived of normal, competitive trading patterns.  Instead, they were subjected to artificially determined prices and price trends as a direct, foreseeable, and intended result of Defendants' unlawful and

manipulative conduct. As a consequence thereof, Plaintiffs suffered financial losses and were, therefore, injured in their business or property.

**FIRST CAUSE OF ACTION:**
**MANIPULATION IN VIOLATION OF THE**
**COMMODITY EXCHANGE ACT, 7 U.S.C. § 1**

185.    Plaintiffs repeat and re-allege the previous allegations as if fully set forth herein.

186.    (a)    Each Defendant acted in whole or in part through Defendant Term Commodities, Inc. and/or by virtue of each Defendant's ownership of, control over, directions to, or conduct in concert with Defendant Term Commodities, Inc. Defendants intentionally manipulated and artificially inflated May 2011 Contract prices and July 2011 Contract prices.

(b)    In the same manner, Defendants also intentionally exacerbated and abused the preexisting conditions of (1) the relatively low supplies of cotton certificated for delivery on ICE, and (2) the considerable capacity constraints arising from the amount of time that was required to certificate new cotton for delivery on ICE. This intentional exacerbation and abuse further manipulated, artificially inflated, and exacerbated the manipulation of May 2011 Contract prices and July 2011 Contract prices.

187.    According to the *Financial Times*,[20] "Louis Dreyfus Commodities," through its Allenberg subsidiary, was a dominant buyer of ICE cotton futures contracts and dominant stopper of deliveries in the May 2011 Contract and the July 2011 Contract. Louis Dreyfus Commodities and Allenberg each acted, in whole or in very substantial part, through Defendant Term Commodities Inc.

---

[20] Gregory Meyer & Javier Blas, "Cotton Traders Probed on Squeeze," *Financial Times* (May 23, 2012), available at http://www.ft.com/cms/s/0/e2b9f84c-a4eb-11e1-b421-00144feabdc0.html#axzz1zCt643I0.

188.    As previously alleged, cotton was available in the cash markets at substantially lower prices than the prices, respectively, of the May 2011 Contract and July 2011 Contract.  *See* ¶¶ 74-123.  Moreover, large volume offers of cotton were made on The SEAM market in which Defendants, through Defendants Allenberg and Nicosia, were leading participants.  *See* ¶¶ 74-108.

189.    **Role of Each Defendant.**  Plaintiffs have good grounds to believe and do allege as follows.  First, Defendant Nicosia controlled and made the decision for Allenberg to acquire large long positions and stop large numbers of deliveries to satisfy such long positions in the May 2011 Contract and the July 2011 Contract.

190.    Second, Defendant Allenberg purchased its large long positions and took its large deliveries, in whole or in large part, through Defendant Term Commodities.  Defendant Allenberg was a person acting on behalf of, and a person owned or controlled by, Defendants LDC, Louis Dreyfus Company Holding Inc., and Louis Dreyfus Company LLC.

191.    Third, Defendants LDC, Louis Dreyfus Company Holding Inc., and Louis Dreyfus Company LLC (a) acted through Defendant Allenberg and other affiliates to manipulate prices as alleged herein, and/or (b) knowingly and intentionally provided, directly or indirectly, financial assistance, credit, credibility, physical facilities, and other assistance to such manipulation.

192.    The Defendants were not neophytes in the cotton market.  Each well knew of the price distortions and the other publicly available information.  Each actually knew or actually received reports indicating the cotton futures contract positions and conduct of Allenberg, Term Commodities, Inc., and their affiliates.  Each had readily available to them the

full information regarding such long positions and deliveries.  With such knowledge, each Defendant undertook and/or continued its conduct to allow and further the manipulation.

193.    Defendants undertook the activities alleged herein individually, in concert, and as one another's principal, control person, agent, or otherwise acting on behalf of one another within the meaning of Section 2(a)(1)(b) of the CEA, 7 U.S.C. §2(a)(1)(B).

194.    Each Defendant or its control person or principal or agent or a person acting on its behalf specifically intended their activities alleged herein to move or support the prices of, first, May 2011 Contract prices to or at artificial levels and, later, move or support July 2011 Contract prices to or at artificial levels.  As a direct result of such intentional conduct, Defendants' conduct caused such prices and the price trends to be artificial during the Relevant Periods.

195.    In each of the foregoing ways as well as in others, Defendants manipulated ICE cotton futures contract prices in violation of Sections 6(c), 6(d), 9(a), and 22(a) of the CEA, 7 U.S.C. §§ 9, 13b, 13(a), and 25(a) during the Relevant Periods.

