# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GLENCORE LTD. and VITERRA B.V. (f/k/a GLENCORE GRAIN B.V.),<br><br>    Plaintiffs,<br><br>  v.<br><br>LOUIS DREYFUS COMPANY B.V. (f/k/a LOUIS DREYFUS COMMODITIES B.V.), ALLENBERG COTTON CO., LOUIS DREYFUS COMPANY HOLDING INC. (f/k/a LDC HOLDING INC.), TERM COMMODITIES INC., LOUIS DREYFUS COMPANY LLC (f/k/a LOUIS DREYFUS COMMODITIES LLC), and JOSEPH NICOSIA,<br><br>    Defendants. | Case No. 1:23-cv-11125 |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Eliot Lauer
Jacques Semmelman
Julia B. Mosse
Nathaniel Ament-Stone
KATTEN MUCHIN ROSENMAN LLP
50 Rockefeller Plaza
New York, New York 10020
(212) 940-8800

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITES ................................................................................................ iii

PRELIMINARY STATEMENT ...................................................................................... 1

SUMMARY OF ARGUMENT ........................................................................................ 3

FACTUAL BACKGROUND ........................................................................................... 6

    A.   While Professing to Need Cotton, LDC Underbid Its Offers
        to Buy Cotton in the Cash Market ............................................................ 6

    B.   LDC Belatedly Reported New Export Sales to USDA Based on Months-Old
        Contracts, Creating the False Impression of Current Heightened Demand .................. 7

    C.   LDC Continuously Exceeded Its Own Value at Risk Limits ............................... 8

    D.   During the May 2011 Contract Period, Defendants Knew and
        Exploited the Fact That Physical Supply Was Tight .................................... 9

        1.   Events Leading up to the May 2011 Contract Period .......................... 9

        2.   The May Squeeze ...................................................................... 9

    E.   Knowing Physical Supply Was Tight, Defendants Continued to Build
        Their Dominant Long May Futures Position,
        While Refusing to Buy Cotton in the Cash Market ...................................... 11

    F.   LDC Applied for a May 2011 Notice-Period Hedge Exemption,
        Falsely Representing to ICE That It Was a Bona Fide Hedger,
        and ██████████████████████████████████ ........................ 12

    G.   LDC Continued to Reject Glencore Ltd.'s Offers of Tenderable-Quality Cotton,
        and Only Purchased Small Amounts of Cotton in the Cash Market .................. 13

    H.   LDC Stopped the Board for Five Times as Much ICE Cotton █████████
        ██████████████████████████, and Paid Far More Than the Cash
        Price ........................................................................................ 16

    I.   During the July 2011 Contract Period, Defendants Knew and
        Exploited the Fact That Physical Supply Was Tight .................................... 16

    J.   LDC Applied for a July 2011 Notice-Period Hedge Exemption,
        Falsely Representing to ICE That It Was a Bona Fide Hedger,
        and ██████████████████████████████████ ........................ 17

    K.   Three Days After Representing to ICE That Its 9,000 Contract Hedge
        Exemption █████████████████████████████████████
        ████████████████████ ............................................................ 18

    L.   LDC Stopped the Board for Four Times as Much ICE Cotton █████████
        ███████████████████, and Paid Far More Than the Cash
        Price ........................................................................................ 19

M.  Glencore Ltd. and Glencore Grain B.V. Acted Responsibly to Mitigate
Their Losses Caused by LDC's Manipulation of the May and July 2011
Contracts ...................................................................................................... 19

N.  In 2011, Plaintiffs Internally Blamed LDC for Their Losses,
but Made a Business Decision to Hold Off Filing Suit ................................. 21

O.  Neither ICE Nor the CFTC Made Any Findings with Respect
to Market Manipulation or Monopolization, and the CFTC Ceased Investigative
Activity Once the Class Action Was Filed .................................................... 22

LEGAL STANDARD ........................................................................................................ 23

ARGUMENT .................................................................................................................... 24

I.  SUMMARY JUDGMENT ON THE CEA CLAIMS SHOULD BE DENIED ........... 24

A.  There Are Triable Issues of Fact as to Whether LDC Caused
and Intended to Cause Artificial Prices ........................................................ 24

1.  Whether the Price Was Artificial is a Triable Issue................................... 24

2.  Whether LDC *Caused* the Price Artificiality is a Triable Issue of Fact ...... 25

B.  Tightness of Deliverable Supply Is an Issue of Fact for the Jury......................... 29

1.  The Evidence Suffices for the Jury to Find Tightness
of Deliverable Supply in May and July 2011 ............................... 29

2.  Deliverable Supply Can Be Estimated Using Basic Arithmetic.................. 32

C.  LDC'S Purported Defenses Are Invalid and
Do Not Support Summary Judgment................................................. 33

1.  The Effect of Plaintiffs' Alleged Irresponsible Conduct
Is (at Most) a Triable Issue ...................................................... 33

a.  This Court Has Held That Whether Plaintiffs Made
Adequate Delivery Preparations Is an Issue of Fact, and the
Evidence in This Case Favors Plaintiffs Even More Strongly ........... 34

b.  Whether Either Plaintiff Acted "Irresponsibly" in Not Exiting
Its Positions at Earlier Dates is (at Most) an Issue of Fact for Trial... 35

2.  ICE's and the CFTC's "Regulation" of the Cotton Futures Market
Does Not Preclude a Finding of Manipulation or Monopolization ............. 37

II.  SUMMARY JUDGMENT ON THE
ANTITRUST CLAIMS SHOULD BE DENIED........................................................ 39

CONCLUSION..................................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**CASES**

*Cargill, Inc. v. Hardin*,
    452 F.2d 1154 (8th Cir. 1971) ............................................................ 24, 26, 29, 30

*Dougherty v. Carver Fed. Sav. Bank*,
    112 F.3d 613 (2d Cir. 1997) ................................................................ 38

*Garcia v. Heath*,
    74 F.4th 44 (2d Cir. 2023) .................................................................. 24

*Great W. Food Distributors v. Brannan*,
    201 F.2d 476 (7th Cir. 1953) ............................................................... 30

