UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

   GLENCORE LTD. ET AL                  :

                       Plaintiffs,   :

        -against-            :      1:23-cv-11125 (ALC)

   LOUIS DREYFUS COMPANY B.V. ET AL   :

                  Defendants   :      **ORDER & OPINION**

-------------------------------------------------------------x

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiffs Glencore and Viterra ("Plaintiffs") bring this action against Defendants Louis Dreyfus Company B.V. et al ("Defendants") for engaging in acts and practices that constitute violations of the Commodity Exchange Act, 7 U.S.C. §§ 1 et seq. ("CEA"), and Section 2 of the Sherman Act, 15 U.S.C. § 2.

Defendants move for summary judgment on both of Plaintiffs' claims. Defendants also move for the exclusion of opinion and testimony of various of Plaintiffs' experts: Wallace Darneille, Ronald H. Filler, Glen Donaldson, and Daniel Spulber. Finally, Defendants move to modify the stipulated protective order.

Plaintiffs move to strike or disregard specific portions of Defendants' 1) Reply and Objections to Plaintiffs' Response to Defendants' Local Rule 56.1 Statement ("ECF No. 159") and 2) Reply in Support of Defendants' Motion to Exclude Opinions and Testimony of Glen Donaldson, phD ("ECF No. 156").

1

For the reasons stated below, Defendants' Motion for Summary Judgment and Motion to Exclude Experts are DENIED. Defendants Motion to Modify the Stipulated Protective Order is GRANTED. Plaintiffs' Motion to Strike is DENIED as moot.

## BACKGROUND[1]

### Parties

Plaintiffs Glencore and Viterra are suppliers of commodities and raw materials to industrial consumers and engage in commodities trading. Complaint at ¶¶ 14-15. Defendant LDC trades and markets commodities, including cotton, and is owned by Louis Dreyfus Holding B.V. *Id.* at ¶16. Defendant LD Commodities Cotton LLC does business under the name Defendant Allenberg and is owned by LDC. *Id.* at ¶17. Defendant Louis Dreyfus Holding Inc. is owned by LDC. *Id.* at ¶17. Defendant Term Commodities, Inc. is a subsidiary of LDC. *Id.* at ¶18. Defendant Joseph Nicosia was the Chief Executive Officer of Allenberg. *Id.* at ¶20. He was also involved with LDC, LD Commodities Cotton LLC, and Louis Dreyfus Holding Inc. *Id.*

### Facts

In addition to being sold for cash in a "physical" market, cotton can be traded in a futures market, which involves contracts wherein buyers and sellers agree to buy or sell a commodity at a predetermined price on a specific date. D. Stmt. ¶ 20, 28. The Parties bought and sold cotton on the International Exchange ("ICE"). Complaint ("Compl.") ¶ 2. By entering into a cotton futures contract, the seller agrees to make delivery of physical cotton bales (the "short" position), and the buyer agrees to accept delivery of those bales (the "long" position). D. Stmt. ¶ 29-31. If a party to a futures contract does not wish to make or accept physical delivery, it can exit its position by

---

[1]    This section is drawn from the Complaint, see ECF No. 1, Defendants' Statement of Undisputed Material Facts, *see* ECF No.112 ("D. Stmt."), Plaintiff's Counter Statement of Undisputed Material Facts submitted pursuant to Local Civil Rule 56.1, *see* ECF No. 140 ("ECF No. 140"), Defendants' Reply to Plaintiff's Statement of Undisputed Material Facts, *see* ECF No. 159 ("D. Repl. Stmt."), and the summary judgment briefing.

executing a second, opposite trade—offsetting its obligations under the first contract. D. Stmt. ¶ 32. ICE, along with the Commodity Futures Trading Commission ("CFTC"), surveils and regulates the cotton futures market. *Id.* ¶¶ 68-78.

Specifically at issue here is the Cotton No. 2 futures contracts traded on ICE. Those with obligations in the physical cotton market can use futures contracts to "hedge"—that is, offset or reduce—risk in the physical cotton market. *Id.* ¶¶ 55-56. Generally, longs profit in the futures market when prices rise and shorts profit in the futures market when prices fall. *Id.* ¶¶ 58-59.

For shorts who intend to make physical delivery, the procedure is governed by a highly regulated notice process. The "First Notice Day" is the first day shorts may issue a delivery notice. *Id.* ¶¶ 111-13. If a long has retained its position through the First Notice Day, it must accept a noticed delivery. *Id.* ¶ 114. Shorts have until the "Last Trading Day" to decide whether to deliver or exit their positions with offsetting futures contracts; after the Last Trading Day, any remaining short position must be settled by delivery. *Id.* ¶¶ 120-21. All deliveries must be noticed by the "Last Notice Day" and effectuated between the "First Delivery Day" and the "Last Delivery Day." *Id.* ¶¶ 117, 124-25, 128. To satisfy its delivery obligations, a short must deposit "certificated" bales of cotton in one of several dozen ICE warehouses located in five cities by the Last Delivery Day. *Id.* ¶¶ 134-37. "Certificated" cotton is cotton that has been tested and confirmed by the United States Department of Agriculture ("USDA") to meet the specifications of the Cotton No. 2 futures contract. *Id.* ¶¶ 136-37.