196.    Thereby, Defendants proximately caused Plaintiffs injury for which each is entitled to recover the actual damages resulting from the manipulation and other violations of the CEA.

197.    Plaintiffs are also entitled to punitive damages based upon Defendants' willful and intentional violations in the executions of orders through ICE.  7 U.S.C. § 25(a)(3).

198.    The statute of limitations for private claims under the CEA is two years.  7 U.S.C. § 25(c).  The statute of limitations was tolled between June 29, 2012, when the class action was filed, and November 20, 2023, when Plaintiffs submitted their notices of exclusion to the Class Administrator.  Therefore, Plaintiffs' claims under the CEA are timely.

## SECOND CAUSE OF ACTION:
## AIDING AND ABETTING AND CONTROL PERSON
## LIABILITY FOR MANIPULATION

199.    Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

200.    To any extent that any Defendant is not liable under the First Claim, then that Defendant is liable under this Claim. The price distortions alleged herein were publicly available during the Relevant Periods.  Each Defendant knowingly rendered substantial assistance to such manipulation.

201.    Defendants LDC and Louis Dreyfus Company Holding Inc. were the holding companies of Defendants, and willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by Defendants.

202.    Defendant Louis Dreyfus Company LLC is the holding company for various operating companies engaged in LDC's North American businesses of Defendants, and willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by Defendants.

203.    Defendant Term Commodities, Inc. was the clearing member for Defendants, and willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by Defendants.

204.    Defendant Allenberg Cotton Co. is a wholly owned division or company of LDC which is engaged in cotton merchandising for Defendants, and willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by Defendants.

205.    Defendant Joseph Nicosia, at all times relevant herein, was the Chief Executive Officer of Allenberg Cotton Co. and is the Senior Platform Head Cotton trader of the

Louis Dreyfus Commodities Executive Group.  He willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by Defendants.

206.    Defendants each played their component role and each knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein.

207.    Defendants willfully intended to assist the manipulation in violation of the CEA.

208.    Plaintiffs are each entitled to damages for the violations alleged herein.

**THIRD CAUSE OF ACTION:**
**VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**

209.    Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

210.    In violation of Section 2 of the Sherman Act, Defendants monopolized and/or attempted to monopolize the relevant market as previously alleged herein.

211.    Defendants willfully acquired, maintained, and exercised monopoly power over the market for cotton futures.  As alleged herein, it did so by executing an unlawful "market squeeze" or corner in the market for May 2011 Contract and July 2011 Contract futures, thereby controlling and manipulating the available supply of May 2011 and July 2011 cotton futures, and artificially inflating the price of cotton futures sold within the Relevant Market.

212.    Defendants' actions to acquire, maintain, and exercise monopoly power were not a consequence of superior product, business acumen, or historic accident.  Their actions were the consequence of their consciously unlawful plan and practices.  There is no procompetitive justification for Defendants' actions.

213.    As a direct and foreseeable result, Plaintiffs were injured in their property in that they had to pay artificially high prices for May 2011 Contracts, or July 2011 Contracts, or

cotton on-call contracts that were based on the prices of the May 2011 Contract or the July 2011 Contract.

214.    The statute of limitations for claims under the Sherman Act is four years. 15 U.S.C. § 15b.  The statute of limitations was tolled between June 29, 2012, when the class action was filed, and November 20, 2023, when Plaintiffs submitted their notices of exclusion to the Class Administrator.  Therefore, Plaintiffs' claims under the Sherman Act are timely.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

(A)    For a declaratory judgment that Defendants violated the CEA, Section 2 of the Sherman Act, and common law alleged herein;

(B)    For a judgment awarding Plaintiffs actual damages and punitive damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

(C)    For a judgment awarding Plaintiffs treble damages against Defendants as a result of their unlawful anticompetitive conduct alleged herein under applicable federal antitrust law, together with prejudgment interest at the maximum rate allowable by law;

(D)    For an award to Plaintiffs of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(E)    For such injunctive and declaratory relief, and such other and further relief, as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs respectfully demand a trial by jury.

Dated:       New York, New York
             December 22, 2023              **KATTEN MUCHIN ROSENMAN LLP**

                                           By:    /s/ Eliot Lauer
                                                  Eliot Lauer
                                                  Jacques Semmelman
                                                  Nathaniel Ament-Stone
                                                  50 Rockefeller Plaza
                                                  New York, New York 10020
                                                  Phone: (212) 940-8800
                                                  Fax: (212) 940-8776

                                                  *Counsel for Plaintiffs Glencore Ltd. and*
                                                  *Viterra B.V.*