*In re Cox*,
    CFTC No. 75-16, 1987 WL 106879 (July 15, 1987)........................................ passim

*In re Crude Oil Commodity Futures Litig.*,
    913 F. Supp. 2d 41 (S.D.N.Y. 2012) ....................................................... 40

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
    767 F. Supp. 2d 880 (N.D. Ill. 2011) ...................................................... 40

*In re MG Refining & Mktg., Inc. Litig.*,
    No. 94 Civ. 2512 (SS), 1997 WL 23177 (S.D.N.Y. Jan. 22, 1997)........................... 38

*In re Soybean Futures Litig.*,
    892 F. Supp. 1025 (N.D. Ill. 1995) ........................................... 24, 26, 29, 35

*In re Term Commodities Cotton Futures Litig.*,
    No. 12-cv-5126 (ALC), 2020 WL 5849142 (S.D.N.Y. Sept. 30, 2020).......................... passim

*Jae Shin v. Party Well Rest. & Oriental Bakery, Inc.*,
    No. 24-1189, 2025 WL 783737 (2d Cir. Mar. 12, 2025)..................................... 38

*Minpeco, S.A. v. Hunt*,
    718 F. Supp. 168 (S.D.N.Y. 1989) ......................................................... 40

*Ploss v. Kraft Foods Grp., Inc.*,
    197 F. Supp. 3d 1037 (N.D. Ill. 2016) ..................................................... 40

*U.S. Commodity Futures Trading Comm'n v. Parnon Energy Inc.*,
    875 F. Supp. 2d 233 (S.D.N.Y. 2012) ................................................... 26, 30

**OTHER AUTHORITIES**

Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* ........................................... 2

Sherman Act Section 2, 15 U.S.C. § 2 ..................................................... 1, 2

Plaintiffs Glencore Ltd. and Viterra B.V. (f/k/a/ Glencore Grain B.V.) (collectively, "Plaintiffs") respectfully submit this Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (ECF Nos. 110-111) (the "Motion").

## PRELIMINARY STATEMENT

Defendants move for summary judgment based in large measure on purported defenses this Court decisively rejected in the class action (the "Class Action").[1]  Specifically, Defendants would have the Court repudiate its rulings made in the Class Action that: (1) as a matter of law, regulatory oversight does not preclude a private claim for market manipulation or monopolization; (2) the adequacy of Glencore Ltd.'s delivery preparations during the relevant delivery month is a question for the jury; and (3) as a matter of law, each of the May and July 2011 ICE Futures U.S. ("ICE") contracts constitutes a relevant market for a Sherman Act Section 2 monopolization claim. These purported defenses are the very ones this Court already disposed of in the Class Decision. Defendants' conduct is identical in both cases.  The Court's determinations are equally applicable in both cases.  They should not be repudiated.  At a minimum, they do not support summary dismissal of this action.

Stripped of these purported defenses, Defendants cannot seriously contend that no reasonable jury could find them liable for squeezing the ICE futures contract prices for May and July 2011, in light of *their own conduct*.  Briefly stated, in March through July 2011, Defendants exploited a tight market for physical cotton by accumulating a long futures position, steeply escalating their dominant long position only after it became too late for holders of short futures positions to certificate enough cotton to satisfy their obligations through physical delivery.  As

---

[1] *See In re Term Commodities Cotton Futures Litig.*, No. 12-cv-5126 (ALC), 2020 WL 5849142 (S.D.N.Y. Sept. 30, 2020) (the "Class Decision").

their final nail in the coffin, Defendants stood for delivery, trapping the shorts, who were forced to pay inflated prices to close out their positions.

The price inflation was not the result of market forces. It was caused by Defendants' scheme to corner and then squeeze the market for cotton futures, driving up the price. This was unlawful manipulation as well as monopolization, in violation of the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.*, and Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. Plaintiffs suffered losses, not just when Defendants attained their maximal dominant long positions, but starting weeks earlier, when Defendants began accumulating long positions en route to dominance that enabled manipulation. The record is replete with evidence that in perpetrating their schemes, Defendants engaged in multiple deceitful and manipulative acts, which can allow a reasonable jury to find that Defendants knowingly and willfully squeezed (and attempted to squeeze) the ICE futures contract prices in both May and July 2011, causing significant losses to Plaintiffs.

In addition to the purported defenses rejected by the Court in the Class Decision, Defendants raise the following arguments, both of dubious relevance and neither of which justifies summary judgment. First, that Plaintiffs never *publicly* accused Defendants of manipulating the ICE futures contract prices—as if that somehow constitutes a *preclusive admission* that bars the claims. (Motion at 29-30.) Second, that Plaintiffs fired their head cotton trader, Mark Allen, following the loss of hundreds of millions of dollars in May and July 2011—again, as if that insulates Defendants from liability. (*Id.* at 28-29.)

Finally, Defendants challenge certain of Plaintiffs' experts' opinions, while making the claims that (i) there is no evidence that enables a jury to conclude that Defendants' squeezes were the proximate cause of *any* of Plaintiffs' losses (Motion at 36-37), and (ii) to establish a squeeze, the jury must separately find that Plaintiffs quantified the "deliverable supply" of cotton that could

be certificated in time to meet delivery obligations under the May and July 2011 Contracts (*id.* at 31-34). As shown below and in Plaintiffs' Oppositions to the *Daubert* motions, there is ample direct evidence of causation, and there is no requirement that deliverable supply be quantified in order to prove market manipulation. Even if there were such a requirement, Plaintiffs have provided abundant evidence permitting the jury to find tightness of supply.

In sum, the evidence of liability, causation, and damages is more than adequate. The purported defenses do not support summary judgment. The Motion should be denied.[2]

## SUMMARY OF ARGUMENT

During the May and July 2011 contract periods, supply of physical cotton was recognized by ████████████████████████████████████████ as very tight. In each contract month, Defendants exploited the tightness by manipulating the price of cotton futures through a short squeeze—the same short squeezes at issue in the Class Action, in which the Court denied summary judgment.