During the 2010/2011 year, USDA reported that the physical supply of cotton was very tight, meaning supply was low and demand high. Plaintiffs' Counter 56.1 Statement ("ECF No. 140") ¶ 464. On February 10, Defendants submitted an application to ICE for a March 2011 notice-period hedge exemption,[2] in which it informed ICE that "[w]e are only able to find very limited amounts of

---

[2] "Hedging" allows those with obligations in the physical market to offset their risk using futures contracts. D. Stmt. ¶¶ 55-56. If a market participant wishes to carry a larger futures position than allowed under ICE's "speculative" position limits to hedge physical cotton obligations, it must submit a written request for a so-called "hedge

cotton to purchase in the cash market," and also reported "very long warehouse delays." ECF No. 140 ¶¶ 468-469. In early April 2011, industry publications and cotton merchants were referring to the cotton futures market as being subject to a "short squeeze." Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("ECF No. 138"), at 9. Defendants had the largest long position in the May 2011 contract and Plaintiffs had the largest short position. D. Stmt. ¶ 232. As Defendants' expert Dr. James Overdahl testified, Defendants' long May and short July positions were approximately equal and opposite, and constituted a calendar spread, as defined by the CFTC. ECF No. 140 ¶ 509. As Glen Donaldson and Plaintiffs' expert Ronald Filler each explain, the calendar spread did not hedge any physical position. *Id.* ¶ 510. Therefore, Defendants' representation to ICE that it would only use the exemption to hedge physical cotton may have been false. *Id.* ¶ 513.

Between March 16 and April 18, 2011, while Defendants built a long position in May futures that peaked at 3,093,200 bale equivalents, they purchased only 1,893 bales in the cash market. *Id.* ¶ 522. Around this time, Plaintiffs started to file complaints with ICE about Defendants' actions, or lack thereof. D. Stmt. ¶¶ 244-64. In response to why Defendants were not buying physical cotton, Defendants told ICE that what was available was "mix[ed] grade" cotton "located in widely scattered locations across the United States, some of which have substantial loading delays" and, all things considered, was "not cheaper than May 2011 futures." *Id*. ¶¶ 208-209.

In June, Defendants continued to increase their long position and according to Donaldson and Filler, Defendants misrepresented to ICE that their futures positions were bona fide hedges. ECF No. 140 ¶¶ 556-557, 560. On June 21, 2011, ICE granted Defendants a hedge exemption of 9,000 contracts long. *Id.* ¶ 566. The same day, Defendants wrote to ICE, representing that "the 9,000-contract limit is not sufficient to meet our legitimate, demonstrated requirements based on our currently outstanding sales[.]" *Id.* ¶ 567. Nevertheless, as of June 21, Defendants were offering over

---

exemption" demonstrating to ICE "that the proposed Transactions are bona fide hedging Transactions." *Id.* ¶¶ 105-06.

229,648 bales of tenderable U.S. cotton in Thailand. *Id.* ¶ 568. Between June 21 and 24, LDC was able to cancel or buy back more than 500,000 bales, such that on June 24, Allenberg's Vice President and Chief Operating Officer Thomas Malone reported to LDC's Global Head of Market Risk, Olivier Hamy, that we "will not end up needing anywhere close to even the 9000"-contract limit granted by ICE. *Id.* ¶ 572. Expert Wallace Darneille Darneille expresses the opinion that Defendants' failure to cover more of its physical cotton position prior to the respective notice and delivery periods in the May and July 2011 Contracts was inconsistent with an intention to satisfy unfilled sales commitments. *Id.* ¶ 584. Donaldson's analysis shows that Plaintiffs lost $99,375,159 due to price inflation from the squeeze of the May 2011 Contract, and $164,801,621 due to price inflation from the squeeze of the July 2011 Contract, totaling $264,176,780 in combined losses for the two months, resulting from Defendants' squeezes. *Id.* ¶¶ 818-819.

In December 2012, the CFTC conducted a Rule Enforcement Review of ICE for the period November 1, 2010, to November 1, 2011 (the "2012 RER"). *Id.* ¶ 760. The 2012 RER did not mention either the May or July 2011 Contracts, or market manipulation. *Id.* ¶ 761. Allen filed a class action lawsuit after his termination based on his personal trading. *In re Term Commodities Cotton Futures Litig.* ("*Term Commodities*"), No. 12-cv-5126 (ALC), 2020 WL 5849142 (S.D.N.Y. Sept. 30, 2020), at *6-8. 12 years into the class litigation, Plaintiffs opted out and filed the instant lawsuit in December 2023.

### **Procedural History**

On December 22, 2023, Plaintiffs filed a Complaint. ECF No. 1. On February 26, 2024, Defendants filed an Answer. ECF No. 34. On July 22, 2025, Defendants filed their Motion for Summary Judgment (ECF No. 111) and their Rule 56.1 Statement (ECF No. 112). On July 22, 2025, Defendants also filed their Motions to Exclude Opinion and Testimony of Wallace

Darneille (ECF No. 114), Ronald H. Filler, Glen Donaldson (ECF No. 118), and Daniel Spulber (ECF No. 120).