While asserting defenses that the Court already rejected as bases for summary judgment, Defendants defer to the determination in the Class Decision that there is sufficient evidence for a jury to find that Defendants *intended* to cause price inflation. (Motion at 37.) Plaintiffs are therefore not obligated at this time to present evidence of intent. However, it bears noting that intent will be shown at trial through substantial evidence of Defendants' misconduct, which includes making false representations to ICE; seeking and obtaining ICE exemptions far in excess of their needs; delaying their reporting of export sales to USDA to mislead the market; establishing a dominant long position just weeks before the delivery month, and timing their actions to optimize their trap; behaving in ways that were uneconomical as well as incompatible with their stated

---

[2] Plaintiffs do not concede the relevance or admissibility of any of Defendants' arguments and respectfully reserve the right to move *in limine* to preclude them at trial.

needs, such as claiming severe need for cotton but repeatedly rejecting discounted offers of cotton superior to standing for delivery; and engaging in delayed and manipulative buybacks. If Defendants claim to have innocent explanations, they can present them to the jury.

In their Motion (at 35-37), Defendants argue that Plaintiffs have not met their burden of showing there was price inflation in May and July 2011 futures or that it was caused by Defendants' squeezes. As shown below, Plaintiffs have met their burden on each issue. There is direct evidence of causation because the long (LDC[3]) demanded inflated prices for futures contracts that shorts had to buy in order to exit their positions, in the absence of sufficient deliverable supply. Moreover, Dr. Glen Donaldson, Plaintiffs' financial economist (whose qualifications have not been challenged), has submitted expert reports that analyze the market and Defendants' activities during the May and July 2011 periods. Through detailed analyses, supported by graphs and econometric modeling, Donaldson's work (at least) enables a reasonable jury to conclude that, for each month, Defendants squeezed the futures market and caused price inflation.

Defendants also argue (Motion at 31-34) that Donaldson's methodology is defective, supposedly because he did not *quantify* deliverable supply in his analysis that led him to conclude that Defendants executed a squeeze. Defendants cite no case that requires quantification of deliverable supply, or that identifies the factors to be used for such quantification. Nor do they cite any case that requires the jury to specifically find that supply was tight, or that such a finding cannot be based on the *direct proof* of tightness inherent in the fact that shorts were forced to pay inflated futures prices to liquidate. In any event, there is ample *qualitative* evidence that (above and beyond the evidence of inflated futures prices) allows a jury to find tightness, in addition to

---

[3] References to "LDC" are to the various Louis Dreyfus entities named as Defendants in this action.

Defendants' own *admissions* and the market's documented *recognition* of tightness based on unusual circumstances that raise concerns and suggest irregularities. Although not required, deliverable supply can also be estimated using basic arithmetic, as set forth below.

In addition, Defendants rely on three purported defenses rejected in the Class Decision and equally inapplicable here.

First, as to the purported defense of Plaintiffs' inadequate preparation, the Court held in the Class Decision that the adequacy of Glencore Ltd.'s preparations in the delivery month was for the jury, in light of the substantial evidence of Glencore Ltd.'s adequate preparations and the volume of its actual deliveries.  Class Decision at *27.  The same result should follow here.

In the Motion, Defendants attempt to conjure from whole cloth a defense of "irresponsible" trading, relying on a misreading of *In re Cox*, CFTC No. 75-16, 1987 WL 106879 (July 15, 1987). (Motion at 23-28.)  As the Court recognized in the Class Decision, *Cox* addresses a short's adequate preparations *in the delivery month*.  That has no application to Glencore Grain B.V., which, ████████████████████████████████████████████████████████████
████████████████████████████████████.  Because ICE does not accept non-U.S. cotton in satisfaction of a short position, Glencore Grain B.V. ████████████████████████████████████████
████████████████████████████████████.  Thus, Glencore Grain B.V. acted responsibly, and (as the Court held with respect to Glencore Ltd.) any evaluation of its trading decisions is a question for the jury.

Defendants allege that Plaintiffs contrived the case against them, supposedly with knowledge that Allen was solely responsible for the losses.  (Motion at 24-26, 28-30.)  That is incorrect, and contradicted by contemporaneous evidence, including the fact that in 2011, Plaintiffs
████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████

Second, as to the purported defense based on "regulatory oversight," apart from the Court's holding that regulatory oversight does not defeat a private right of action (Class Decision at *26), the alleged "oversight" by ICE and the CFTC was nothing like Defendants claim. Among other facts, the CFTC ceased its post-hoc investigation as soon as the Class Action was filed. Neither ICE nor the CFTC made any findings regarding market manipulation.

Third, the purported defense to the Section 2 monopolization claim, that Plaintiffs have not defined a proper relevant market, has already been rejected in the Class Decision (at *36), in which the Court held that the May and July 2011 ICE futures contracts constitute a relevant market.

In sum, nothing in Defendants' Motion supports a grant of summary judgment on any issue. The Motion should be denied.

## FACTUAL BACKGROUND

A.    **While Professing to Need Cotton, LDC Underbid Its Offers to Buy Cotton in the Cash Market**

The events leading up to the May and July 2011 squeezes began in March 2011, when Defendants started accumulating their long May futures position. (Pltfs.' Resp. to Defs.' Local Rule 56.1 Statement ("SMF"), ¶¶ 507-510.) ████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████ (SMF ¶¶ 511, 522.)

At the same time, despite a claimed need for cotton, LDC avoided acquiring physical cotton. While purporting to attempt to buy back cotton it had agreed to sell, on March 7, ██████

███████████████████████████████████████████████████

**B.    LDC Belatedly Reported New Export Sales to USDA Based on Months-Old Contracts, Creating the False Impression of Current Heightened Demand**

USDA export sales reports for the weeks ending March 17 and 24, 2011, surprised the market by reporting positive net sales of U.S. cotton, contrary to the market trend of rapidly falling demand for U.S. cotton due to extraordinarily high prices as compared to non-U.S. cotton.  (SMF ¶¶ 497, 499.)  The March 17 report showed 45% of U.S. exports going to Vietnam, where Texhong, one of LDC's largest customers, was based.  (SMF ¶¶ 497-498.)  The March 24 report showed a large number of net exports to China.  (SMF ¶ 499.)