On September 2, 2025, Defendants filed a Motion to Modify the Stipulated Order. ECF No. 133 On September 2, 2025, Plaintiffs filed their Opposition to Defendants' Motion for Summary Judgment (ECF No. 138) and their Counter Statement to Defendants' Rule 56.1 Statement (ECF N0. 140). Plaintiffs also filed their Opposition to Defendants' Motion to Exclude Experts Wallace Darneille (ECF No. 142), Ronald H. Filler (ECF No. 144), Glen Donaldson (ECF No. 146), and Daniel Spulber (ECF No. 148).

On September 16, 2025, Defendants filed their Reply in Support of their Motion for Summary Judgment (ECF No. 153) and Replies regarding the Experts Darneille (ECF No. 154), Filler (ECF No. 155), Donaldson (ECF No. 156), and Spulber (ECF No. 157), as well as Defendants' Reply to Plaintiffs' Counter Statement to Rule 56.1 (ECF No. 159).

On October 2, 2025, Plaintiffs filed their Opposition to the Motion to Modify the Stipulated Protective Order. ECF No. 176. On October 16, 2025, Defendants filed their Reply in Support of their Motion to Modify the Stipulated Protective Order. ECF No. 186. On November 4, 2025, Plaintiffs filed their Motion to Strike Specific Portions of ECF No. 159 and ECF No. 156. ECF No. 194. On November 18, 2025, Defendants filed their Opposition to the Motion to Strike. ECF No. 197. On November 25, 2025, Plaintiffs filed their Reply to their Motion to Strike. ECF No. 200.

On February 5, 2026, the Court held oral arguments. On February 10, 2026, Defendants filed the requested Post-Argument Letter Brief (ECF No. 209) and on February 16, 2026, Plaintiffs did the same (ECF No. 212).

6

**STANDARD OF REVIEW**

## I.      Summary Judgment

Summary judgment is appropriate where "there is no genuine issue as to any material fact"

and "the moving party is entitled to a judgment as a matter of law." *Cortes v. MTA New York City*

*Transit*, 802 F.3d 226, 230 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247–48 (1986)) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(a). Material facts

are those that may affect the outcome of the case. *See Anderson*, 477 U.S. at 248. Speculation,

conclusory allegations, and mere denials are not enough to raise genuine issues of fact.

*See National Union Fire Ins. Co. of Pittsburgh, Pa. v. Walton Ins. Ltd.*, 696 F. Supp. 897, 900

(S.D.N.Y. 1988). An issue of fact is "genuine" when a reasonable fact finder could render a verdict

in the nonmoving party's favor. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to

find for the non-moving party, there is no genuine issue for trial") (internal quotation omitted).

At summary judgment, the moving party has the burden "to demonstrate that no genuine

issue respecting any material fact exists." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22

F.3d 1219, 1223 (2d Cir. 1994). A movant "may discharge its burden by showing that the

nonmoving party has 'failed to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Better*

*Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 383 (S.D.N.Y. 2023) (quoting *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"To avoid summary judgment, a party must "do more than simply show that there is some

metaphysical doubt as to the material facts." *Gallo*, 22 F.3d at 586. When the moving party has

met its burden, "the nonmoving party must come forward with admissible evidence sufficient to

raise a genuine issue of fact for trial in order to avoid summary judgment." *Simsbury-Avon Pres. Soc'y LLC v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial." *Id.*

In deciding a summary judgment motion, courts must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Niagara Mohawk Power Corp. v. Jones Chemical Inc.*, 315 F.3d 171, 175 (2d Cir. 2003). Courts may not assess credibility, nor may they decide between conflicting versions of events because those matters are reserved for the jury. *See Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005). However, "[t]he mere existence of a scintilla of evidence in support of the [nonmovant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Id.* (citing *Anderson*, 477 U.S. at 252).

## II.    Admissibility of Expert Testimony

Under Federal Rule of Evidence 702, expert testimony is usually admissible where it is relevant and reliable. See *Daubert v. Merrell Dow Pharm.*, Inc., 509 U.S. 579, 597 (1993). To admit an expert's testimony, a court must conclude that (1) the witness is "qualified as an expert;" (2) the witness's testimony is based on reliable data and methodology; and (3) the testimony will "assist the trier of fact." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005). Testimony may also be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Id. (citing Fed. R. Evid. 403). "It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert

8

opinions," and district courts enjoy broad discretion to admit expert testimony. *Nimely*, 414 F.3d at 395. Because of this liberal admissibility standard, exclusion of expert testimony is warranted only when the district court finds "serious flaws in reasoning or methodology." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009).

If the testimony falls within a "range where experts might reasonably differ," the duty to evaluate the weight and sufficiency of the evidence on which the expert relied lies properly with the jury, rather than the trial court. *Kumho Tire, Co. v. Carmichael*, 526 U.S. 137, 153 (1999). Similarly, credibility challenges to expert testimony ordinarily do not require its preclusion, but rather go to its weight. See *Daubert*, 509 U.S. at 596. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

"[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements under Rule 702 are satisfied." *United States v. 17 Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citing *Daubert*, 509 U.S. at 593 n.10). There is "a presumption of admissibility of expert evidence and the rejection of expert testimony is the exception rather than the rule." *Oleg Cassini, Inc. v. Electrolux Home Prods., Inc.*, No. 11-cv-1237, 2014 WL 1468118, at *6 (S.D.N.Y. Apr. 15, 2014). "[T]he district court is the ultimate gatekeeper . . . [and must] 'ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" Id. (quoting *Daubert*, 509 U.S. at 597).