In reaction to these reports,

7



**C.    LDC Continuously Exceeded Its Own Value at Risk Limits**

Value at Risk (VaR) is a statistical measure that estimates the maximum potential loss of a financial investment or portfolio over a specific period.  (SMF ¶ 474.) ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[4] This statement is admissible pursuant to Federal Rule of Evidence 804(b)(3)(A) (statement against interest) and 801(d)(2)(E) (statement by coconspirator).

████████████████████████████████████████████████

[6] LDC's 2012 Annual Report confirms that its market risk limits "are based on" VaR and that VaR "represents an estimate, with a confidence level of 95%, of the potential loss that is not expected to be exceeded" and that "losses exceeding the VAR figure are not expected to occur statistically more than once every twenty (trading) days."  (SMF ¶ 480.)  There is no publicly available LDC Annual Report for 2011.  (SMF ¶ 481.)

**D.    During the May 2011 Contract Period, Defendants Knew and Exploited the Fact That Physical Supply Was Tight**

**1.    Events Leading up to the May 2011 Contract Period**

At all relevant times, the supply of physical cotton was very tight.  The USDA estimated that the 2010/2011 crop year presented a very tight supply and demand balance.  (SMF ¶ 464.)

**2.    The May Squeeze**

---

[7] Emphasis is added throughout, except where noted as "emphasis in original."

On April 14, May 2011 futures prices were 5.65¢ per pound higher than USDA-reported cash prices. (SMF ¶ 543). This price gap rose to 15.23¢ the next day, then continued to rise past First Notice Day (April 25), peaking at 19.63¢ May 3 and falling to 18.6¢ May 5, and 8.33¢ May 6, 2011, the Last Trading Day. (SMF ¶ 543.)



████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

E.    **Knowing Physical Supply Was Tight, Defendants Continued to Build Their Dominant Long May Futures Position, While Refusing to Buy Cotton in the Cash Market**

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

**F.**    **LDC Applied for a May 2011 Notice-Period Hedge Exemption, Falsely Representing to ICE That It Was a Bona Fide Hedger, and** ██████████████████████████
████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ Therefore, LDC's

representation to ICE that it would only use the exemption to hedge physical cotton was false.

(SMF ¶ 513.)

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



**G.    LDC Continued to Reject Glencore Ltd.'s Offers of Tenderable-Quality Cotton, and Only Purchased Small Amounts of Cotton in the Cash Market**

███████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████

**H.    LDC Stopped the Board for Five Times as Much ICE Cotton** ████████████████████
████████████████████████████ **and Paid Far More Than the Cash Price**

As of May 13 (Last Notice Day), LDC had stopped notices for 3,898 contracts, and took

delivery of 389,800 bales from the exchange.  (SMF ¶ 547.) █████████████████████████

██████████████████████████████████████  LDC's stop notices represented

136.93% of the highest total of certificated stocks reached during the May 2011 notice period.

(SMF ¶ 548.)  When █████████████████████████████████████  the May futures

price was consistently higher than the USDA spot price, ranging from a 4.8¢-per-pound gap in

early April to a 15-to-20¢-per-pound gap between April 15 and May 5, 2011.  (SMF ¶ 550.)  While

LDC paid substantially more to acquire May futures than it would have paid in the cash market,

those premium payments were dwarfed by the inflated prices LDC forced the shorts to pay for

offsetting contracts.  (SMF ¶¶ 543, 551, 788, 802.)

**I.    During the July 2011 Contract Period, Defendants Knew and Exploited the Fact That Physical Supply Was Tight**

█████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████

███████████████████████████████████████████████



**J.**    **LDC Applied for a July 2011 Notice-Period Hedge Exemption, Falsely Representing to ICE That It Was a Bona Fide Hedger, and** ████████████████████████████

**K.**     **Three Days After Representing to ICE That Its 9,000 Contract Hedge Exemption**

███████████████████████████████████████████

████████████████████

        ████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

**L.    LDC Stopped the Board for Four Times as Much ICE Cotton** ██████████
        ████████████████████████████**, and Paid Far More Than the Cash Price**

        ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████    By July 14, LDC had stopped notices for 1,613 contracts (161,300

bales) from the exchange, ████████████████████████████    (SMF ¶¶ 581, 583.)

LDC's stop notices represented 171.16% of the highest total of certificated stocks reached during

the July 2011 notice period.  (SMF ¶ 582.)

        Between June 17 and July 17, July futures ranged between 9¢ and 32¢ per pound above

the spot price.  (SMF ¶ 577.)  Yet, LDC still chose to stand for delivery of █████████████

████████████████████████████████████████████    thereby paying

a much higher price (SMF ¶ 578) for no economic reason other than squeezing the shorts on the

offsetting sales.

**M.    Glencore Ltd. and Glencore Grain B.V. Acted Responsibly to Mitigate Their Losses
        Caused by LDC's Manipulation of the May and July 2011 Contracts**

        At all relevant times, Glencore Ltd. traded cotton in the U.S., while Glencore Grain B.V.

traded overseas.  ████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

Only certificated U.S. cotton is deliverable against ICE futures positions; Glencore Grain B.V. used ICE futures to hedge ████████████████████████████████████. (SMF ¶ 722.) Therefore, Glencore Grain B.V. had no reason to and ███████████████████████████ ██████████████████████████████; its only option on the exchange was to liquidate its positions, while relying on ICE to monitor the contracts in the direction of equilibrium. (SMF ¶ 722.)[9] ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

In 2011, certificating cotton could take several weeks. (SMF ¶ 528.) ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[8] ████████████████████████████████████████████████████████
████████████████████████████████

[9] Futures contracts are expected to converge with the cash market due largely to the potential for physical delivery of the hedged commodity. (SMF ¶ 544.) In the case of ICE Cotton No. 2 futures, shorts hedging non-deliverable foreign growths are unable to influence such convergence and must rely on ICE to monitor the contract market for uneconomic price gaps with the cash commodity.