I.    Defendants' Motion for Summary Judgment

Defendants move for summary judgment on both the CEA and antitrust claims. The Court denies summary judgment for the following reasons.

A. CEA Claim

A CEA manipulation claim requires a plaintiff to prove that "(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price." *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013). Additionally, a plaintiff needs to show that a defendant caused actual injury. *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 111 (2d Cir. 2018).

1. A rational jury could find that Defendant's proximately caused Plaintiffs' losses.

Defendants argue that they were not the proximate cause of Plaintiffs' financial losses in 2011. They cite to *In the Matter of Edward A. Cox, Jr. and George F. Frey, Jr.,* CFTC No. 75-16, which they argue "illuminates the contours of proximate cause in the context of an alleged squeeze," disallowing a market participant from blaming another when they engaged in "irresponsible market behavior." Defendants' Motion for Summary Judgment ("D. Mot."), at 23. Defendants argue that Plaintiffs erred in hiring Allen and point to some of Plaintiffs' own statements that Allen had mismanaged Glencore's cotton futures contracts in May and June 2011. *Id.* In analyzing proximate causation, *In re Cox* found that "there can be multiple causes of an artificial price. Where these causes can be sorted out, and respondents are a 'proximate' cause of the artificial price, a charge of manipulation can be sustained."1987 WL 106879, at *12. The Court finds that given the evidence alleged, a jury will need to sort out potentially multiple causes to determine whether Defendants are in fact the proximate cause of injury. Here, Plaintiffs have put forward sufficient evidence that Defendants proximately caused Plaintiffs' loss. For example, Plaintiffs submit contemporaneous emails between Glencore Grain B.V.'s then-CEO Christopher Mahoney and Glencore CEO Ivan Glasenberg. The emails document how Defendants were forcing

Plaintiffs, the shorts, to pay higher prices. ECF No. 140 ¶¶ 744-749. Additionally, Plaintiffs cite to expert opinion from Donaldson to explain how the squeeze occurred in detail. Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, ECF No. 138, at 26-27. Defendants will be free to argue to a jury that Plaintiffs caused the loss themselves by making poor business decisions.

2.   A rational jury could find Defendants possessed the ability to influence price.

Defendants next contend that Plaintiffs cannot make out any of the elements required under the CEA, starting with ability to influence price. Defendants argue no trier of fact could find that Glencore's position exceeded deliverable supply, which they argue is necessary to find that they influenced the price. Relying on this Court's decision in the Class Action, Defendants point to a "distinction between deliverable supply and supply generally" when evaluating the ability to influence price. *Term Commodities*, 2020 WL 5849142, at *25 (citing, *e.g.*, *Cox*, 1987 WL 106879, at *4). Defendants state that Plaintiffs have not put forth any evidence to calculate deliverable supply. Defendants also state that while Plaintiffs have not, their expert Overdahl has demonstrated that Defendants' position did not exceed deliverable supply.

Plaintiffs contend that they actually aren't even required to put forth evidence quantifying deliverable supply but that qualitative evidence is enough. Plaintiffs cite to *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1051 (N.D. Ill. 1995) and *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1167 (8th Cir. 1971). Both of these cases dealt with manipulation claims where defendants were accused of influencing prices. Neither case required plaintiffs to allege exactly how much deliverable supply there was to demonstrate this. The evidence Plaintiffs put forth shows that a rational jury could find that Defendants' position exceeded deliverable supply. For instance, Defendants' expert Dr. Sharon Brown-Hruska stated the deliverable supply for the May and July 2011 Contracts was "small relative to the size of positions held by traders as the contracts approached expiration." ECF

11

No. 140 ¶ 453. *Apex Oil Co. v. DiMauro* does state that it "must be pleaded and proved that the respondent accumulated a position in the futures market that exceeded the available deliverable supply." 713 F. Supp. 587, 600 (S.D.N.Y. 1989) (internal citations and quotations omitted). But this case also does not require the sort of quantification Defendants seek. One of the problems with quantification is the dispute over what constitutes "deliverable supply," which includes not just certificated cotton but perhaps also all cotton that could be certificated. Determining whether cotton could be certificated is a factual inquiry for a jury. Therefore, the Court finds that there are material factual disputes regarding whether Defendants had the. ability to influence price.

> 3. A rational jury could find Defendants prices were artificial.

Plaintiffs are not required to provide a wide variety of evidence sources to support particular elements of the CEA claim. It is sufficient for plaintiffs to have one source. Defendants take issue with this and say that Donaldson is the only person who provides any evidence that prices of cotton were artificially caused by Defendants. As the Court will explain later in more detail, Donaldson's opinions are not being excluded.

"An artificial price is one that does not reflect the market or economic forces of supply and demand." *Cox*, 1987 WL 106879, at \*8; *Term Commodities*, 2020 WL 5849142, at \*31. "[T]o determine whether an artificial price has occurred … the focus should not be as much on the ultimate price, as on the nature of the factors causing it." *Cox*, 1987 WL 106879, at \*9. Put simply, "a statistically unusual high (or low) price will not on that basis alone be deemed artificial." *Term Commodities*, 2020 WL 5849142, at \*31 (citation omitted).