███████████████████████████████████████████████████

███████████████████████████████████████

        █████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████

        █████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████

**N.      In 2011, Plaintiffs Internally Blamed LDC for Their Losses, but Made a Business Decision to Hold Off Filing Suit**

        █████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

On September 20, 2011, Mahoney terminated Allen, ████████████████████████

██████████████████████████████████████████

On April 15, 2019, Mahoney publicly referred to LDC's actions in 2011, though he did not expressly name LDC, saying: "Rather than swap US cotton for other cheaper origins, which was the economic thing to do in my view, they maintained their long position in US futures and the market went sky high."  (SMF ¶ 754.)

**O.    Neither ICE Nor the CFTC Made Any Findings with Respect to Market Manipulation or Monopolization, and the CFTC Ceased Investigative Activity Once the Class Action Was Filed**

███████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

In early 2012, the CFTC served document subpoenas on LDC and other market participants related to the May and July 2011 Contracts; the Class Action was filed June 29, 2012.  (Class

Action ECF No. 1.) ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

In December 2012, the CFTC conducted a Rule Enforcement Review of ICE for the period

November 1, 2010 to November 1, 2011 (the "2012 RER"). (SMF ¶ 760.) The 2012 RER did not

mention either the May or July 2011 Contracts, or market manipulation. (SMF ¶ 761.) In the 2012

RER, the CFTC criticized ICE for performing an insufficient investigation in a different matter,

finding that because ICE failed to interview employees of a firm accused of wash trading, it did

not uncover misconduct that it might have with proper investigation. (SMF ¶¶ 763-764.) In July

2014, the CFTC conducted an RER of ICE covering the period June 15, 2011 to June 15, 2012

(the "2014 RER"), which did not include the May 2011 Contract, and which also made no mention

of market manipulation. (SMF ¶¶ 766-767.) Neither the 2012 RER nor the 2014 RER exonerated

LDC with respect to the May and July 2011 Contracts. (SMF ¶¶ 762, 768.)[11]

## **LEGAL STANDARD**

"The party seeking summary judgment has the burden to demonstrate that no genuine issue

of material fact exists," and only if the moving party meets that burden does the burden shift "to

the non-moving party to bring forward 'specific facts showing a genuine issue for trial.'" Class

Decision at *10 (citation omitted). In evaluating the motion, a court is required to resolve all

---

[10] ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████

[11] The 2014 RER found that ICE's statements to the CFTC that the Market Surveillance Division "generally takes the advice of the Control Committees" meant that ICE had inappropriately ceded authority to the Control Committees, which under the applicable rules and guidance, should not exercise more than a "consultative" role. (SMF ¶¶ 769-771.) ████████████████████████████████████

ambiguities and draw all permissible factual inferences in favor of the non-moving party. *Garcia v. Heath*, 74 F.4th 44, 49 (2d Cir. 2023) (citation omitted).

## ARGUMENT

I.    **SUMMARY JUDGMENT ON THE CEA CLAIMS SHOULD BE DENIED**

    A.    **There Are Triable Issues of Fact as to Whether LDC Caused and Intended to Cause Artificial Prices**

        1.    **Whether the Price Was Artificial is a Triable Issue**

Contrary to Defendants' arguments (Motion at 35), a rational jury could find that futures prices were artificial during the relevant periods, given the price analysis conducted by Donaldson, the testimony of cotton traders, and market conditions during the relevant periods.  In determining whether a price was "artificial," courts look at contemporaneous price and market analyses.  *See In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1056 (N.D. Ill. 1995) (finding genuine issue of material fact with regard to price artificiality when spread between near and deferred futures months "exploded to record levels," and where "record inversions in the cash and futures market" occurred); *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1167-70 (8th Cir. 1971) (finding evidence of price artificiality in historical analyses of movements in futures prices, such as the spread between the near and next-to-mature futures months, between futures and cash prices, and between futures traded in the suspect and normal markets); *In re Cox*, 1987 WL 106879, at *8 ("Proof of artificiality generally has focused on significant deviations from normal historical futures market patterns and from related contemporaneous markets.") (citations omitted).

Consistent with case law, Donaldson demonstrates artificiality of the prices during the relevant periods in three ways: ██████████████████████████████████████

████████████████████████████████████████████████████████████



### 2. Whether LDC *Caused* the Price Artificiality is a Triable Issue of Fact

There is direct evidence of causation. ████████████████████████████

████████████████████████████████████████████ Accordingly, the longs *dictate*

*the price* at which they will sell the contract, and thereby *directly cause* the resulting price inflation

through their demands. This happened here, as evidenced by contemporaneous emails from

---

[12] ████████████████████████████████████████████████████████████

████████████████████████████████ Contrary to Defendants' contention, and
as described below, even though the *price* was influenced by supply and demand factors, the *price abnormality* during
the relevant periods was not due to global supply and demand factors, but rather to Defendants' manipulations.

███████████████████████████████████████████████████

████████████████████

Moreover, contrary to Defendants' contention (Motion at 37), Donaldson has addressed causation head-on.[13] ████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████

████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[13] Donaldson applied ████████████████████████████████████████ ██████ which is an appropriate methodology. *See Cargill*, 452 F.2d at 1167-70 (proof of causation sufficient where dominant long actively increased its positions during period of market tightness, followed by price spike); *Soybean Futures*, 892 F. Supp. at 1058 (proof of causation sufficient to show "the existence of artificial prices" based on record backwardations and non-convergence between cash and futures prices); *U.S. Commodity Futures Trading Comm'n v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 248 (S.D.N.Y. 2012) (allegations that defendants held onto long positions, sending pricing signals to the market and creating significant backwardation, were sufficient for causation).

███████ *see also Cox*, 1987 WL 106879, at *4 ("[W]ithout the ability to force shorts to deal with him either in the cash or futures market, the (long) manipulator is not able ***successfully to dictate prices***").

This analysis is sufficient to enable a jury to determine that the cause of the price inflation was Defendants' squeeze. In further support, Plaintiffs' expert Prof. Daniel Spulber █████████



       This confirmatory correlation is not, as Defendants argue (Motion at 36-37), the sole basis

for Donaldson's opinions.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████

In sum, there is sufficient evidence to establish a triable issue of fact as to whether Defendants caused the price artificiality during the relevant periods.