Defendants attack Donaldson's opinions because they say he not only doesn't use the word "artificial" when describing the prices but also seems to suggest the prices were merely statistically unusual, which does not meet the legal standard. Unfortunately, Defendants have misread the Class Action's decision regarding statistically unusual prices. Without more, they cannot be deemed to be

artificial, but here, Donaldson sufficiently analyzes multiple years of prices to allow a rational jury to conclude that the prices were artificially caused by Defendants. Defendants can cross-examine Donaldson on the difference between "artificial" and "statistically unusual."

       4.   A rational jury could find Defendants specifically intended to cause artificial price.

Finally, with regard to specific intent, Defendants offer defenses such as their long positions being bona fide hedges, their supposed significant steps to alleviate the market of congestion, and their reasonable belief that the shorts could and would deliver on their contractual obligations. ECF No. 111, at 37. There are genuinely disputed issues of material fact concerning their defenses. Therefore, the Court finds that this element can certainly go to a jury. For the aforementioned reasons, the Court denies Defendant's Motion for Summary Judgment as to the CEA claim.

       B.   Antitrust Claims

       1.   Plaintiffs do not need to put forth evidence of a legally cognizable market.

Defendants incorrectly assert that to raise a § 2 claim under the Sherman Act that Plaintiffs must put forth evidence of a legally cognizable market. "It is well-settled law in this Circuit that 'pleading a defendant's direct control over prices is an alternative to pleading relevant market share.' *Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 141 (S.D.N.Y. 2016). Similarly, here the Court declines to address the Parties' disputes about whether Plaintiffs have adequately defined the relevant market given the persuasive evidence that Defendants' ability to control prices." *Term Commodities*, No. 12-cv-5126 (ALC), 2020 WL 5849142 (S.D.N.Y. Sept. 30, 2020), at *36.

       2.   A rational jury could find that Defendants had monopoly power.

"Monopoly power … is 'the power to control prices or exclude competition.'" *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97-98 (2d Cir. 1998) (internal citation omitted). The existence of

monopoly power "may be proven directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market." *Id.* at 98. Here, Plaintiffs will present expert testimony, including from Spulber, on Defendants' alleged ability to control prices in the market. This is sufficient for a rational jury to determine Defendants had monopoly power. Defendant' argument that Spulber does not get to causation of monopoly at this stage is unavailing because as Plaintiffs point out, at summary judgment, they do not need to put forth only expert evidence of causation.

        3.    A rational jury could find that Plaintiffs suffered an injury proximately caused by Defendants.

As the Court has already concluded with respect to causation of a CEA injury, the Court similarly finds that a rational jury could find an actual injury as defined by the Sherman Act was proximately caused by Defendants. Jurors will hear testimony about allegedly poor business decisions, but they will also hear from numerous experts about how Defendants continued to increase their long position in a very tight market. Therefore, there is a dispute of material fact as it pertains to this element.

    II.      Daubert Motions

    A.  Wallace Darneille

Defendants seek to exclude certain opinions and testimony from Wallace Darneille, a cotton and cotton trading expert, not based on a lack of qualifications but based on the opinions being "improper" under Federal Rules of Evidence 403 and 702.

        1.    Darneille's opinions from the reports will not be excluded based on usurping the role of a jury.

First, Defendants argue that Darneille's opinions invade the province of the jury because he "repeatedly and impermissibly speculates about LDC's motive, intent, and state of mind" and judges

14

the credibility of witnesses. Defendants' Motion to Exclude the Opinions and Testimony of Wallace Darneille ("ECF No. 114") at 8.  Defendants rely heavily on a ruling from the Class Action that they say is identical, *See Term Commodities*, 2020 WL 5849142, at *14. In the Class Action, this Court was deciding whether certain opinions of Gerald C. Marshall, a former cotton merchandising businessman for Cargill Inc., was permissible. *Id*. at *12.

> Specifically at issue was his testimony that,
>
> Defendants knew well in advance ... that there was a possibility the export sales cancellations and switches to polyester ... might result in diminishing warehouse delays in coming weeks and months… that Defendants had strong reasons to expect that the shorts would be incapable of creating any significant quantity of cert stock… and that he personally believe[d] [Defendants'] motivation for the activity was to squeeze front-month shorts.
>
> *Id.* at *14 (internal citations and quotations omitted and cleaned up).

The Court reminded the Parties that "while '[e]xperts are not permitted to testify to an actor's state of mind, [ ] an expert can testify to whether a given practice is consistent with a given state of mind.'" *Id.* (quoting *U.S. Commodity Futures Trading Commn. v. Wilson*, 13-CV-7884, 2016 WL 7229056, at *8 (S.D.N.Y. Sept. 30, 2016)). The Court distinguished this testimony from an expert's opining on Defendants' motivation "i.e., that he 'personally believes [Defendants'] motivation for the activity was to squeeze front-month shorts,'" which would be impermissible testimony about state of mind. *Id.*

Here, Defendants point to certain opinions that seem impermissible while others are not. For instance, Darneille's statements that "LDC acted with 'intent' to boost 'reported … export sales' and that "Glencore had no intention of misleading ICE" are impermissible opinions about Defendants' intentions. ECF No. 114, at 9. However, these statements appear to be from Darneille's depositions, which Plaintiffs assert are not in the disclosed expert reports. Plaintiffs must ensure that these deposition statements are not introduced at trial, which Plaintiffs acknowledge. Plaintiffs' Opposition to Defendants' Motion to Exclude Opinions and Testimony of Wallace Darneille ("ECF No. 142"), at 9. However, at this time, the Court will not categorically exclude Darneille's opinions in the reports,

as long as they do not usurp the role of a jury. Additionally, to the extent Defendants are concerned that Darneille is opining about the credibility of witnesses, Defendants can put up their own expert like Anthony Tancredi to alleviate this, or else cross-examine Darneille.