**B.    Tightness of Deliverable Supply Is an Issue of Fact for the Jury**

**1.    The Evidence Suffices for the Jury to Find Tightness of Deliverable Supply in May and July 2011**

Defendants assert (Motion at 30-31) that no reasonable jury could conclude that deliverable supply in May and July 2011 was sufficiently tight to enable Defendants to squeeze the futures prices by standing for delivery. Defendants argue (at 31-34) that the absence of a quantified estimate of deliverable supply entitles them to summary judgment on the theory that market participants were not forced to deal with Defendants but could acquire deliverable supply in the market. That is factually and legally incorrect.

The shorts were forced to deal with LDC and forced by LDC to pay inflated prices to buy offsetting contracts from LDC each month. Further, the law does not require a plaintiff in a manipulation case to *quantify* deliverable supply. To the contrary, while no case recognizes such a requirement, a *qualitative* showing that adequate deliverable supply was not available, or was available only on economically unreasonable terms, is more than sufficient to create an issue of fact for the jury. *See Soybean Futures*, 892 F. Supp. at 1051 (finding triable issues as to deliverable supply where factors such as "time, cost, and difficulty of bringing additional supplies to market" were considered); *Cargill*, 452 F.2d at 1167 (long had manipulated market where "shorts could not fulfill their contracts" through economically reasonable terms in either physical or futures

markets); *U.S. Commodity Futures Trading Comm'n v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 244-51 (S.D.N.Y. 2012) (allegations that defendants refrained from selling their long physical position in tight physical market, leading others to assume that supplies were committed, were sufficient).[14]

Defendants admit that "'the distinction between deliverable supply and supply generally is paramount' when evaluating alleged ability to influence price." Motion at 32 (quoting Class Decision at *25). The CFTC defines "economically deliverable supply" as "[t]hat portion of the deliverable supply of a commodity that is **in position** for delivery against a futures contract and is not otherwise unavailable for delivery." (SMF ¶ 450.) The CFTC further defines "in position" as "a commodity located where it can **readily be moved** to another point or delivered on a futures contract." (SMF ¶ 451.) Consistent with this definition, Donaldson ███████████████

██████████████████████████████████████████████████

████████████████████████████████

In addition, financial considerations, including costs of freight and other logistics, can preclude cotton from being included in deliverable supply. *See Great W. Food Distributors v. Brannan*, 201 F.2d 476, 480 (7th Cir. 1953) ("economically excluding" from deliverable supply any supply with "economic impediment[s]" such as "freight and differential charges"). Likewise, the failure to offer a market premium for delivery of higher-quality cotton is a basis for exclusion from deliverable supply. *See Cargill*, 452 F.2d at 1156 (excluding higher-quality wheat from calculation of deliverable supply because "**no premium was allowed for its delivery**"); *cf. Cox*,

---

[14] That quantification is not required is consistent with the fact that any effort to quantify deliverable supply is highly subjective, as it requires assumptions about timing and cost that are no more than educated guesses, based on arbitrary assumptions as to when shorts should undertake the logistical endeavor and expense to locate, ship, and certificate cotton for delivery. ████████████████████████████████████████

1987 WL 106879, at *10 (including higher grades of wheat in deliverable supply where futures contract included quality premium).

As noted above, the objective evidence reflects market consensus as to tightness of physical supply (*of which deliverable supply is a subset*). Hudson ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████ With

a 30¢ price gap between the cash and futures, shorts had a large profit incentive to deliver physical cotton. (SMF ¶¶ 543, 577.) Thus, the fact there is a sustained non-convergence between the cash and futures market prices is evidence there was tight deliverable supply, as shorts would surely have bought the cotton and delivered it if there was adequate deliverable supply.

There is also abundant evidence that the shorts—including *both* Plaintiffs—were forced to deal with Defendants (either through an expensive delivery option or artificially high futures prices), and had no recourse.  Industry publications reported ██████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████

In sum, there is sufficient evidence for the jury to find that deliverable supply was tight during the relevant periods.

## 2. Deliverable Supply Can Be Estimated Using Basic Arithmetic

In a 2012 publication, Hudson and his coauthors calculated "likely deliverable supply" for the 2008/2009 cotton crop year, finding that a mere 1.8 million bales out of the total physical supply of 12.1 million bales was "likely deliverable."  (SMF ¶ 700.)  To arrive at this figure, Hudson subtracted cotton that was subject to quality constraints, staple penalties, and location constraints.  (SMF ¶¶ 696-699.)

Using Hudson's methodology as the baseline, and reasonably subtracting (i) actual exports and outstanding export sales (cotton already sold for export, but not yet exported), and (ii) the ████████████████████████████████████ yields a plausible estimate of the likely deliverable supply of cotton.  (SMF ¶¶ 701-707.)  After these additions and subtractions, the "likely deliverable supply" for the May future on April 14, 2011 (the day after the Goldman Roll) is estimated to be 595,049 bales.  (SMF ¶ 712.)  For the July future, the "likely deliverable supply" on June 16, 2011 (three days post-Goldman Roll) is estimated to be 655,990 bales.  (SMF ¶ 716.)  These figures are well below LDC's long position on each of these days: 3,002,300, and 1,146,000,

respectively, and even further below the total market long position on those days of 4,900,900 and 2,595,600, respectively. (SMF ¶¶ 714-715, 718-719.)



To the extent the jury would benefit from quantification, the data behind this calculation is more than adequate. While the calculation is no more than an estimate,[15] it reflects the tight supply unequivocally described in the extensive qualitative evidence, namely that deliverable supply was insufficient for the shorts to avoid dealing with Defendants to close out their May and July futures positions.

### C.    LDC'S Purported Defenses Are Invalid and Do Not Support Summary Judgment

LDC argues that its conduct is not actionable because (1) Plaintiffs supposedly acted irresponsibly; and (2) the putative oversight of LDC's conduct by ICE and the CFTC immunizes Defendants. This Court expressly rejected both of these purported defenses in the Class Decision, and should reject them again here.