### 2. Darneille's opinions are helpful to a jury.

Defendants also argue that Darneille's opinions about Value at Risk ("VaR"), LDC's cotton buyback efforts, ICE's Cotton Control Committee, and Glencore's responsible management position are unsupported and unhelpful to a jury. This is not true. Darneille's opinions are based on reliable methods and analysis of the market during the relevant timeframe. Also, because Darneille is an industry expert, he "need not offer scientifically testable opinions, nor need he correlate his opinions to specific instances of industry practice that he observed or articulate an objective industry benchmark; the reliability of such an expert's opinion may be inferred from his experience." *In re Davis N.Y. Venture Fund Fee Litig.*, No. 14 CV 4318-LTS-HBP, 2019 WL 11272913, at *6 (S.D.N.Y. July 2, 2019). Defendants can cross-examine Darneille on the areas they point out in their motion and the jury can decide what weight to give his testimony,

### B. Ronald H. Filler

Ronald H. Filler is a law professor that Plaintiffs intend to offer to rebut Defendants' expert, Dr. Brown Hruska. Defendants claim that Filler is unqualified to serve as an expert about ICE's and the CFTC's regulation of the cotton futures market, his opinions are unsupported, and he offers inadmissible legal opinions.

### 1. Filler's qualifications

Defendants argue that Filler is unqualified to offer any opinions about ICE's or the CFTC's regulation of the May and July Contracts because he has never worked at the CFTC, ICE, or a futures exchange. Defendants' Motion to Exclude Opinions and Testimony of Ronald H. Filler ("ECF No. 116"), at 6. He also has never he ever worked at an agricultural commodities merchant or in cotton

16

trading and does not have an academic background in economics. *Id.* Defendants point to a decision by Judge Cote where Filler was excluded from opining on market manipulation, *Sec. & Exch. Comm'n v. Lek Sec. Corp.*, No. 17CV1789 (DLC), 2019 WL 1304452 (S.D.N.Y. Mar. 21, 2019). Plaintiffs concede that Filler has not worked in those specific roles. However, they say he is qualified because of his experience working at the U.S. Securities and Exchange Commission, as Director of Managed Futures and Associate General Counsel at ContiCommodity Services (a Futures Commission Merchant ("FCM") registered with the CFTC), as Managing Partner at an FCM and Commodity Pool Operator that Professor Filler himself founded, as a Partner and Senior Futures Lawyer at the law firm Vedder Price, and as Managing Director and Director of Institutional Futures Administration at Lehman Brothers Inc., where Filler worked for over 15 years and handled "all of Lehman's requests to seek any hedge exemptions." Plaintiffs' Opposition to Defendants' Motion to Exclude Opinions and Testimony of Ronald H. Filler ("ECF No. 144"), at 4. Plaintiffs also point out that Brown-Hruska has never worked at the ICE or CFTC.

At issue in *Sec. & Exch. Comm'n* was Filler's ability to offer testimony on statistics. Because Filler will not be opining on statistics and econometric analyses, but rather that LDC mispresented to ICE that it was a hedger, when it was in fact a speculator, and other issues that Plaintiffs say refute Defendants' claims that the ICE and CFTC were not doing their jobs, the Court finds that Filler is sufficiently qualified. After all, he has 50 years of experience working in futures exchange and commodities.

   2.   Filler's report is not speculative or unsupported.

Defendants also argue that Filler's report is speculative or unsupported. However, Filler bases his testimony on his experience working with the ICE. For instance, he does have experience with ICE and trading from his time at Lehman Brothers. ECF No. 144, at 14. Filler also has sufficient experience about how CFTC works, despite never having personally worked there. *Id.* This

17

testimony is not speculative and to the extent Defendants want to cross-examine Filler on the various points they raise, they can.

### 3. Filler does not make impermissible legal opinions.

Finally, Defendants argue that Filler makes impermissible legal opinions about LDC "violat[ing]" speculative position limits and "misrepresent[ing]" information to ICE that Defendants claim is based on Filler's own interpretations of the statutes. Plaintiffs contend that this characterization of Filler's testimony is incorrect and he will be explaining how ICE and CFTC's lack of investigation into Defendants does not mean they should be absolved of wrongdoing. As this Court's Class Decision makes clear, an expert can provide factual commentary and can also provide testimony about ICE's rules that are not part of the claims. *See Term Commodities*, 2020 WL 5849142, at *13. For instance, Filler may opine on ICE Rule 6.26, as long as he is not opining on the ultimate legal issue for what constitutes manipulation or monopolization. Defendants have not alleged that Filler has opined on the actual elements of the CEA or Sherman Act. Therefore, the Court will not exclude Filler's testimony or opinions.