#### 1.    The Effect of Plaintiffs' Alleged Irresponsible Conduct Is (at Most) a Triable Issue

LDC argues that Plaintiffs cannot prove an injury proximately caused by LDC's conduct because Plaintiffs, through Allen, engaged in "irresponsible" behavior by "fail[ing] to prudently plan for delivery" and not "exit[ing] its futures positions" earlier. (Motion at 23-28.) This Court already held in the Class Decision that the adequacy of preparation to deliver is an issue for the

---

[15] These deliverable supply estimates are plausible only if one assumes that merchants holding cotton were still able to sell it, even though much of it had likely already been sold.

jury.  Class Decision at *27.  LDC's parallel criticism of how Plaintiffs managed their positions in terms of liquidation is likewise an issue for the jury.  The evidence supports the conclusion that Plaintiffs acted appropriately under the circumstances, consistent with the risk tolerance of a sophisticated trading firm.  There is no basis for summary judgment.

> **a.    This Court Has Held That Whether Plaintiffs Made Adequate Delivery Preparations Is an Issue of Fact, and the Evidence in This Case Favors Plaintiffs Even More Strongly**

In the Class Action, relying on *Cox*, 1987 WL 106879, LDC argued—as it does here—that "it was the shorts' inadequate preparations that caused any delivery constraints" and, specifically, that "Plaintiffs did not make any preparation for delivery."  Class Decision at *27.  The Court rejected this argument, focusing on the facts—equally true in this case—that Glencore Ltd. delivered more bales against the May Contract "than the level of ICE certified stocks on April 15, 2011 (i.e., 207,474)" and also "offered as many as 500,000 bales of cotton directly to [LDC] via exchange of futures for physical . . . between April 19-21, 2011."  *Id*.  The Court held that "a reasonable jury could conclude that Plaintiffs did, in fact, make adequate delivery preparations[.]"  *Id.*  The Court should reach the same result here.

With respect to the July 2011 Contract, LDC argues that "ICE explicitly and contemporaneously found Glencore's failure to plan for delivery to be 'irresponsible,'" but LDC ignores that the "major short" to which the ICE CCC was referring was ███████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████  This is not an explicit finding by ICE (as LDC wrongly contends).  It also demonstrates a fundamental lack of awareness on the CCC's part that ████████

████████████████████████████████████████████ In any event, as discussed

below, the CCC's hearsay remark is not binding on the Court or Plaintiffs.

Finally, *Cox*, on which LDC relies for its argument that Plaintiffs had a "prudent-planning

obligation" (Motion at 27-28), only addresses a short's adequate preparations in the delivery

month—████████████████████████████ *Cox* also establishes that the CFTC

does not recognize blame-the-victim defenses to claims of market manipulation. In *Cox*, the CFTC

wrote that if a respondent "took affirmative actions in the marketplace on [the relevant dates]

specifically intending to raise prices to 'artificial' levels and if such 'artificial' prices resulted," the

defendant is liable "regardless of whether the shorts, through their own neglect, actually created

the opportunity for the manipulation or worsened its effect." 1987 WL 106879, at *22 ("If a bank

leaves its vault open overnight and a burglar takes the money, the burglar cannot escape guilt based

on the bank's negligence."). Likewise, in *Soybean Futures*, the court rejected defendants' similar

attempt to "shift the entire burden to the shorts[.]" 892 F. Supp. at 1051. It is not conceded that

LDC can even present its "inadequate preparations to deliver" defense to a jury, but if it can, a

reasonable jury can reject it.

> **b.    Whether Either Plaintiff Acted "Irresponsibly" in Not Exiting Its Positions at Earlier Dates is (at Most) an Issue of Fact for Trial**

LDC argues that Plaintiffs' losses were caused by Allen's decision not to reduce Plaintiffs'

futures positions in the May and July 2011 Contracts prior to the end of the respective Goldman

Rolls. (Motion at 24-26). This is just a repackaging of LDC's "prudent planning" defense that

this Court already held is no basis for summary judgment. Further, while LDC attempts to paint

---

[16] No CCC member explained why it was irresponsible for a major trading company to stand on its position and wait for the market to move closer to equilibrium, rather than pay the higher price of buying back contracts at inflated prices.

Allen as an inexperienced rogue employee, contemporaneous emails and position sheets, as well as deposition testimony by ███████████████████████████████████████

*and* public statements by Mahoney years before this litigation was commenced, establish that the short positions Allen took were hedging net long physical positions. (SMF ¶¶ 722, 725-730, 744-747, 754.) The evidence also reflects that Mahoney, a member of senior management, ████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

██████████████████ (SMF ¶¶ 501, 725-727, 744-749, 754.)

Moreover, Hudson testified ████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ The jury could conclude that such economic decisions were reasonable, and do not relieve Defendants from liability.

Defendants' argument that the Glencore entities publicly and privately blamed Allen (Motion at 28-30) is contrary to the evidence. ███████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████ Not

36

only did Mahoney *publicly* blame the dominant long in May and July futures (LDC), but Defendants themselves cite numerous contemporaneous documents showing ███████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ A reasonable jury could conclude that Plaintiffs recognized from the outset that LDC's squeezes, rather than Plaintiffs' hedging and trading strategies, were the proximate cause of Plaintiffs' losses.

### 2. ICE's and the CFTC's "Regulation" of the Cotton Futures Market Does Not Preclude a Finding of Manipulation or Monopolization

As it did in the Class Action, LDC argues that ICE's and the CFTC's oversight of the cotton futures market and monitoring of LDC's positions precludes a finding of market manipulation. As in the Class Action, LDC's argument fails.

In the Class Decision, the Court observed, "[a]ccording to Defendants, the fact that they complied with ICE's directives undermines allegations that the market was congested and that Defendants acted improperly to exacerbate that congestion." Class Decision at *26. The Court rejected that argument:

> Defendants cite no cases that support the proposition that regulatory oversight from an exchange precludes finding that a defendant had the ability to influence prices. Indeed, if Defendants argument was true, then ICE and the CFTC's regulatory authority alone would significantly undermine the private right of action to enforce commodity laws recognized and affirmed by the Supreme Court.