### C. Glen Donaldson

Plaintiffs offer Glen Donaldson, PhD, a finance professor at the University of British Columbia, to opine that Defendants artificially inflated prices. Defendants primarily contend that his opinions are based on unreliable data. Additionally, Defendants take issue with his opinions on "key squeeze conditions" because they supposedly do not consider deliverable supply. Finally, Defendants argue his opinions do not give a basis for a jury to conclude causation. As this Court has already explained in its decision to deny summary judgment, there is enough evidence for a jury to find causation rather than correlation. However, the Court will briefly explain its reasoning as it pertains to Donaldson below.

### 1. The data Donaldson relies on

Defendants argue that Donaldson's opinions should be excluded because there was an issue with the Cotlook data, since they withdrew their A-Index price for June 2011. Defendants' Motion to Exclude the Opinions and Testimony of Glen Donaldson ("ECF No. 118"), at 1. Plaintiffs point out that the decision to remove data from June 2011 has no bearing on May 2011. As for July 2011, Plaintiffs argue that Donaldson was also able to find the data he needed to analyze on Bloomberg and Refinitiv. Plaintiffs' Opposition to Defendants' Motion to Exclude the Opinions and Testimony of Glen Donaldson ("ECF No. 146"), at 10. Additionally, in an abundance of caution, Donaldson has also created an alternative model that does not use the data removed from June 2011. *See* Plaintiff's Post-Argument Brief ("ECF No. 212"), at 7. At this juncture, the Court thinks it best for the Parties to stipulate to using the alternative model. If the Parties are unable to do so, the Court will re-visit this issue closer to trial. The Court will not exclude any opinions or testimony from Donaldson on this issue at this time.

2. Donaldson's opinions on "key squeeze conditions"

In their summary judgment motion, Defendants argued that Plaintiffs need to put forward evidence quantifying the deliverable supply. Unsurprisingly here, Defendants take issue with Donaldson for not accounting for deliverable supply in his "key squeeze conditions" analysis, which they argue is contrary to law. However, as the Court has already discussed, it is not necessary for Donaldson's testimony to quantify deliverable supply if there is qualitative evidence. Additionally, at trial, Donaldson's testimony may not be the only evidence Plaintiffs offer to support their assertion that Defendants caused a squeeze in the market. Therefore, the Court will not exclude Donaldson's opinions on this basis.

3. Donaldson can opine on causation.

Finally, Defendants argue that Donaldson's opinions on causation must be excluded because they actually only support correlation, However, as Plaintiffs point out, by explaining the logical

chain of events in a squeeze, Donaldson will allow jurors to decide for themselves whether the element of causation is met for the claims. Donaldson also provides modeling in the form of the Many Variables Model that allowed him to test for various other causes of price inflation. For this reason, the Court declines to apply the reasoning in *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, which was a case where an expert's testimony was excluded for being unable to bridge the gap between correlation and causation, 299 F. Supp. 3d 430 (S.D.N.Y. 2018). Donaldson has provided reasoned analytical opinions that jurors should be able to consider. Thus, the Court will not exclude Donaldson's opinions and testimony on causation.

### D. Daniel Spulber

Daniel Spulber is a professor Plaintiffs seek to use as a rebuttal expert to Defendants' expert Dr. Justin McCrary to support Plaintiffs' allegations of monopolization. Defendants argue that Spulber's report was not timely disclosed under Rule 26. Alternatively, Defendants argue that Spulber's methods are unreliable.

#### 1. Spulber's report was timely disclosed.

Plaintiffs contend, and the Court agrees, that McCrary's testimony on market definition is not needed in this case since Plaintiffs are not required to define the market given the ample other evidence they provide of Defendants' controlling prices in the market. The Court has already explained this in the Class Action as well as in this decision. *See* Sec. I.B.1. Plaintiffs argue that they included Spulber to demonstrate why Defendants were wrong on the merits about what is required to prove the Sherman Act claim.

Federal Rule of Civil Procedure 26 permits rebuttal opinions only if "intended solely to contradict or rebut evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(a)(2)(D)(ii). Defendants argue that Spulber should have been disclosed earlier to support Plaintiffs' monopolization claims. The Court disagrees. Because Plaintiffs do not need to define the market to make out a Sherman Act violation, they properly disclosed Spulber as a rebuttal witness.

2.    Spulber satisfies Rule 702.

Defendants argue, in the alternative, that Spulber has not met the standard under Rule 702 because his methods are unreliable. Defendants state that Spulber doesn't provide methodology for finding direct evidence of anticompetitive effects. Defendants also state that Spulber doesn't rely on his own data and merely cites to Plaintiffs' complaint. The Court disagrees and finds that Spulber's methods reliable. He can rely on ICE rules and their application to the facts of this case. Moreover, Spulber will only be needed as a witness if Defendants call McCrary. Plaintiff has satisfied its obligations under Rule 702.

III.    Modification of the Stipulated Protective Order

Finally, Defendants move to modify the May 23, 2024 Stipulated Protective Order ("the Protective Order") (ECF No. 39), arguing they should be allowed to use discovery obtained from or about Plaintiffs in the Glencore Action, to move to decertify the class and disqualify Mark Allen as class representative in the Class Action. Specifically, Defendants want to use four deposition transcripts and 19 internal Glencore documents of which they say Plaintiffs have not raised confidentiality concerns. Defendants' Motion to Modify the Stipulated Protective Order, ECF No. 133, at 2.