*Id*. That ruling applies equally in this case.

LDC does not and cannot point to a single statement by ICE or the CFTC that there was "no manipulation." Instead, LDC attempts to extrapolate such a determination from certain actions and statements by the CCC and the CFTC. (Motion at 16-17, 20-21, 26, 28.) LDC ignores that █

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████ Equally unavailing is the so-called "multi-year investigation" by the CFTC (*id.* at 20-21), as there is no evidence of any investigation by the CFTC beyond an initial round of document subpoenas in early 2012.  (SMF ¶¶ 779-781.)

LDC transforms ICE's and the CFTC's inaction into an affirmative finding that LDC did not engage in manipulation.  There are many reasons why a regulator might decide not to exercise discretion to prosecute, including lack of resources—which the CFTC faced in 2011 and 2012— or, ███████████████████████████████████████████ as the SEC did in the case of the Madoff Ponzi scheme.  (SMF ¶¶ 775-778.)  The jury is free to consider these alternative explanations for regulatory inaction.

Even if ICE or the CFTC had made a determination that LDC did not manipulate or monopolize the cotton futures market, it would not be binding.  *See Jae Shin v. Party Well Rest. & Oriental Bakery, Inc.*, No. 24-1189, 2025 WL 783737, at *5-7 (2d Cir. Mar. 12, 2025) (U.S. Department of Labor findings had no preclusive effect); *Dougherty v. Carver Fed. Sav. Bank*, 112 F.3d 613, 623 (2d Cir. 1997) (agency determinations made without adversary hearing and meaningful opportunity to litigate are generally not given preclusive weight).

In *In re MG Refining & Mktg., Inc. Litig.*, No. 94 Civ. 2512 (SS), 1997 WL 23177, at *1-2 (S.D.N.Y. Jan. 22, 1997), then-Judge Sotomayor held that a "decision by [the CFTC] cannot be the basis for collateral estoppel unless it was an adjudicative decision."  *Id.* at *3 (citations and quotation marks omitted).  Although the CFTC's consent order "unequivocally conclude[d]" that the contracts were illegal, "this determination was reached without any hearing" and the party

seeking to enforce the contracts in the private lawsuit "was not a party to the CFTC action." *Id.* This reasoning applies here. Even if ICE or the CFTC had determined that LDC did not engage in manipulation or monopolization, such a determination would not have preclusive effect in this case, as there was no adjudicative decision, process, or hearing.

## II.    SUMMARY JUDGMENT ON THE ANTITRUST CLAIMS SHOULD BE DENIED

Consistent with the Court's ruling in the Class Decision, there are triable issues of fact as to whether LDC committed antitrust violations under Section 2 of the Sherman Act (Count III). In the Class Action, Defendants argued the Class Plaintiffs had "not properly or sufficiently defined the relevant market for purposes of demonstrating monopoly power." (SMF ¶ 443.) The Court rejected that: first, because the evidence that created triable issues as to Defendants' power to control prices made such market definition unnecessary; and second, because the complaint adequately alleged a relevant market. (SMF ¶ 443.)

Plaintiffs have adduced the same evidence that Defendants knew the market for deliverable cotton was tight, built dominant long positions, rejected commercially attractive offers in the cash market despite claiming a severe need for cotton, and engaged in other types of uneconomic conduct intended to squeeze the market. (*See*, *e.g.*, SMF ¶¶ 507-511, 522, 554-558, 568-569, 616-682.) Plaintiffs' Sherman Act Section 2 claim should proceed to trial on this basis alone. Even if Plaintiffs had to define a relevant market, they have done so, by alleging *the very same market definition* as the Class Plaintiffs (ECF No. 1 at ¶¶ 155-156), which the Court held was sufficient as a matter of law. Class Decision at *36. Defendants simply ignore the Court's decision and again argue the defined market "is not legally cognizable." (Motion at 39.) Even if the Court had not already decided this issue, this argument is plainly incorrect.

First, the market definition *expressly does not* "exclude" physical cotton substitutes; the definition includes "the market for taking deliveries on such [futures] Contract," meaning the

market for deliverable cotton.  The complaint's market definition is therefore ████████

████████████████████████████████████████████████████████████████████████████████

████████████████

Second, the case law recognizes that a market for the futures contract or the commodity deliverable against that futures contract *is* a relevant market that can be monopolized, even if the temporal duration of the alleged monopolization was brief, even if the defendant's ability to control prices was short-term and sporadic, and even if the defendant did not have a dominant position in the underlying physical commodity.  *See In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 54-55 (S.D.N.Y. 2012); *Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1070, 1072 (N.D. Ill. 2016); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 902 (N.D. Ill. 2011); *Minpeco, S.A. v. Hunt*, 718 F. Supp. 168, 171 (S.D.N.Y. 1989).

Finally, Defendants' argument that no reasonable jury could find that LDC had monopoly power merely because Spulber did not opine that Defendants' monopoly power "caused" the observed price impact makes no sense.  Defendants cite no authority that a plaintiff must offer expert testimony on causation in order to prove causation at trial.  In the Class Decision, the Court held that a reasonable jury could find causation based on the evidence of LDC's ability to control prices, all of which evidence will be presented to the jury here.  (SMF ¶¶ 443-444.)  Donaldson provided a detailed analysis of how LDC obtained market power in the form of a corner in both months and, on the basis of its dominant long position, squeezed the shorts who were trapped by LDC's swiftly constructed position, and who had to pay LDC's inflated prices for liquidating trades.

## CONCLUSION

For the foregoing reasons, the Motion should be denied.

Dated: September 2, 2025
      New York, New York

                            KATTEN MUCHIN ROSENMAN LLP

By:    /s/ *Eliot Lauer*
           Eliot Lauer
           Jacques Semmelman
           Julia B. Mosse
           Nathaniel Ament-Stone
           50 Rockefeller Plaza
           New York, New York 10020
           T: (212) 940-8800
           F: (212) 940-8776
           eliot.lauer@katten.com
           jacques.semmelman@katten.com
           julia.mosse@katten.com
           nathaniel.ament-stone@katten.com

           *Attorneys for Plaintiffs*