"Once a court enters a protective order and the parties rely on that order, it cannot be modified 'absent a showing of improvidence in the grant' of the order or 'some extraordinary circumstance or compelling need.'" *AT&T Corp. v. Sprint Corp.*, 407 F.3d 560, 562 (2d Cir. 2005) (quoting *Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d 291, 296 (2d Cir. 1979)); *S.E.C. v. TheStreet.Com*, 273 F.3d 222, 229 (2d Cir. 2001) (noting "strong presumption against the modification of a protective order."). "The following factors are relevant when determining whether a party has reasonably relied on the protective order: (1) the scope of the protective order; (2) the language of the order itself; (3) the level of inquiry the court undertook before

21

granting the order; and (4) the nature of reliance on the order. Additional considerations that may influence a court's decision to grant modification include: the type of discovery materials the collateral litigant seeks and the party's purpose in seeking a modification." *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 255 F.R.D. 308, 318 (D. Conn. 2009).

Defendants argue that the Protective Order needs to be modified because it is in the interest of the class to have an adequate class representative, which they argue is at risk if Allen remains the representative. ECF No. 133, at 11. Additionally, addressing the four factors analyzed by courts in the Second Circuit, Defendants argue that 1) the Protective Order is a blanket order with an expansive scope; 2) that the Order includes language that the parties may produce Confidential and Highly Confidential discovery material to a list of enumerated people, as well as "any other person … upon order of the Court;" (ECF No. 39 at 7 (¶ C.1.j), 8 (¶ D.1.g)), suggesting future modification; 3) the Court did not conduct a good-cause hearing conducted after the Order was proposed; and 4) Plaintiffs have not relied on the Order because they haven't given up any 5th Amendment rights or produced documents that wouldn't have existed if not for the Order.

Plaintiffs argue that Defendant's request to modify comes at suspect juncture, after discovery has closed and Defendants had agreed not to use Plaintiffs' produced discovery in the Class Action. ECF No. 176, at 2. With respect to the newness of the information Defendants purport to now have, Plaintiffs point out that two of the demand letters from Allen's Dutch counsel can already be used without modification of the Protective Order because they are already in Allen's and the Class's possession. Plaintiffs then go on to argue some of the other supposedly new discovery does not support Defendants' motion to decertify the class. *Id*., at 4-6. The Court will not evaluate these arguments at this time because it finds them premature. As it pertains to the four-factor test, Plaintiffs only argue they relied on the understanding that they couldn't obtain discovery material from the Class Action for use in the Glencore Action.

The Court finds the approach in *Marcelletti v. GEICO Gen. Ins. Co.*, instructive, No. 6:23-CV-06211 EAW CDH, 2025 WL 2314763 (W.D.N.Y. Aug. 12, 2025). There, plaintiffs moved to modify a protective order and the court held that the defendants had not reasonably relied on the order. Here, even though it was the only factor Plaintiffs address, they have not sufficiently explained why they have relied on the Order, apart from understanding that they could not use discovery material from the Class Action in the Glencore Action. Meanwhile, Defendants are correct in pointing out that Plaintiffs have not waived any constitutional rights or else produced documents they otherwise would not have because of reliance on the Order. As in *Marcelletti,* the Court finds the Protective Order at issue to be a blanket order and finds the language of providing highly confidential material to "any other person…upon order of the Court" to have expressly contemplated modification. Finally, because the Court did not order a good-cause hearing prior to approving the Protective Order, which was the case in *Marcelletti*, the Court finds this weighs against any claim of reasonable reliance. *Id.* at \*5. Therefore, given the four factors are in Defendants' favor, the compelling need to protect the Class's interests, and because Defendants' request is narrowly tailored, the Court will allow a modification of the stipulated order.

IV.    Plaintiffs' Motion to Strike

Plaintiffs have moved to strike or disregard specific portions of Defendants' 1) Reply and Objections to Plaintiffs' Response to Defendants' Local Rule 56.1 Statement (ECF No. 159) and 2) Reply in the Support of Defendants' Motion to Exclude Opinions and Testimony of Glen Donaldson (ECF No. 156). The Court has not relied on either of these documents when deciding Defendants' summary judgment or *Daubert* motion, so the Court denies Plaintiffs' Motion to Strike as moot. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 801 F. Supp. 3d 330

23

(S.D.N.Y. 2025), *appeal dismissed sub nom. In re Libor-Based Fin. Instruments Antitrust Litig. v. The Royal Bank of Scotland PLC*, No. 25-2756, 2025 WL 4092207, n. 170 (2d Cir. Dec. 10, 2025) (finding motions to strike moot where the court did not rely on the arguments requested to be stricken).

## CONCLUSION

For the aforementioned reasons, Defendants' Motion for Summary Judgment is DENIED. Defendant's Motions to Exclude the Opinions and Testimony of Experts are DENIED. Defendants' Motion to Modify the Stipulated Protected Order is GRANTED. Plaintiffs' Motion to Strike is DENIED.

Additionally, the following Motions to Seal, ECF No. 191, 196, 208, 211, 214, 217, are GRANTED. The Clerk of Court is respectfully directed to all pending motions.

The Parties should submit a joint status report regarding the status of settlement by April 20, 2026.

**SO ORDERED.**

**Dated: March 30, 2025**

        **New York, New York**                    **ANDREW L. CARTER, JR.**

                                             **United States District Judge**